<<Material appearing in DIGEST section, including Topic and Key Number
    classifications, Copyright 2001 West Publishing Company>>

J.E.M. AG SUPPLY, INC. (doing business as FARM ADVANTAGE, INC.),
                              FARM
   ADVANTAGE, INC., Larry BENZ, Merle PRUETT (doing business as
                        SIOUXLAND SEEDS,
   INC.), Kevin WOLFSWINKEL, Tim KAMSTRA, and TOM EISCHEN SEED &
                           CHEMICALS,
                         Petitioners,
                              v.
        **PIONEER** HI-BRED INTERNATIONAL, INC., Respondent.
                       **No. 99-1996.**
            United States Supreme Court Petitioner's Brief.
                         May 4, 2001.

 On Writ Of Certiorari To The United States Court Of Appeals For
The Federal
                          Circuit
                  BRIEF FOR PETITIONERS

 Bruce E. Johnson (Counsel of Record) S. P. DeVolder Lewis,
Webster, Johnson, Van Winkle & DeVolder, L.L.P. 418 Sixth Avenue
Suite 620, Liberty Building Des Moines, Iowa 50309-2407 Telephone:
(515) 243-1000 Facsimile: (515) 288-7000 Attorneys for Petitioners

                    **\*i** QUESTION PRESENTED

 Are patents issued under 35 U.S.C. § 101 granting the right to
exclude others from sexually reproducing plants or plant varieties,
or from selling or using plants or plant varieties reproduced by
means of sexual reproduction (by seed), invalid because the Plant
Variety Protection Act of 1970, 7 U.S.C. § 2321, et seq., and the
Plant Patent Act of 1930, 35 U.S.C. § § 161-64, are the exclusive
means of obtaining a federal statutory right to exclude others from
reproducing, selling, or using plants or plant varieties?

            **\*ii** PARTY AND CORPORATE DISCLOSURE STATEMENT
The parties to the proceeding are those listed in the caption.

 There is no parent or publicly held company owning 10% or more of
the stock of any of the corporate petitioners.

                  **\*iii** TABLE OF CONTENTS

Question Presented ... i

Party And Corporate Disclosure Statement ... ii

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Table Of Contents ... iii

Table Of Authorities ... v

Citations Of Opinions And Orders Entered In The Case ... 1

Statement Of Jurisdiction ... 1

Statutory Provisions Involved ... 2

Statement Of The Case ... 2

Summary Of The Argument ... 7

Argument ... 10

I. Utility Patents Issued On Sexually Reproducing Plant Varieties, The Parts Thereof And Their Seeds Are Invalid Because These Varieties And Seeds Are Subject To Federal Protection Only Through The Issuance Of Certificates Of Plant Variety Protection ... 10

A. Background Discussion Of The Issue Raised And The Statutes Involved ... 10

B. Congress Has Directly Spoken On The Scope Of Federal Protection Of Plant Varieties And It Has Precluded Protection Of Plant Varieties Through The Issuance Of Utility Patents ... 13

*iv C. The PTO And Federal Circuit Ignored The Language Congress Used In The Relevant Statutes Themselves And Instead Relied On An Erroneous Reading Of Legislative History To Conclude That Utility Patents Could Be Issued To Provide Federal Protection Of Seeds And Seed Grown Plants ... 28

D. The Legislative History Of The Plant Specific Acts Further Demonstrates Congress' Stated Intent That Sexually Reproduced Plant Varieties And Their Seeds Are Subject To Federal Protection Only Under The PVPA ... 37

E. The PTO And Federal Circuit's Interpretation Of § 101 Is Not Permissible Because Allowance Of Utility Patents And PVP

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Certificates On Seeds And Seed Grown Plants Results In Conflicting
Federal Protection ... 43

Conclusion ... 49

## *v TABLE OF AUTHORITIES

Cases

Application of Bergy, 596 F.2d 952 (Cust. & Pat. App.1979), affd.
sub nom., Diamond v. Chakrabarty, 447 U.S. 303 (1980) ... 32, 33

Asgrow Seed Co. v. Winterboer, 513 U.S. 179 (1995) ... 21, 48

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) ... 14

Diamond v. Chakrabarty, 447 U.S. 303 (1980) ... passim

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S.
120 (2000) ... passim

Ex Parte Hibberd, 227 U.S.P.Q. 443 (Bd. Pat. App. & Interf. 1985)
... passim

Imazio Nursery, Inc. v. Dania Greenhouses, 69 F.3d 1560 (Fed.Cir.
1995), cert. denied, 518 U.S. 1018 (1996) ... 19, 30

Mazer v. Stein, 347 U.S. 201 (1954) ... 45

Pioneer Hi-Bred Internat., Inc. v. J.E.M. Ag Supply, Inc., 200 F.3d
1374 (Fed.Cir. 2000), cert. granted, ___ U.S. ___, 121 S.Ct. 1077
(2001) ... passim

Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc., 733 F.2d
858 (Fed.Cir.), cert. denied, 496 U.S. 856 (1984) ... 12, 44

Ropat Corp. v. McGraw-Edison Co., 535 F.2d 378 (7thCir. 1976) ...
45, 46, 47

Sorensen v. Secretary of the Treasury, 475 U.S. 851 (1986) ... 26

Traffix Devices, Inc. v. Marketing Displays, Inc., ___ U.S. ___, 121 S.Ct. 1255, 2001 WL 265741 (March 20, 2001) ... 46, 47

**vi** United States v. Estate of Romani, 523 U.S. 517 (1998) ... 16, 27, 36

United States v. Missouri Pac. R. Co., 278 U.S. 269 (1929) ... 28

Statutes

7 U.S.C. § 2321 ... passim

7 U.S.C. § 2323 ... 2, 12, 21, 22

7 U.S.C. § 2327 ... 12, 13, 21, 23

7 U.S.C. § 2401(a)(3) ... 2, 22

7 U.S.C. § 2402 ... 2, 11, 12, 22, 31

7 U.S.C. § 2422(1) ... 30

7 U.S.C. § 2461 ... 21

7 U.S.C. § 2462 ... 21

7 U.S.C. § 2481 ... 21

7 U.S.C. § 2483 ... 21

7 U.S.C. § 2541 ... 2, 21, 22, 23, 43

7 U.S.C. § 2543 ... 2, 12, 22, 43, 48, 49

7 U.S.C. § 2544 ... passim

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

7 U.S.C. § 2567 ... 2, 24, 44

17 U.S.C. § 101 ... 46

28 U.S.C. § 1254(1) ... 1

28 U.S.C. § 1292(b) ... 1

28 U.S.C. § 1292(c)(1) ... 1

*vii 28 U.S.C. § 1295 ... 1

28 U.S.C. § 1338(a) ... 1

35 U.S.C. § 101 ... passim

35 U.S.C. § 112 ... 29

35 U.S.C. § 119(f) (Pub.L. 106-113, Nov. 29, 1999, Consolidated Appropriations Act of 2000, Subtitle H-Miscellaneous Patent Provisions, § 4802) ... 26, 27

35 U.S.C. § 161 ... passim

35 U.S.C. § 162 ... 8, 19, 22, 29, 34, 39

35 U.S.C. § 163 ... passim

35 U.S.C. § 164 ... 8, 19, 22, 29, 34, 39

35 U.S.C. § 201(d) and (e) ... 24, 25

Revised Statutes, § 4884 ... 2, 18

Revised Statutes, § 4886 ... passim

Revised Statutes, § 4888 ... 29

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Townsend-Purnell Plant Patent Act of 1930 (PPA), Ch. 312, 46 Stat. 376  (codified at 35 U.S.C. § § 161-64) ... 11

Plant Variety Protection Act of 1970 (PVPA), Pub.L. No. 91-577, § 42, 84 Stat. 1547 (codified at 7 U.S.C. § 2321 et seq.) ... 11

**viii** Plant Patent Amendments Act of 1998, Pub.L. 105-289, 112 Stat. 2780 ... 2, 25

Pub.L. 98-620, Title V, § 501(1) and (2), 99 Stat. 3335 ... 24

Other Authorities

7 C.F.R. § 97.6(d) ... 30

1994 PVPA Amendments H.R. Rep. (Agricultural Committee) No. 103-699, Aug. 12, 1994, Section 10 ... 48

George Washington letter to farm manager William Pierce, November 16, 1791 ... 48

H.R. Rep. No. 91-1605, 91st Cong., 2nd Sess. 1970, U.S.C.C.A.N. 5082, October 13, 1970 ... 40

Patent Law Revision Hearings, Subcommittee on Patents, Trademarks, and Copyrights, Senate Judiciary Committee, 90th Cong., 2nd Sess., 1960, Part 3 ... 38, 39

Senate Judiciary Committee's Report No. 91-1246 (1970) ... 40

S. Rep. No. 82-1979, 82nd Cong., 2nd Sess. (1952) ... 28, 29

S. Rep. No. 315, Calendar 307, 71st Cong. (1930) ... 38

The Garden and Farm Books of Thomas Jefferson, p. 509, Robert C. Baron Ed., 1987 ... 17

        **1** CITATIONS OF OPINIONS AND ORDERS ENTERED IN THE CASE

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The opinion (Pet.App. 1-9) of the panel of the Federal Circuit is reported as Pioneer Hi-Bred Internat., Inc. v. J.E.M. Ag Supply, Inc., 200 F.3d 1374 (Fed.Cir. 2000), cert. granted, ___ U.S. ___,121 S.Ct. 1077 (2001). The circuit's order (Pet.App. 10-12) that granted the petitioners' petition for interlocutory appeal is unreported. The district court's order (Pet.App. 13-39) that denied the petitioners' motion for summary judgment on the defense of patent invalidity is unreported. The circuit's order (Pet.App. 40-41) that denied the petitioners' petition for rehearing is unreported.

## STATEMENT OF JURISDICTION

The district court's jurisdiction rested on 28 U.S.C. § 1338(a), which provides that the district courts "shall have jurisdiction of any civil action arising under any act of Congress relating to patents...." The Federal Circuit's jurisdiction rested on 28 U.S.C. § § 1292(b) and (c)(1), as the circuit granted the petitioners' timely filed petition for interlocutory appeal from the district court's order that denied petitioners' motion for summary judgment on the patent invalidity defense. The circuit otherwise had jurisdiction of the appeal under 28 U.S.C. § 1295. This Court's jurisdiction rests on 28 U.S.C. § 1254(1), as the petitioners filed their petition for a writ of certiorari within 90 days of the circuit's denial of the petitioners' timely filed petition for rehearing. The rehearing petition was referred along with the response to the circuit judges who were in regular active service. This Court granted the petition for a writ of certiorari by order entered on February 20, 2001.

## *2 STATUTORY PROVISIONS INVOLVED

1. Revised Statutes, § § 4884, 4886 (the precursor of 35 U.S.C. § 101) and 4888, as amended by the 1930 Plant Patent Act. (Pet.App. 42)
2. 35 U.S.C. § 101, defining the subject matter of "Inventions patentable." (Pet.App. 43)
3. 35 U.S.C. § 161, defining the subject matter of "Patents for Plants" issued under Title 35. (Pet.App. 44)
4. 35 U.S.C. § 163, limiting a plant patent grant to the right to exclude others from asexually reproducing the plant or selling or using the plant so reproduced. (Pet.App. 44)
5. The Plant Variety Protection Act of 1970, 7 U.S.C. § § 2321, 2323, 2401(a)(3), 2402 (defining the right of a plant breeder to obtain a PVP certificate on a plant variety that has been sexually reproduced -- that is, by seed) (Pet.App. 45), 2541 (sexual reproduction of a plant variety, or selling or using plants so reproduced, constitutes infringement) (Pet.App. 46), 2543 (infringement exception for a farmer saving seed) (Pet.App. 48), 2544 (infringement exception for plant breeding research) (Pet.App. 43) and 2567.
6. Plant Patent Amendments Act of 1998 P.L. 105-289 (HR 1197),

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

October 27, 1998 (Pet.App. 49), amending 35 U.S.C. § 163 to make it more consistent with protections offered to breeders of sexually reproduced plants under the Plant Variety Protection Act Amendments of 1994.

STATEMENT OF THE CASE

The petitioner J.E.M. Ag Supply, Inc. d/b/a Farm Advantage, Inc. (Farm Advantage) is a family owned agricultural supply business located in Belmond, Iowa. (Pet.App. 14.) The other petitioners are distributors for **3** Farm Advantage. (Pet.App. 14.) Farm Advantage in the 1998 growing season purchased 600 bags of hybrid corn seed produced by the respondent **Pioneer** Hi-Bred International, Inc. **(Pioneer). (**Pet.App. 15.) Farm Advantage sold the seed to certain of its farmer customers who then planted the seeds in their fields. (Pet.App. 15.) The purchasing farmers sold the resulting corn crop to the local elevator or used the crop for forage.

**Pioneer** sued petitioners in a federal district court on the claim of patent infringement. (J.A. 6-11.) **Pioneer** asserted the hybrid seed corn sold by Farm Advantage was identifiable by the following ten hybrid product numbers: 3394; 3489; 3559; 3730; 34R06; 35N05; 34K77; 35R57; 3563; and 3751. (J.A. 9.) **Pioneer** further asserted each of these hybrids was the subject of one or more of seventeen utility patents issued to **Pioneer (**J.A. 9), and which patents are identified in a table of patents submitted in the summary judgment record and also identified in the complaint for patent infringement (J.A. 9). These seventeen utility patents as a group purport to protect certain inbred corn plants, the parts thereof and their seeds and certain hybrid corn plants, the parts thereof and their seeds. (J.A. 9.) The patents were issued to **Pioneer** between January 21, 1992 and November 18, 1997. (J.A. 9.)

Farm Advantage and its distributors are not licensed sales representatives of **Pioneer.** (Pet.App. 15.) **Pioneer** in its suit raises a single claim of patent infringement (J.A. 6-11); no state law claims are asserted and thus there is no issue in this litigation that concerns **Pioneer's** ability to restrict the number and identity of the sellers of its corn seed products outside of any such right to restrict that may be associated with the patents.

One of the patents-in-suit is no. 5,491,295 (the '295 patent). (J.A. 28.) The '295 patent was issued to Pioneer **4** on February 13, 1996, and the grant is entitled "Hybrid Corn Plant and Seed." (J.A. 28.) The grant provides in column 7 (J.A. 32):

This invention includes the hybrid corn seed of 3394, the hybrid corn plant produced from the hybrid corn seed, and variants, mutants, and modifications of 3394.

The grant further provides in column 22 (J.A. 39):

1. A hybrid corn plant designated as 3394 and its parts, and having ATCC accession number 97224.

...

6. Seed produced by a hybrid corn plant designated as 3394, said

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

hybrid corn plant having ATCC accession number 97224. The hybrid corn plants, designated as no. 3394, and that are the subject of the '295 patent are grown by seeds. (J.A. 28.)

The other patents-in-suit that are titled "Hybrid Corn Plant and Seed" each contain language that is the same or to the same effect as the above-quoted provisions from the grant contained in the '295 patent. These patents accordingly purport to protect seed grown hybrid corn plants, the parts thereof and their seeds.

Another of the patents-in-suit is no. 5,506,367 (the '367 patent). (J.A. 40.) The '367 patent was issued to Pioneer on April 9, 1996, and the grant is entitled "Inbred Corn Line PHP38." (J.A. 40.) The grant provides in column 6 (J.A. 43):
  Inbred corn line PHP38 is a yellow, dent corn inbred that provides an acceptable male or female parental line in crosses for producing first generation F1 corn hybrids.
The grant further provides in the same column (J.A. 43):
  Inbred corn line PHP38, being substantially homozygous, can be reproduced by planting **5** seeds of the line, growing the resulting corn plants under self- pollinating or sib-pollinating conditions with adequate isolation, and harvesting the resulting seed, using techniques familiar to the agricultural arts. The plants of the inbred corn line, designated at PHP38, and that are the subject of the '367 patent are grown by seeds. (J.A. 40.)

The other patents-in-suit that are entitled "Inbred Corn Line" each contain language that is the same or to the same effect as the above-quoted provisions from the grant contained in the '367 patent. These patents accordingly purport to protect seed grown inbred corn plants, the parts thereof and their seeds.

The Patent and Trademark Office issued to Pioneer each of the seventeen patents-in-suit under the utility patent provisions of Title 35 of the United States Code, 35 U.S.C. § § 101-157. (Pet.App. 16.) All of the inbred corn lines identified as subjects of those patents-in-suit that are entitled "Inbred Corn Line" also are subjects of Plant Variety Protection Certificates issued to Pioneer under the provisions of the Plant Variety Protection Act of 1970, 7 U.S.C. § 2321 et seq. (Record transcript of summary judgment hearing, Docket No. 49, at p. 32.)

The tags affixed to the Pioneer hybrid corn seed bags and that were sold by Farm Advantage contain the following statement (J.A. 51):
  The purchase of these seeds includes a limited license under patent(s) [numbers omitted] (pending patent applications) to produce a single corn crop in the United States (or other applicable country). This license does not extend to the use of seed from such crop or the progeny thereof for propagation or seed multiplication. Furthermore, the use of such seed or the progeny thereof for propagation or seed **6** multiplication or for production

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

or development of a hybrid or different variety of seed is strictly prohibited.

In response to Pioneer's lawsuit, the petitioners raised the defense of patent invalidity. (J.A. 13-14, 16-17.) This defense is based on the position that sexually reproducing plants (i.e., seed grown plants), the parts thereof and their seeds are not included within the scope of the subject matter provision of the utility patent statute, 35 U.S.C. § 101; to the contrary, the petitioners contend that seeds and seed grown plants are exclusively protectable by federal law under the provisions of the Plant Variety Protection Act of 1970, 7 U.S.C. § 2321 et seq. (Pet.App. 16.) Accordingly, in answer to the suit the petitioners raised the following defense (J.A. 13-14):

DEFENSE II - PATENT INVALIDITY

9. The alleged patents listed in the Table of Patents-In-Suit set out in paragraph 13 of the Complaint purport to confer upon Plaintiff Pioneer the right to exclude others from selling, offering for sale, or reproducing the listed hybrids, and the right to exclude others from using the listed hybrids in producing a hybrid or different variety therefrom.
10. The listed hybrids are corn (maize) plant hybrids and the listed patents cover corn hybrids and corn inbreds that reproduce sexually (from seeds).  11. The listed patents are invalid because corn (maize) plants are not patentable subject matter within the scope of 35 U.S.C. § 101.

Farm Advantage and its distributors moved for a complete summary judgment on their defense. (Pet.App. 13.) The district court overruled the motion. (Pet.App. 13-39.) It concluded that a producer of seed corn like Pioneer could receive federal protection of a sexually **7** reproducing plant variety and its seeds under both the utility patent provisions contained in Title 35 and the PVPA provisions contained in Title 7. (Pet.App. 39 -- "At no place in any of the statutes does it say that seed corn plants cannot be given a patent. At no place in the statutes does it say that you cannot have both patent and PVPA protection. At no place in the law does it say that you have to make an election of one or the other, section 101 or the PVPA.") A panel of the Federal Circuit affirmed that ruling following the petitioners' interlocutory appeal. (Pet.App. 1-9.) This Court granted certiorari to review the issue of the source of federal protection of seed grown plants, the parts thereof and their seeds.

SUMMARY OF THE ARGUMENT

Utility patents that are issued to provide federal protection of sexually reproducing corn plant varieties and their seeds are invalid. Seeds, seed grown plants and the parts thereof are not included within the ambit of the utility patent subject matter

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

definitional section, 35 U.S.C. § 101. Rather, federal protection of the corn seed products at issue in this case is exclusively obtainable under the provisions of the Plant Variety Protection Act of 1970 (PVPA) 7 U.S.C. § 2321 et seq. This result is mandated by Congress' express intent stated in the terms of two plant specific statutes and the legislative histories of these enactments. Additionally, dual federal protection of the item at issue, in this case the right to exclude others from reproducing, using or selling sexually reproduced plant varieties, is not allowed. This result is further established by the conflicts that would result if federal protection of seeds and seed grown plants is allowed under both the utility patent statute and the PVPA.

Congress directly stated its intent that seeds and seed grown plants are not subject to federal protection through **8** the issuance of utility patents. Congress made plain its intent in the language that appears in the two plant specific statutes, and in the statutory language changes made by Congress during its 1952 comprehensive revision and reenactment of the patent statute.

Section 101 of 35 U.S.C. sets forth subjects that can be federally protected through the issuance of utility patents. The language that presently appears in the statute was passed by Congress during its 1952 reenactment of the patent statute. Before that reenactment, the language that now appears in § 101 was contained in the section's immediate precursor, Revised Statutes, § 4886. In 1930, Congress passed and the president signed into law the Townsend- Purnell Plant Patent Act (PPA). The PPA amended the patent subject matter provision, Revised Statutes, § 4886, to include a new category of things subject to patent protection -- "plants," but limited only to those plants that are asexually reproduced. Before 1930, § 4886 and its precursors never included the word "plants" in the language defining patentable subject matter. Sexually reproducing plants are those grown by seed. Congress in 1930, when it enacted the PPA, expressly stated its intent that seeds and seed grown plants were not to be included within the ambit of patentable subject matter when it limited the patent rights granted for the new category of "plants" to the right to exclude others from asexually reproducing the patented plant variety.

Congress enacted § 101 as part of the 1952 patent law reenactment. Congress removed only one category of things subject to federal protection by issuance of a utility patent -- "plants." Congress provided for patent protection of plants in a new Chapter 15 of Title 35, 35 U.S.C. § § 161-64, and entitled that chapter "Patents of Plants." Section 101 was entitled "Inventions Patentable." Congress retained the asexual reproduction limitation for **9** plant patents that originally appeared in § 101's precursor, Revised Statutes, § 4886, as amended by the PPA.

In 1970, Congress passed and the president signed into law the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

PVPA. This is a comprehensive, stand-alone statute. It deals specifically with federal protection of seeds, seed grown plants and the parts thereof. The statute creates a new agency within the Department of Agriculture, the PVP Office and Board, to administer the statute and to grant federal protection of sexually reproducing plant varieties. Protection is accorded by the grant of certificates of plant variety protection. No allowance is made for dual federal protection through the grant of utility patents. The Patent and Trademark Office is accorded no role under the PVPA to grant federal protection of sexually reproducing plant varieties.

The terms of the plant specific statutes show Congress' intent that federal protection of seeds and seed grown plants is not available through patents. The statutory language is dispositive of the question presented for review. It is not necessary to review any other source to answer the question presented. However, the legislative history of the plant specific acts also establishes that Congress never intended seeds and seed grown plants to be the subject of utility patent protection. The legislative history shows Congress on three occasions (1930, 1968 and 1970) debated the precise issue of whether sexually reproducing plants should be subject to federal protection under the patent laws. On each occasion, Congress determined that seeds and seed grown plants should not be so protected. This is why Congress passed the PVPA -- to set forth the precise manner of federal protection that Congress deemed best suited for seeds and seed grown plants.

The PVPA establishes a mechanism for federal protection of sexually reproducing plant varieties that is **10** inconsistent with the protection accorded to inventors of things subject to utility patents. The standards for granting PVP protection to a plant breeder are specific to seeds and seed grown plants. The utility patent standards are different than the PVPA standards and are specific to those inventions that are properly patentable under § 101. Further, the PVPA permits uses of protected sexually reproducing plant varieties and their seeds that would not be allowed under patent law. The issuance of PVP certificates and utility patents on sexually reproducing plant varieties accordingly would result in impermissible dual federal protection and direct conflicts in the scope of the federal protection granted on the same attribute -- the ability to sexually reproduce the plant variety.

ARGUMENT
I.

UTILITY PATENTS ISSUED ON SEXUALLY REPRODUCING PLANT VARIETIES, THE PARTS THEREOF AND THEIR SEEDS ARE INVALID BECAUSE THESE VARIETIES AND SEEDS ARE SUBJECT TO FEDERAL PROTECTION ONLY THROUGH THE ISSUANCE OF CERTIFICATES OF PLANT VARIETY PROTECTION.

A. Background Discussion Of The Issue Raised And The Statutes

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Involved.

The Federal Circuit panel ruled that a breeder of a sexually reproducing plant variety qualifies for federal protection of the variety, the parts thereof and its seeds under both the utility patent provisions of the general patent statute, 35 U.S.C. § § 101-157, and the provisions of the Plant Variety Protection Act, 7 U.S.C. § 2321 et seq. Pioneer Hi-Bred Internat., Inc. v. J.E.M. Ag Supply, Inc., 200 F.3d 1374 (Fed.Cir. 2000), cert. granted, ___ U.S. ___, 121 S.Ct. 1077 (2001). Specifically, the panel concluded that **11 seed grown plants such as the corn inbreds and hybrids at issue in this appeal are included within the ambit of the subject matter section of the utility patent statute, 35 U.S.C. § 101. Id. at 1378 ("We conclude that patentable subject matter under 35 U.S.C. § 101 includes seeds and seed-grown plants."). The panel reached this result by reasoning that the scope of § 101 is expansive, and is specifically intended to encompass "anything under the sun that is made by man" including living things such as plants and their seeds. Id. at 1375-76 (quoting S. Rep. No. 1979, at 5 (1952)).

The circuit's conclusion defeats the express intent of Congress that is manifested in two plant specific statutes: the Townsend-Purnell Plant Patent Act of 1930 (PPA), Ch. 312, 46 Stat. 376 (codified at 35 U.S.C. § § 161- 64), and the Plant Variety Protection Act of 1970 (PVPA), Pub. L. No. 91- 577, § 42, 84 Stat. 1547 (codified at 7 U.S.C. § 2321 et seq.). [FN1] The utility patents issued under § 101's subject matter provision purport to grant holders rights of exclusion that Congress deliberately chose not to grant when it debated and passed the plant specific statutes.

> FN1. 7 U.S.C. § 2402(a) provides:
> The breeder of any sexually reproduced or tuber propagated plant variety (other than fungi or bacteria) who has so reproduced the variety ... shall be entitled to plant variety protection for the variety....

For example, the Federal Circuit's ruling that upholds the validity of utility patents on seeds and seed grown plants means this conduct constitutes patent infringement: (1) a farmer's act of saving seeds from the patented plants to plant on his own farm in a subsequent growing season; (2) a plant breeding researcher's act of using a patented plant and its seeds in bona fide research **12 for the purpose of developing a new plant variety [FN2]; and (3) selling seeds of the patented variety even though that act does not involve further propagation of the variety. [FN3] Each of these acts is specifically excluded under the PVPA from acts that constitute infringement of the federally protected seed grown plant. 7 U.S.C. § § 2543-2544.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

FN2. Experimental use of a patented item in connection with the experimenter's business or with the idea of selling the experimental results is infringement under Title 35. Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc., 733 F.2d 858, 862-863 (Fed.Cir.), cert. denied, 496 U.S. 856 (1984).

FN3. Propagation of a variety means increasing or multiplying the variety to create new seeds of the variety that could compete with the owner's seeds.

 Further, Congress when it enacted the PVPA established four standards that must be satisfied before a certificate of plant variety protection can be issued that grants the holder the right to exclude others from sexually reproducing a plant variety, or from selling or using a plant variety so reproduced. A plant variety is protectable under the PVPA only if it is judged to be new, distinct, uniform (to a "commercially acceptable" degree) and stable. 7 U.S.C. § 2402. Utility patents on sexually reproducing plant varieties and their seeds are not issued under these four standards. 35 U.S.C. § § 101-103 (standards to issue a utility patent). Applying the PVPA's standards requires one to make judgments of degree. Congress as part of the PVPA directed that a special agency be created to apply these standards and administer the other carefully drawn plant specific provisions of the PVPA. The Act mandates the creation of the Plant Variety Protection Office and its governing body the Plant Variety Protection Board. 7 U.S.C. § § 2321, 2323, and 2327. These agencies are within the Department of Agriculture, *13 which possesses unique expertise over agricultural matters such as seed grown crops. The Act specifies that the Plant Variety Protection Board consist of "experts in various areas of varietal development covered by this chapter", and whose members "shall include farmer representation and shall be drawn approximately equally from the private or seed industry sector and from the sector of government or the public." 7 U.S.C. § 2327. The Federal Circuit panel's ruling judicially imposes the Patent and Trademark Office (PTO) as an agency authorized to grant the right to exclude others from sexually reproducing plants, or selling or using plants so reproduced (by seed), despite the fact that Congress in the plant specific PVPA made no mention of the PTO's filling such a role. The PTO is not within the Department of Agriculture and it lacks the Department's expertise in matters concerning the nation's important cash crops (e.g., corn, soybeans, cotton, wheat). These crops must be seed grown to be commercially valuable because they must be replanted each year following the harvest.

 B. Congress Has Directly Spoken On The Scope Of Federal Protection Of Plant Varieties, And It Has Precluded Protection Of Plant Varieties Through The Issuance Of Utility Patents.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The PTO, in Ex Parte Hibberd, 227 U.S.P.Q. 443 (Bd. Pat. App. & Interf. 1985), determined that it had authority to issue utility patents to protect seeds and seed grown plants. In Hibberd, the PTO board concluded that seed grown plants (in that particular case, corn and its seeds) fell within the subject matter scope of 35 U.S.C. § 101 because the Court in Diamond v. Chakrabarty, 447 U.S. 303 (1980), supposedly had held that § 101 is to be interpreted to include anything made by man. Id. at 444 ("The language of Section 101 has been set forth, supra, and has **14** been interpreted by the Supreme Court to include everything under the sun that is made by man."). The Federal Circuit based its decision on the same reasoning, when it wrote in Pioneer, 200 F.3d at 1375-76:

  The district court held that the Supreme Court in Diamond v. Chakrabarty, 447 U.S. 303, 309, 206 USPQ 193, 197 (1980), in stating that "Congress intended statutory subject matter to 'include anything under the sun that is made by man,' " (quoting S.Rep. No. 1979 at 5 (1952)), confirmed that there is no basis in law for excluding living things, in this case seeds and seed grown plants and parts thereof, from the subject matter included in § 101[.]

The "threshold issue [in the present case] is the appropriate framework for analyzing the [PTO's] assertion of authority to" issue utility patents on seed grown plants, the parts thereof and their seeds. Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000). This analysis is governed by the rules set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), because the issue in the present case "involves an administrative agency's construction of a statute that it administers". Brown & Williamson, 529 U.S. at 132. The Court must first ask whether Congress has directly spoken to the precise question on review. Ibid. If so, the inquiry is at an end because the judiciary must give effect to the unambiguously expressed intent of Congress. Ibid. The agency's interpretation of a statute it administers is subject to judicial deference only when "Congress has not specifically addressed the question". Ibid. In that situation, the agency's construction will be upheld by a reviewing court if that construction is "permissible." Ibid.

This Court consistently has ruled that reviewing courts should not confine themselves to the examination **15** of a particular statutory provision in isolation when determining whether Congress has addressed the specific subject at hand. The Court in Brown & Williamson, 529 U.S. at 132-33, summarized the relevant case authority when it wrote:

  In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context. See Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) ( "Ambiguity is a creature not of definitional possibilities but of statutory

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

context"). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Michigan Dept. of Treas., 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989). A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," Gustafson v. Alloyd Co., 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and "fit, if possible, all parts into an harmonious whole." FTC v. Mandel Brothers, Inc., 359 U.S. 385, 389, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). Similarly, the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand. See United States v. Estate of Romani, 523 U.S. 517, 530- 531, 118 S.Ct. 1478, 140 L.Ed.2d 719 (1998); United States v. Fausto, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). In addition, we must be guided in a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political **16** magnitude to an administrative agency. Cf. MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218, 231, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994).

That is, each of the acts passed by Congress and enacted into law that deals with the specific issue must be considered to ascertain if Congress has directly spoken as to the particular subject matter. The more recently enacted statutes that deal with the relevant subject can affect the meaning of earlier statutes that also pertain or may be inclusive enough to be construed to pertain to the same subject. In United States v. Estate of Romani, 523 U.S. 517, 532 (1998), the Court explained:

As was the case with the National Bank Act, the Transportation Act of 1920, and the Bankruptcy Act of 1989, the Tax Lien Act is the later statute, the more specific statute, and its provisions are comprehensive, reflecting an obvious attempt to accommodate the strong policy objections to the enforcement of secret liens. ... Even before the 1966 amendments to the Tax Lien Act, this Court assumed that the more recent and specific provisions of that Act would apply were they to conflict with the older priority statute.

The Court in Brown & Williamson, 529 U.S. at 143, employed this same reasoning when it observed:

At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." United States v. Fausto, 484 U.S., at 453, 108 S.Ct. 668. This is particularly so where the scope of the earlier statute is broad but the **17** subsequent statutes more specifically address the topic at hand. As recognized recently in United States v. Estate of Romani, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

ha[s] not been expressly amended." 523 U.S. 530-531, 118 S.Ct. 1478.

 Congress first directly legislated on the subject of the scope of federal protection for plants in 1930. That is when the PPA was enacted into law. Before this enactment, the definition of useful things subject to patent protection was "any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof ...". [FN4]

   FN4. This pre-1930 definition of things patentable was largely unchanged from the original patent subject matter provision penned by Thomas Jefferson in 1793. Jefferson was a plant breeder: "[T]he greatest service which can be rendered any country is to add a useful plant to its culture." The Garden and Farm Books of Thomas Jefferson, p. 509, Robert C. Baron Ed., 1987. Jefferson's exclusion of "plant" from the definition of things patentable was a conscious omission.

 This definition was contained in Revised Statutes, § 4886, which was the direct precursor of 35 U.S.C. § 101. The 1930 PPA expanded the definition of useful things subject to patents to include the new category of "plants" by adding to § 4886 the phrase "or who has invented or discovered and asexually reproduced any distinct and new variety of plant ..." [FN5].

   FN5. The § 4886 definition of things subject to a utility patent after the 1930 PPA then read in its entirety (Pet.App. 42-3):
   Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, or who has invented or discovered and asexually reproduced any distinct and new variety of plant, other than a tuber-propagated plant, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior tohis application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor.

 *18 The PPA expanded the § 4884 rights a patent holder could obtain by adding the words "(including in the case of a plant patent the exclusive right to asexually reproduce the plant) ..." [FN6].

FN6. The § 4884 rights granted to a patent holder after the 1930 PPA then read in its entirety (Pet.App. 42): Every patent shall contain a short title or description of the invention or discovery, correctly indicating its nature and design, and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the exclusive right to make, use, and vend the invention or discovery (including in the case of a plant patent the exclusive right to asexually reproduce the plant) throughout the United States and the Territories thereof, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

Sexual reproduction of plants is reproducing the plants by seed; asexual reproduction of plants is accomplished by budding, grafting, etc., but not by seed. [FN7]

FN7. Asexually reproducing a plant produces offspring with a genetic combination identical to that of the single parent. Thus, a plant produced by asexual reproduction is a genetic clone of the original parent plant. Sexual reproduction produces offspring with a genetic combination different than that of either of the two parents, resulting in a plant variety consisting of a range of genetic combinations. Imazio Nursery, Inc. v. Dania Greenhouses, 69 F.3d 1560, 1567-1568 (Fed.Cir. 1995), cert. denied, 518 U.S. 1018 (1996).

**\*19** Congress in passing the plant-specific PPA expressly stated its intent that the words "art, machine, manufacture, or composition of matter" appearing in the precursor to § 101 did not include "plants", and that a patent issued on a "plant" conferred only the right to exclude others from asexually reproducing the plant. If the patent laws before 1930 allowed patents on "plants" then there would have been no reason for Congress to have passed the 1930 PPA and to have limited the scope of plant patent protection to plants reproduced by asexual methods.

Congress next addressed the subject of the scope of federal protection of plants in 1952. This was in conjunction with Congress' comprehensive revision of the general patent statute, and its resulting reenactment of the patent statute contained in Title 35 of the United States Code. In the reenactment, Congress moved the plant patent provisions into a separate Chapter 15 of Title 35 named "Patents for Plants". (35 U.S.C. § § 161-64.) The 1952 Congress placed the definition of useful things other than "plants" that are patentable in 35 U.S.C. § 101 and gave that section the title "Inventions Patentable". Chapter 15 continued to limit plant patents to the right to exclude others only from asexually reproducing the patented plant and parts thereof. 35 U.S.C. § 161.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The protection did not extend to seeds. Ibid. None of this legislative effort that culminated with the enactment of the 1952 Patent Act makes sense if Congress intended that § 101 authorized issuance of patents on plant varieties that **20** confer on the patent holder the right to exclude others from sexually reproducing a patented plant variety.

Specifically, the 1952 Congress would not have moved the word "plant" out of § 101 and into Chapter 15 and maintained the asexual reproduction limitation if it intended that § 101 would authorize patents on plants granting the right to exclude others from sexually reproducing plants. If the 1952 Congress had intended § 101 to allow protection of sexually reproducing plants (seeds and seed grown plants), then it would have said so, as it did in 1930 with regard to protecting plants reproduced by asexual methods. The PTO board in Hibberd and the Federal Circuit panel in Pioneer ignored the express words of the statutes (§ § 101, 161 and 163 of Title 35) and judicially amended them by injecting into § 101 language pertaining to plants that does not appear in Congress' reenactment of that section (from Revised Statutes, § 4886) and never had appeared in any of § 101's precursors.

Congress for a third time specifically passed legislation on the subject of the scope of federal protection of plants. This occurred in 1970 when the PVPA was enacted into law. The PVPA, 7 U.S.C. § 2321 et seq., is a comprehensive, stand-alone statute. Its exclusive subject matter is the scope of federal protection of plant varieties and includes federal protection of seeds, seed grown plants and the parts thereof. The PTO is accorded no role whatsoever over the grant of federal protection under this comprehensive act. Nor are the utility patent standards contained in Title 35 incorporated into the PVPA. To the contrary, the PVPA establishes a newly created agency within the Department of Agriculture to administer the grant of federal protection of seeds and seed grown plants, the Plant Variety Protection Office and that Office's governing body the Plant Variety Protection **21** Board. 7 U.S.C. § § 2321, 2323 and 2327. A method is provided for the judicial review of the office's and board's decisions on whether to grant an applicant a certificate of plant variety protection for seeds and seed grown plants. Id. at § § 2461-2462. Federal protection is accorded by the issuance of this certificate. Id., at § § 2481, 2483.

The express terms of the PVPA include federal protection against any type of multiplication of the variety, not just sexual reproduction, with one exception. The only other type of federal protection carved out of the PVPA's otherwise all encompassing sweep is the PPA. The PVPA infringement provision sets out "Acts constituting infringement", 7 U.S.C. § 2541(a)(1)-(8), and then at 7 U.S.C. § 2541(a)(9) provides it also is infringement to "perform any of the foregoing acts in instances where the variety is multiplied other than sexually, except in pursuance of a valid

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

United States plant patent ...". Thus, the PVPA covers all federal
protection of any method of multiplying a protected variety except
for the PPA carveout.

  This Court explained the purpose and function of the PVPA in
Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 181 (1995):
  In 1970, Congress passed the Plant Variety Protection Act (PVPA)
84 Stat. 1542, U.S.C. § 2321 et seq., in order to provide
developers of novel plant varieties with "adequate encouragement
for research, and for marketing when appropriate, to yield for the
public the benefits of new varieties." § 2581. The PVPA extends
patent-like protection to novel varieties of sexually reproduced
plants (that is, plants grown from seed) which parallels the
protection afforded asexually reproduced plant varieties (that is,
varieties reproduced by propagation or **22** grafting) under Chapter
15 of the Patent Act. See 35 U.S.C. § § 161-64.
  The developer of a novel variety obtains PVPA coverage by
acquiring a certificate of protection from the Plant Variety
Protection Office. See 7 U.S.C. § § 2421, 2422, 2481-2483. This
confers on the owner the exclusive right for 18 years [now 20
years, again paralleling the duration of protection for plant
patents under Title 35] to "exclude others from selling the
variety, or offering it for sale, or reproducing it, or importing
it, or exporting it, or using it in producing (as distinguished
from developing) a hybrid or different variety therefrom." § 2483.

 Federal protection of seeds and seed grown plants under the PVPA
conflicts with federal protection of sexually reproducing plant
varieties under the utility patent provisions of Title 35. Some of
the principal conflicts include:
  1) research exemption, 7 U.S.C. § 2544 **[Pioneer** tag prohibits
research (J.A. 51)];
  2) crop saving exemption, 7 U.S.C. § 2543 **[Pioneer** tag prohibits
crop saving (J.A. 51)];
  3) standards rendering a plant variety protectable -- new,
distinct uniform (to a "commercially acceptable" degree) and
stable, 7 U.S.C. § 2402;
  4) protection extends to an "essentially derived variety" but not
to all varieties derived from the protected variety, 7 U.S.C. § §
2401(a)(3) and 2541(c)(1);
  5) establishment of a special office, the plant Variety
Protection Office, to administer the PVPA, 7 U.S.C. § § 2321 and
2323;
  6) establishment of the Plant Variety Protection Board consisting
of "experts in various areas of varietal development covered by
this **23** chapter", which "shall include farmer representation and
shall be drawn approximately equally from the private or seed
industry sector and from the sector of government or the public",
7 U.S.C. § 2327;
  7) acts of infringement of a PVP certificate include:
  (a) sexually multiplying the variety "as a step in marketing (for
growing purposes) the variety" [not for research to develop a new

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

variety], 7 U.S.C. § 2541(a)(3);
   (b) using the variety "in producing (as distinguished from developing) a hybrid or different variety therefrom", 7 U.S.C. § 2541(a)(4) [Pioneer tag states "use ... for ... development of a hybrid or different variety of seed is strictly prohibited." (J.A. 51)]; and
   (c) performing any of the infringing acts specified in § 2541(a) "even in instances in which the variety is multiplied or other than sexually, except in pursuance of a valid United States plant patent" (emphasis supplied), 7 U.S.C. § 2541(a)(9);
   8) infringement does not include performing any act concerning propagating material of any kind of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States "unless the act involves further propagation of the variety" (emphasis supplied), 7 U.S.C. § 2541(d); and [FN8

> FN8. Propagation of a plant variety is multiplying or increasing the variety to create new seeds of the variety. An act not involving propagation of a protected variety does not result in creating new seeds of the variety that can be sold or used in competition against the original breeder. See, 7 U.S.C. § 2541(d).

   **\*24** 9) no damages can be recovered against an infringer without proving actual knowledge unless a protected variety's container is labelled "Unauthorized Propagation Prohibited" or "Unauthorized Seed Multiplication Prohibited", 7 U.S.C. § 2567 [Pioneer's tag contains patent warnings but not these specific and prominent PVPA notices (J.A. 51).]

   Two amendments to Title 35 have specifically addressed the PVPA. First, the 1984 amendments to Chapter 18, Pub.L. 98-620, Title V, § 501(1) and (2), 99 Stat. 3335, amended § § 201(d) and (e) of Chapter 18 of Title 35. Chapter 18 of Title 35 deals with rights of those who create with assistance from federal funds "any invention or discovery which is or may be patentable or otherwise protectable under this title or any novel variety of plant which is or may be protectable under the Plant Variety Protection Act (7 U.S.C. 2321 et seq.)." 35 U.S.C. § 201(d). Section 201(e) provides:
   (e) The term "subject invention" means any invention of the contractor conceived or first actually reduced to practice in the performance of work under a funding agreement: Provided, that in the case of a variety of plant, the date of determination (as defined in section 41(d) of the Plant Variety Protection Act (7 U.S.C. 2401(d))) must also occur during the period of contract performance.
   **\*25** The 1984 amendments added the clauses in § § 201(d) and (e) referencing the PVPA and made clear that under Chapter 18 the PVPA controls the date of determination for a plant variety.

   Second, the PPA was amended by the Plant Patent Amendments Act of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1998, Pub.L. 105-289, 112 Stat. 2780, which provides in § 2(b):
  (b) PURPOSES. -- The purposes of this Act are --
  (1) to clearly and explicitly provide that title 35 United States Code, protects the owner of a plant patent against the unauthorized sale of plant parts taken from plants illegally reproduced. [Emphasis added]
  (2) to make the protections provided under such title more consistent with those provided breeders of sexually reproduced plants under the Plant Variety Protection Act (7 U.S.C. 2321 et seq.), as amended by the plant Variety Protection Act Amendments of 1994 (Public Law 103-349) ... [Emphasis added]
  Section 3(a) of the Plant Patent Amendments Act of 1998 amended 35 U.S.C. § 163 and provides:
  § 163. Grant
  In the case of a plant patent, the grant shall include the right to exclude others from asexually reproducing the plant, and from using, offering for sale, or selling the plant so reproduced, or any of its parts, throughout the United States, or from importing the plant so reproduced, or any parts thereof, into the United States.
  It can be seen that when Congress decided to make it clear that plant protection afforded under Title 35 included protection of plant parts as the PVPA provided, Congress only amended § 163 of the PPA. There was no **26 amendment to § 101 because none was needed since § 101 does not afford protection to plant varieties.

  A reference to foreign applications for plant breeder's rights occurs at 35 U.S.C. § 119(f) (Pub.L. 106-113, Nov. 29, 1999, Consolidated Appropriations Act of 2000, Subtitle H -- Miscellaneous Patent Provisions, § 4802), which provides: "Applications for plant breeder's rights filed in a WTO member country (or in a foreign UPOV Contracting Party) shall have the same effect for the purpose of the right of priority under subsections (a) through (c) of this section as applications for patents ..." Subsections (a) through (c) allow a U.S. patent applicant to use the date of a filing in a foreign country as the effective date of the U.S. filing if the U.S. patent application was filed within twelve months of the foreign filing. 35 U.S.C. § 119(f) has no bearing on the issue before the Court. The text of subdivision (f) does not address the issue of whether § 101 should be amended to return the word "plants" to the statutory text, nor does the subsection specifically address either of the plant-specific acts, the PPA and the PVPA. An isolated amendment tacked on the end of a lengthy, multi-subject revenue bill, and inserted among "miscellaneous patent provisions", is hardly evidence that Congress focused on the issue of whether the PVPA is the exclusive federal statutory means of gaining protection for sexually reproduced plant varieties. See, Chakrabarty, 447 U.S. at 314 ("In any event, absent some clear indication that Congress focused on [the] issues ... directly related to the one presently before the Court, ... there is no basis for reading into its actions an intent to modify the plain meaning of the words found in § 101 ..."); and

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the dissent of Justice Stevens in Sorensen v. Secretary of the Treasury, 475 U.S. 851, 867, n. 2 (1986) (pointing out that **27** isolated provisions in omnibus revenue bills do not sit atop the pinnacle of Congressional awareness, e.g., the Omnibus Budget Reconciliation Act of 1981 contained "a name and phone number -- 'Ruth Seymour', 225-4844 -- standing alone as if it were a special appropriation item.")

Thus, when Congress has explicitly addressed the PVPA in Title 35 statutory text, it has done so in the context of a statutory scheme that does not include plant varieties within § 101 patentable subject matter. The words of the statutory text of 35 U.S.C. § 119(f) do not show Congressional awareness of a statutory scheme different than that clearly expressed in the text of the 1930 PPA, the 1952 Patent Act, and the 1970 PVPA.

The PVPA is the most recent statute passed by Congress that deals with the precise subject of the scope of federal protection for seeds and seed grown plants. It is the statute that should control the Court's construction of the earlier enacted statutes that deal with the subject of the federal protection of plants, the 1930 PPA and the 1952 comprehensive revision and reenactment of the patent statute. Romani, 523 U.S. at 530-31 ("a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended"). The comprehensive PVPA is designed to provide federal statutory protection for plant varieties that require use of sexual reproduction (by seed) to be commercially viable. It is not realistic to contend that the 1970 Congress would carefully construct a complex and specialized statute like the PVPA for the purpose of covering a particular class of plants and their seeds and accord not a scintilla of its attention to 35 U.S.C. § 101 if Congress in fact had ever intended § 101 to authorize patents on sexually reproducing plant varieties. **28** To now administratively and judicially create such a § 101 (utility) patent on "plants" amounts to legislation that overrides the 1930 PPA, the 1952 Patent Act and the 1970 PVPA. This is not agency and judicial construction of a Congressional enactment -- it is Article II and Article III bodies usurping Congress' Article I authority to pass legislation. The PTO's administrative agency "[c]onstruction [of a statute it administers] may not be substituted for legislation." United States v. Missouri Pac. R. Co., 278 U.S. 269, 278 (1929).

C. The PTO And Federal Circuit Ignored The Language Congress Used In The Relevant Statutes Themselves And Instead Relied On An Erroneous Reading Of Legislative History To Conclude That Utility Patents Could Be Issued To Provide Federal Protection Of Seeds And Seed Grown Plants.

The PTO board and Federal Circuit panel each ignored the language Congress used in the plant specific statutes of 1930, 1952 and 1970. Instead, they relied on an erroneous reading of legislative

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

history to conclude that § 101's subject matter reach literally extended to "anything under the sun that is made by man." Hibberd, 227 U.S.P.Q. at 444; Pioneer, 200 F.3d at 1376. The phrase "anything under the sun" does not appear in § 101, and Congress never has written the quoted phrase into actual legislation.

 The source of the "anything under the sun" phrase is Sen. Rep. No. 82-1979, 82nd Cong., 2nd Sess., 1952 WL 3180 (Leg.Hist.), issued in connection with Congress' 1952 reenactment of the patent statute. The quotation relied on by the board and panel must be read in its entirety and in its original context in the legislative reports. The full and correct statement is: "A person may **29** have 'invented' a machine or a manufacture, which may include anything under the sun that is made by man ..." (Emphasis added). Sen. Rep. No. 82- 1979, 1952 WL 3180, p. 3 (Leg.Hist.) (the Senate Report repeats the substance of the House Report). The report here was addressing "a machine or manufacture". [FN9]

> FN9. It was not addressing a plant, which unlike a machine or manufacture is replicated if the plant's DNA is protected as the plant grows and as its seeds are stored.

 The very next page (1952 WL 3180, p. 4 (Leg.Hist.)) of the Senate Report specifically addresses "plants": "Chapter 15 collects the provisions relating to plant patents ..." At 1952 WL 3180, p. 10, the Senate Report provides: "Section 101 follows the wording of the existing statute [i.e., Revised Statutes, § 4886] as to the subject matter for patents, except that reference to plant patents has been omitted for incorporation in section 301 [35 U.S.C. § 161] ..." (See also 1952 WL 3180, p. 11, of the Senate Report moving the relaxed written description requirement for "plants" to the new Chapter 15, 35 U.S.C. § § 161-64.) [FN10] Thus, when read in the context of the **30** original source document, the committee report's phrase "anything under the sun that is made by man" was not intended by Congress to have the effect decades later of rewriting the utility patent subject matter provision to once again include "plants" and this time do so without the original asexual reproduction limitation.

> FN10. To permit the patenting of asexually reproduced plants in 1930, Congress was required to relax the written description requirement of Revised Statutes, § 4888. The PPA amendments of the utility patent statute accordingly provided (Pet.App. 43):
> Section 4888 of the Revised Statutes, as amended (U.S.C., title 35, sec. 33), is amended by adding at the end thereof the following sentence: "No plant patent shall be declared invalid on the ground of noncompliance with this section if the description is made as complete as is reasonably possible."

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

After the 1952 reenactment, the written description requirement for utility patents was placed in 35 U.S.C. § 112. The relaxed written description requirement for plant patents was moved to 35 U.S.C. § 162. There presently is no relaxed written description allowed for a utility patent.
An asexually reproduced plant is a genetic clone of its parent. In contrast, a seed grown plant contains a range of genetic combinations which are not identical to the genetic combination of either of its parents. Imazio Nursery, 69 F.3d at 1567-68. Further, without the ability to actually grow, breed and otherwise use the plant variety in a research environment, all of the information contained in the plants and seeds of the variety is not available and thus has not been disclosed.
This difference is addressed in the PVPA's disclosure provision. Specifically, the Plant Variety Protection Office requires, in exchange for issuance of a Plant Variety Protection Certificate on a corn hybrid, that the identities of the inbred parents that are cross-pollinated to make the hybrid are disclosed, that seed of the inbred parents is deposited, and that the breeding history of each of the inbred parents is detailed (See 7 U.S.C. § 2422(1) and 7 C.F.R. § 97.6(d).) Also, research with a protected variety is allowed. 7 U.S.C. § 2544.
The PTO in issuing the corn hybrid patents disputed in this case did not require disclosure of any of this information and therefore one skilled in the art of plant breeding would not be able to recreate the patented corn hybrids.

  Both the PTO board and Federal Circuit panel said the Court's analysis in Chakrabarty supported the conclusion that § 101 should be read to include within the subject matter of utility patents "anything under the sun that is made by man." Hibberd, 227 U.S.P.Q. at 444; Pioneer, 200 F.3d at 1367. The Court in its Chakrabarty decision did not state, let alone even intimate, that an agency and reviewing court should select a snippet of a **31** sentence from the legislative history of a statutory reenactment like the 1952 Patent Act and use that snippet to rewrite a provision of the Act like § 101.

  At issue in Chakrabarty was whether a live, human-made micro-organism (a genetically altered oil-eating bacterium) could be the subject of a utility patent. 447 U.S. at 305. The Chakrabarty dissent argued that the enactments of the PPA and PVPA showed Congress' intent that no living organism, genetically engineered or otherwise, could be patented under 35 U.S.C. § 101. Chakrabarty, 447 U.S. at 319-322 (Brennan, J., dissenting). The majority in Chakrabarty countered that the passage of these plant-specific acts did not evidence Congress' intent that § 101 could never cover any form of a living thing, such as a genetically altered bacterium. Id. at 311-314. A bacterium is specifically excluded from coverage

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

within the PVPA, and thus is not subject to federal protection under that act. 7 U.S.C. § 2402(a). Importantly, the Chakrabarty majority agreed with the dissent that not all genetically altered or engineered living organisms were the proper subjects of utility patent protection. The majority observed that Congress can express its intent to exclude from § 101's subject matter reach a living organism created, modified or altered by genetic engineering in either of the following two ways:

Congress is free to amend § 101 so as to exclude from patent protection organisms produced by genetic engineering. Cf. U.S.C. § 218(a), exempting from patent protection inventions "useful solely in the utilization of special nuclear material or atomic energy in an atomic weapon." Or it may choose to craft a statute specifically designed for such living things. But, until Congress takes such action, this Court must construe the language of § 101 *32 as it is. The language of that section fairly embraces respondent's invention.

447 U.S. at 318.

In the case of seeds, seed grown plants and the parts thereof Congress has done both. In enacting the 1930 PPA, Congress specifically expanded the scope of § 101's precursor, Revised Statutes § 4886, to include for the first time "plants", but limited the expansion to plants that are reproduced by asexual methods. Congress in 1952 when it drafted § 101 specifically refused to include the category of "plants" within the subject matter of utility patents; instead, it placed the provisions governing plant patents in a separate Chapter 15 of Title 35. Congress later passed a comprehensive law, the 1970 PVPA, that is specifically designed to provide federal protection of seed grown plants, the parts thereof and their seeds. The Federal Circuit's approval of the granting of utility patent protection over sexually reproduced plant varieties is in direct conflict with (1) Congress' decision not to include sexual reproduction of plants in the 1930 PPA, (2) Congress' 1952 decision to exclude "plants" from § 101, (3) Congress' enactment of the 1970 PVPA and (4) the Supreme Court's analysis in Chakrabarty.

The fact that the phrase "anything under the sun that is made by man" was not intended to include "plants" certainly was apparent to Judge Giles Rich when he authored the opinion in Application of Bergy, 596 F.2d 952 (Cust. & Pat.App. 1979), affd. sub nom., Diamond v. Chakrabarty, 447 U.S. 303 (1980). Before he became a federal judge, Judge Rich was a respected patent law attorney who testified before Congress during the hearings on the 1952 reenactment of the Patent Act; he later had a distinguished career as a judge sitting on the Federal *33 Circuit and its predecessor court. In Bergy, Judge Rich noted in 596 F.2d at 987:

The terms [of § 101] are broad: "any *** manufacture, or composition of matter." If we had any doubt about the propriety of giving those words a broad interpretation, it would be dispelled by the identical statement in the House and Senate reports

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

accompanying the 1952 reenactment, quoted supra, that "a machine, or a manufacture *** may include anything under the sun that is made by man." (Emphasis ours.)25

Judge Rich made clear at note 25 that neither the underscored phrase plucked from legislative history, nor the text of § 101, was intended by the 1952 Congress to include "plants":

We recognize that, at the time the statement was made, its authors realized that Congress did not intend the term "manufacture" in § 101 to include plants, which were specifically provided for elsewhere. It is with this in mind that we take the quoted statement as an expression of congressional will that the term "manufacture" otherwise be given the broadest possible interpretation.

Id. at 987, n. 25.

The Federal Circuit handed down its Pioneer ruling before this Court issued its decision in Brown & Williamson, supra, 529 U.S. 120. In Brown & Williamson, the majority held the FDA did not have authority under its enabling statute to promulgate and enforce certain regulations intended to reduce tobacco consumption among children and adolescents. One basis relied on by the majority was the fact that Congress had "enacted six separate pieces of legislation since 1965 addressing the problems of tobacco use and human health." Id. at 143. *34 This incremental legislation included restrictions on tobacco advertising and the sales of tobacco products to minors, which restrictions were similar in subject and scope to the challenged regulations promulgated by the FDA. Id. at 144. Given these legislative enactments and the FDA's historical position that it lacked regulatory authority over tobacco products, the majority concluded: "Congress has created a distinct regulatory scheme to address the problem of tobacco and health, and that scheme, as presently construed, precludes any role for the FDA." Ibid.

The PTO board issued its Hibberd ruling in 1985. This is 55 years after the enactment of the PPA and 15 years after the enactment of the PVPA. Unlike the tobacco specific legislation involved in Brown & Williamson, the plant specific acts are comprehensive -- the PPA now appears in a separate chapter of Title 35 and the PVPA is a stand-alone statute that is contained in Title 7. That statute establishes a special agency within the Department of Agriculture to grant federal protection to breeders of novel varieties of sexually reproduced plants and their seeds -- the PVP Office and the PVP Board. Accordingly, the case against the PTO for authority to issue utility patents to protect seeds and seed grown plants is much stronger than the case against the FDA to regulate the marketing and sale of tobacco products to minors. Congress legislated comprehensively when it addressed the scope of federal protection of plants (PPA and PVPA), and it specifically stated which agency had authority to issue the grant of federal protection -- the PTO for asexually reproduced plants under the plant patent provisions of the general patent statute, 35 U.S.C. § § 161-64,

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

and the PVP Office and PVP Board for seeds **\*35** and seed grown plant varieties under the provisions of the PVPA, 7 U.S.C. § 2321 et seq.

 The Brown & Williamson dissent took issue with the majority's statutory construction analysis on the basis that the incremental tobacco specific legislation did not contain "a no jurisdiction assumption." Brown & Williamson, 529 U.S. at 182 (Breyer, J., dissenting). Specifically, the dissent argued "the subsequent legislative history" of the six tobacco specific acts "is critically ambivalent" on whether Congress intended to divest the FDA of whatever jurisdiction it may have had but historically never exercised over tobacco product marketing and sales to minors. Ibid. There is no such similar ambiguity with regard to the granting of federal protection of seeds and seed grown plants.

 First, the legislative history is not "critically ambivalent" as to Congress' intent on assigning agency jurisdiction to grant federal protection over seeds and seed grown plants. This history is detailed in the next subdivision of this brief.

 Second, and more important, Congress in the plant specific statutes themselves expressly assigned agency jurisdiction for the granting of federal protection over plants. In 1930 and 1952, Congress expressly stated in legislation that the PTO could issue patents on plants ("plant patents") but limited to those plants that are reproduced asexually. In 1970, Congress expressly stated in legislation that the PVP Office and PVP Board of the Department of Agriculture could issue patent-type protection (through PVP certificates) for seeds and seed grown plants. Congress gave the PTO no jurisdiction in any of these plant specific statutes to issue utility patents (or, for that matter, plant patents) on seeds and seed grown plants.

 **\*36** Imagine how the Brown & Williamson case would have been much simpler to decide had Congress passed and the president signed into law an enactment that comprehensively regulated the marketing and sale of tobacco products to minors and children. Imagine further that this enactment established a special agency within the Health and Human Services Department that was charged with responsibility to issue implementing regulations and administer the provisions of this comprehensive statute. Call this special agency the Tobacco Regulatory Administration (TRA). Assume further this enactment made no provision for the FDA's filling any role in the tobacco regulatory scheme. The later enacted comprehensive tobacco specific legislation would control over the earlier enacted and less specific FDA's general enabling statute. Romani, 523 U.S. at 530-31. The FDA could not regulate tobacco product marketing and sales to minors under this fact scenario, even applying the analysis of the Brown & Williamson dissent. Congress would have specifically expressed its intent to divest the FDA from a role when, through the enactment of subject matter specific legislation, it made the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

jurisdictional grant to the TRA.

   This hypothetical case is, of course, almost the exact fact pattern presented in the present appeal. Only the present appeal has an additional fact that makes this case even stronger than the TRA hypothetical case. Here, Congress did make a jurisdictional grant on the specific subject to the PTO, but limited the grant to the PTO's issuing patents to protect plants that are reproduced by asexual methods. Congress by plant specific legislation accorded jurisdiction in a specially created agency, the PVP Office and Board, to administer the grant of federal protection **37** of seeds and seed grown plants. Congress made no provision for the PTO to exercise jurisdiction over this same subject. To the contrary, Congress in 1930 and again in 1952 specifically limited the scope of the PTO's jurisdictional grant to plants that are reproduced asexually.

   D. The Legislative History Of The Plant Specific Acts Further Demonstrates Congress' Stated Intent That Sexually Reproduced Plant Varieties And Their Seeds Are Subject To Federal Protection Only Under The PVPA.

   Because the PTO board and Federal Circuit panel relied on legislative history to conclude utility patent protection exists for seeds and seed grown plants, the petitioners set forth the relevant legislative history of the plant specific enactments. This history demonstrates Congress' intention, as stated in the terms of the plant specific statutes themselves, that federal statutory protection of seeds and seed grown plants is exclusively available under the PVPA.

   The petitioners maintain the first and foremost source of authority for Congressional intent is the terms of the plant specific statutes themselves. For the reasons discussed in subdivisions I.B and C of this brief, those terms are not ambiguous. Congress specifically indicated its intent in the language of the statutes that federal protection of sexually reproducing plant varieties is exclusively available under the PVPA. An excursion into legislative history, while perhaps diverting, is not necessary let alone essential to decide this case. The PTO's Hibberd ruling and the Federal Circuit's Pioneer opinion illustrate that primary reliance on legislative history over the language Congress used in the statutes themselves can be tricky business. This is particularly so when a part **38** of a single sentence appearing in the legislative reports ("anything under the sun") is ripped out of its context and then isolated unto itself as the ultimate manifestation of Congress' actual intent.

The Senate Committee on Patents Report on the PPA provides:

I. Purposes of the Bill
   The purpose of the bill is to afford agriculture, so far as

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

practicable, the same opportunity to participate in the benefits of the patent system as has been given industry, and thus assist in placing agriculture on a basis of economic equality with industry. The bill will remove the existing discrimination between plant developers and industrial inventors. To these ends the bill provides that any person who invents or discovers a new and distinct variety of plant shall be given by patent an exclusive right to propagate that plant by asexual reproduction; that is by grafting, budding, cuttings, layering, division, and the like, but not by seeds. [Emphasis added]

Senate Report No. 315, Calendar 307 [To Accompany S. 4015], 71st Congress, April 2, 1930, p. 1. Senate Report No. 315 further provides at page 4 that the purpose of the PPA was to grant a limited form of protection:

On the other hand, it does not give any patent protection to the right of propagation of the new variety by seed, irrespective of the degree to which the seedlings come true to type.

Five years before the enactment of the 1970 PVPA, a presidential commission was appointed to work with Congress to review the operation of the United States patent system. Eighteen months were spent accomplishing this review. Patent Law Revision Hearings, Subcommittee on Patents, Trademarks, and Copyrights, Senate **\*39** Judiciary Committee, 90th Cong., 2nd Sess., 1968, Part 3. p. 648. One recommendation of the presidential commission was that all provisions in the patent statute for plant patents be deleted. Id. [FN11] The Department of Agriculture opposed a proposed amendment to expand the coverage of 35 U.S.C. § § 161-64, the plant patent provisions, to include patent protection for seeds and seed grown plants. Id. at 716. [FN12] These references are offered only to remind us of the extent of the continuing political debate that preceded the passage of the 1970 PVPA. Congress at this time once again considered the precise issue of whether patents should be issued to provide federal protection of seeds and seed grown plants. Congress again concluded seeds and seed grown plants should not be the subject of patent protection. Ultimately the interest groups involved in the debate received a political resolution of their positions by way of the passage of the PVPA. It is exactly this type of debate that is circumvented by the administrative and judicial amendment of § 101 that **\*40** reinserts "plants" without the asexual reproduction limitation imposed by Congress since 1930 when it first legislated on the precise issue.

FN11. The record of the 1968 Patent Law Revision Hearings, supra, provides at Part 3, p. 648: While the commission acknowledges the valuable contribution of plant breeders, it does not consider the patent system the proper vehicle for the protection of such subject matter regardless of whether the plants reproduce sexually or asexually.

FN12. The Department of Agriculture's statement at Part 3, p.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

716, of the 1968 Patent law Revision Hearings, supra, reads:
Our second ground of objection to the proposed amendment stems
from the fundamental differences between vegetative or asexual
reproduction of plants and the reproduction of plants by seed.
It is also because of these differences that patenting can be
a satisfactory medium only for the protection of asexually
reproduced plants.

When Congress passed the PVPA it declared its intent that Title 35
did confer patent protection that covered the sexual
reproduction of plant varieties when it stated at page 1 of House
Report No. 91-1605, 91st Cong., 2nd Sess. 1970, U.S.C.C.A.N. 5082,
October 13, 1970, under "Purpose":
Under patent law, protection is presently limited to those
varieties of plants which reproduce asexually, that is, by such
methods as grafting or budding. No protection is available to those
varieties of plants which reproduce sexually, that is, generally by
seeds. Thus, patent protection is not available with respect to new
varieties of most of the economically important agricultural crops,
such as cotton or soybeans.

The 1970 PVPA Senate Judiciary Committee's Report No. 91-1246
likewise indicates that Title 35 did not provide protection for
sexually reproducing plant varieties andtheir seeds. The report
further notes Congress again specifically determined that patent
protection of sexually reproducing plant varieties was not
appropriate, and that federal protection instead should be granted
under the provisions of the newly drafted PVPA. Senate Report No.
91- 1246 provides at pp. 2-3:
During the hearings by this committee's Subcommittee on Patents,
Trademarks, and Copyrights on the legislation providing for a
general revision of the patent laws, consideration was given to an
amendment of the plant patent section of the patent law. Under the
patent law, patent protection is limited to those varieties of
plants which reproduce asexually, that is, by such methods as
grafting or budding. **41** No protection is available to those
varieties of plants which reproduce sexually, that is, generally by
seeds. Thus, patent protection is not available with respect to new
varieties of most of the economically important agricultural crops,
such as cotton or soybeans. The Patent Subcommittee conducted
hearings on February 1, 1968, on an amendment to broaden the scope
of plant patent protection so as to apply to sexually reproduced
plants. A number of objections to this proposal were advanced
during the hearings, and no further action in that area has been
taken by the subcommittee.
Subsequently, legislation was introduced to encourage the
development of novel varieties of sexually reproduced plants by the
issuance of certificates of plant variety protection by the
Department of Agriculture. S. 3070, to establish such protection,
was reported by the Committee on Agriculture and Forestry, and on
August 24 this legislation was referred to this committee for the

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

purpose of reviewing its impact on the plant patent statute. The committee accordingly has examined S. 3070 and finds that it does not alter protection currently available within the patent system. The committee recommends the bill, S. 3070, favorably as amended. [FN13]

> FN13. The PTO board in Hibberd committed another obvious error on the legislative history when it relied on a partial sentence from the excerpted Senate Report No. 91-1246 to conclude that Congress actually had expressed its intent that seeds, seed grown plants and the parts thereof are patentable under § 101. Specifically, the board in Hibberd wrote in 227 U.S.P.Q. at 445: The examiner does not refer to the legislative histories of the plant-specific Acts to support his position as to the intent of Congress. Rather, he merely asserts, e.g., at page 2 of his answer, that "... it is clear that congress intended a 'distinct and new variety of plant' covered by the plant Patent Act to be something apart from the statutory categories of invention embraced by Section 101" and at page 3 "... the only reasonable statutory interpretation is that each [PPA and PVPA] carved out from Section 101, for specific treatment, the subject matter covered by each." However, as noted by appellants at page 17 of their brief, there is nothing in the legislative histories of the plant-specific Acts from which one could conclude that Congress intended to remove from protection under Section 101 any subject matter already within the scope of that section. Rather, the Senate committee on the Judiciary concluded on September 29, 1970 in its Report on Senate bill S.3070 in which it recommended passage of the Plant Variety Protection Act that " ... it does not alter protection currently available within the patent system."
> This paragraph demonstrates that the PTO board in Hibberd either never looked at the full text of the legislative reports or totally misunderstood them if it did look. The former is most likely. The Hibberd excerpt suggests the board, for recitation of the legislative history, entirely relied on the brief of a seed producer. This producer was the patent applicant and obviously wanted sexually reproducing plants to be the subject of utility patents. The Hibberd board simply assumed the partial quote from the report was contextually accurate, when in fact it patently was not. The full text of the Senate report, set forth in the text of this brief, shows that the PVPA "does not alter the protection currently available within the patent system" because seeds and seed grown plants were not and had never been included within the scope of patentable subject matter. Only plants reproduced by asexual methods were then patentable, under the provision of the 1930 PPA that amended the precursor of § 101 (Revised Statutes, § 4886) to include this category of plants.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**\*42** This legislative history is unmistakable. The PVPA was enacted because sexually reproducing plant varieties **\*43** and their seeds were not and had never been intended by Congress to be included within the classes of things patentable under Title 35.

E. The PTO And Federal Circuit's Interpretation Of § 101 Is Not Permissible Because Allowance Of Utility Patents And PVP Certificates On Seeds And Seed Grown Plants Results In Conflicting Federal Protection.

In subdivision I.B of this brief, the petitioners summarize as examples nine separate ways in which the issuance of both utility patents and PVP certificates on seeds and seed grown plants results in conflicts. The conflicts are direct. For example, the PVPA permits (a) a farmer to save seed from the protected plant variety to replant on his own farm in subsequent growing seasons, 7 U.S.C. § 2543, and (b) a plant breeder to conduct bona fide research on a protected plant variety and its seeds in order to produce a new variety subject to federal protection, id. at § 2544. [FN14] Each of these acts constitutes **\*44** infringement under utility patent law. See, e.g., Roche Products, 733 F.2d at 862-63.

> FN14. These sections of the PVPA, appearing in 7 U.S.C., provide (Pet.App. 48):
> 2543. Right to save seed; crop exemption
> Except to the extent that such action may constitute an infringement under subsection (3) and (4) of section 2541 of this title, it shall not infringe any right hereunder for a person to save seed produced by the person from seed obtained, or descended from seed obtained, by authority of the owner of the variety for seeding purposes and use such saved seed in the production of a crop for use on the farm of the person, or for sale as provided in this section. A bona fide sale for other than reproductive purposes, made in channels usual for such other purposes, of seed produced on a farm either from seed obtained by authority of the owner for seeding purposes or from seed produced by descent on such farm from seed obtained by authority of the owner for seeding purposes shall not constitute an infringement. A purchaser who diverts seed from such channels to seeding purposes shall be deemed to have notice under section 2567 of this title that the actions of the purchaser constitute an infringement.
> 2544. Research exemption
> The use and reproduction of a protected variety for plant breeding or other bona fide research shall not constitute an infringement of the protection provided under this chapter.

The Federal Circuit panel attempted to downplay the conflicts between utility patents issued on sexually reproducing plant varieties and PVPA certificates issued on the same varieties when

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

it observed in the following three conclusory sentences of its Pioneer opinion, 200 F.3d at 1378:

The district court observed, correctly, that the asserted conflict[s] [are] simply the difference in the rights and obligations imposed by the two statutes. It is not unusual for more than one statute to apply to a legal or property interest. For example, an ornamental design may qualify for protection under both copyright and design patent law. The fact that laws are of different scope does not invalidate the laws.

The panel cited no authority for its position. The cases cited by the district court do not support protection of sexually reproducing plant varieties under both the PVPA and utility patent provisions. This is because so-called "dual protection" cannot exist where each federal **45** statute purports to protect the same commercially valuable attribute(s) of a thing.

The valuable attribute of plants protected under the PVPA is that they can be multiplied by sexual reproduction on a commercially profitable scale. The district court in its order found that Title 35 and the PVPA protect the same right -- the right to exclude others from propagating (multiplying or increasing) a protected plant variety by means of sexual reproduction.

The district court principally relied on Mazer v. Stein, 347 U.S. 201 (1954). (Pet.App. 33-34.) In that case, the Court simply held statuettes having artistic value and that are incorporated into a lamp stand having utility could be the proper subject of copyright to protect the artistic value. Id. at 214-217. The statuettes/lamp stands were not patented and the issue of their patentability was not decided. Id. at 217. The Mazer Court found it important to explain that: "Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea -- not the idea itself." Ibid. The copyright statute and Title 35 deal with two different rights of exclusion. One statute (copyright) protects an identifiable and independent attribute of the stands, while another statute (patent) protects a different identifiable and separate attribute. There is not "dual" protection accorded by the two federal statutes -- both could not be applied to protect the same attribute of an item such as a lamp stand.

The district court and circuit panel did not address Ropat Corp. v. McGraw- Edison Co., 535 F.2d 378 (7thCir. 1976). The Ropat court ruled that, while a design patent **46** and a utility patent could be issued under Title 35 on the same construction, each patent must claim a separate, distinct patentable invention. Each of the patents could not be issued "if the feature in which the novel esthetic [a]ffect resides is the identical feature which produces the novel function so that a structure embodying the mechanical invention would of necessity embody the design, and vice versa." Id. at 381.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Congress itself expressed its intent that a copyright and a utility patent could not be issued to protect the same attribute of a construction. The Copyright Act provides at 17 U.S.C. § 101:

[T]he design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from and are capable of existing independently of, the utilitarian aspects of the article.

This Court recently acknowledged the rule that proscribes dual federal protection of the same valuable attribute(s) of a thing. In Traffix Devices, Inc. v. Marketing Displays, Inc., ___ U.S. ___, 121 S.Ct. 1255, 2001 WL 265741 (March 20, 2001), the unanimous Court reversed a circuit court's ruling that had allowed a utility patent holder to in effect extend the period of federal protection for his invention beyond the 20 years' grant contained in its utility patent. The holder had done so by asserting the Lanham Act's trade dress infringement provision protected its invention after the utility patent issued on that invention had expired. In making short work of this argument, the Court in Traffix concluded that statutory trade dress protection did not apply because the invention's purportedly trade dress protectable attributes were **\*47** the same ones previously protected by the utility patent -- specifically, the functional aspects of the invention, which could not be protected by two different federal statutes. 2001 WL 265741, at p. 7.

Dual protection of the same invention is exactly what the PTO board and Federal Circuit panel have sanctioned in the case at bar. Their orders impermissibly allow statutory protection under the PVPA for the right to multiply a plant variety by sexual reproduction while simultaneously allowing statutory protection under Title 35 for the same right. If a Title 35 utility patent and a Title 35 design patent cannot both be issued to provide protection for the same attributes of an invention (see Ropat) and the same is true of a Title 35 utility patent and a Lanham Act trade dress (see Traffix), then a Title 35 utility patent certainly cannot be issued to provide protection for the same valuable attributes of a thing (a plant variety's ability to sexually reproduce) that is subject to federal protection under a separate and more specific statute (the PVPA). Allowance of dual federal protection of seeds and seed grown plants is even more unjustified in this case than the rejected allowance of dual protection of the items of manufacture involved in Ropat and Traffix. Here, the federal statutes directly conflict on the scope of the protection accorded.

The nation's most important cash crops such as soybeans, cotton, corn, wheat and rice all require use of sexual reproduction (seeds) in order to produce crops in commercial quantities because these

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

crops must be replanted each year. Even breeders of plants such as bushes, trees and flowers that can be commercially produced by use of asexual reproduction make use of sexual reproduction during plant breeding research to develop new plants that are then asexually reproduced.

**\*48** Farmers across the nation now are being sued for patent infringement for saving seed to replant on their own farms. This is a direct result of the Hibberd ruling and the PTO's granting utility patents to federally protect seeds and seed grown plants. A farmer's act of saving seed for replanting in his own fields is not a violation of the PVPA. 7 U.S.C. § 2543; see also Asgrow Seed, 513 U.S. at 190-91. George Washington wrote "... it is miserable for a farmer to be obliged to buy his seeds; to exchange seeds may, in some cases, be useful, but to buy them after the first year is disreputable." (George Washington letter to farm manager William Pierce, November 16, 1791.) The 1994 PVPA Amendments House Report (Agricultural Committee) No. 103-699, Aug. 12, 1994 (To accompany H.R. 2927), provides in Section 10, p. 17:

SECTION 10 -- RIGHT TO SAVE SEED; CROP EXEMPTION

Section 10 of the bill amends section 113 of the PVPA by deleting the provision of current law that allows a person, whose primary farming occupation is the growing of crops for sale for other than reproductive purposes, to sell "saved seed" to other such persons, for reproductive purposes. The amendment does not diminish the right of a farmer to save seed for replanting and to use the resulting crop or to sell the seed for other than reproductive purposes.

It is not the intent of the Committee that deletion of the provision allowing the sale of saved seed to be viewed as a step toward the eventual end to the traditional right of farmers to save seed for use on their own holdings. \*\*\* The PTO and Federal Circuit's rulings put an end to the historically recognized and respected right to save seed.

**\*49** The agricultural industry has gone through a period of intense economic consolidation. Allowing twenty year utility patent protection of sexually reproduced plant varieties, the parts thereof and their seeds with no exemption for plant breeding research greatly increases the consolidation of plant gene pools within large corporate entities, contrary to the intent of Congress when it enacted the PPA and PVPA. 7 U.S.C. § 2544. Now a person or company wishing to engage in plant breeding research must take into account the risk of becoming embroiled in a patent infringement lawsuit. A plant's DNA is a storehouse of information that is communicated by RNA messages that manifest themselves in the characteristics of an offspring plant. It is essential that breeders have access to this DNA (a plant's germplasm). A plant's DNA cannot be "manufactured" -- it must be taken from the germplasm. Companies now using utility patents to lock up plant

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

genes for twenty years had previously enjoyed decades of the unfettered use in research of genes from plant varieties developed by others.

These essential PVPA provisions, 7 U.S.C. § § 2543 (seed saving) and 2544 (research exemption), directly conflict with a system of federal protection premised on utility patents. The PVPA is the exclusive source of federal protection for seeds, seed grown plants and the parts thereof.

CONCLUSION

Utility patents cannot be issued to protect seeds, seed grown plants and the parts thereof. The right to exclude others from sexually reproducing plant varieties is subject to federal protection exclusively under the PVPA. The right does not fall within the ambit of the utility patent subject matter provision, 35 U.S.C. § 101.

**\*50** The Court should declare each of the patents-in-suit invalid, and remand this case to the district court with directions that it (a) enter judgment for the petitioners on their patent invalidity defense, (b) order this action dismissed with prejudice and (c) assess all costs to the respondent.

**\*1a** 7 U.S.C. § 2321

2321. Establishment

There is hereby established in the Department of Agriculture an office to be known as the Plant Variety Protection Office, which shall have the functions set forth in this chapter.

7 U.S.C. § 2323

2323. Organization

The organization of the Plant Variety Protection Office shall, except as provided herein, be determined by the Secretary of Agriculture (hereinafter called the Secretary). The office shall devote itself substantially exclusively to the administration of this chapter.

7 U.S.C. § 2327

2327. Plant Variety Protection Board

(a) Appointment

The Secretary shall appoint a Plant Variety Protection Board. The Board shall consist of individuals who are experts in various areas of varietal development covered by this chapter. Membership of the Board shall include farmer representation and shall be drawn approximately equally from the private or seed industry sector and from the sector of government or the public. The Secretary or **\*2a**

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the designee of the Secretary shall act as chairperson of the Board without voting rights except in the case of ties.

(b) Functions of Board

The functions of the Plant Variety Protection Board shall include:

(1) Advising the Secretary concerning the adoption of Rules and Regulations to facilitate the proper administration of this chapter;

(2) Making advisory decisions on all appeals from the examiner. The Board shall determine whether to act as a full Board or by panels it selects; and whether to review advisory decisions made by a panel. For service on such appeals, the Board may select, as temporary members, experts in the area to which the particular appeal relates; and

(3) Advising the Secretary on all questions under section 2404 of this title.

(c) Compensation of Board

The members of the Plant Variety Protection Board shall serve without compensation except for standard government reimbursable expenses.

**\*3a** 7 U.S.C. § 2401

2401. Definitions and rules of construction

(a) Definitions

As used in this chapter:

(1) Basic seed

The term "basic seed" means the seed planted to produce certified or commercial seed.

(2) Breeder

The term "breeder" means the person who directs the final breeding creating a variety or who discovers and develops a variety. If the actions are conducted by an agent on behalf of a principal, the principal, rather than the agent, shall be considered the breeder. The term does not include a person who redevelops or rediscovers a variety the existence of which is publicly known or a matter of common knowledge.

(3) Essentially derived variety

(A) In general

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The term "essentially derived variety" means a variety that --

(i) is predominantly derived from another variety (referred to in this paragraph as the "initial variety") or from a variety that is predominantly derived from the initial variety, while retaining the expression of the essential characteristics that result from the genotype or combination of genotypes of the initial variety;

(ii) is clearly distinguishable from the initial variety; and

**\*4a** (iii) except for differences that result from the act of derivation, conforms to the initial variety in the expression of the essential characteristics that result from the genotype or combination of genotypes of the initial variety.

(B) Methods

An essentially derived variety may be obtained by the selection of a natural or induced mutant or of a somaclonal variant, the selection of a variant individual from plants of the initial variety, backcrossing, transformation by genetic engineering, or other method.

(4) Kind

The term "kind" means one or more related species or subspecies singly or collectively known by one common name, such as soybean, flax, or radish.

(5) Seed

The term "seed", with respect to a tuber propagated variety, means the tuber or the part of the tuber used for propagation.

(6) Sexually reproduced

The term "sexually reproduced" includes any production of a variety by seed, but does not include the production of a variety by tuber propagation.

(7) Tuber propagated

The term "tuber propagated" means propagated by a tuber or a part of a tuber.

**\*5a** (8) United States

The terms "United States" and "this country" mean the United States, the territories and possessions of the United States, and the Commonwealth of Puerto Rico.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(9) Variety

The term "variety" means a plant grouping within a single botanical taxon of the lowest known rank, that, without regard to whether the conditions for plant variety protection are fully met, can be defined by the expression of the characteristics resulting from a given genotype or combination of genotypes, distinguished from any other plant grouping by the expression of at least one characteristic and considered as a unit with regard to the suitability of the plant grouping for being propagated unchanged. A variety may be represented by seed, transplants, plants, tubers, tissue culture plantlets, and other matter.

(b) Rules of construction

For the purposes of this chapter:

(1) Sale or disposition for nonreproductive purposes

The sale or disposition, for other than reproductive purposes, of harvested material produced as a result of experimentation or testing of a variety to ascertain the characteristics of the variety, or as a by-product of increasing a variety, shall not be considered to be a sale or disposition for purposes of exploitation of the variety.

**\*6a** (2) Sale or disposition for reproductive purposes

The sale or disposition of a variety for reproductive purposes shall not be considered to be a sale or disposition for the purposes of exploitation of the variety if the sale or disposition is done as an integral part of a program of experimentation or testing to ascertain the characteristics of the variety, or to increase the variety on behalf of the breeder or the successor in interest of the breeder.

(3) Sale or disposition of hybrid seed

The sale or disposition of hybrid seed shall be considered to be a sale or disposition of harvested material of the varieties from which the seed was produced.

(4) Application for protection or entering into a register of varieties

The filing of an application for the protection or for the entering of a variety in an official register of varieties, in any country, shall be considered to render the variety a matter of common knowledge from the date of the application, if the application leads to the granting of protection or to the entering of the variety in the official register of varieties, as the case may be.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(5) Distinctness

The distinctness of one variety from another may be based on one or more identifiable morphological, physiological, or other characteristics (including any characteristics evidenced by processing or product characteristics, such as milling and baking characteristics in the case of wheat) with respect to which a difference in genealogy may contribute evidence.

**\*7a** (6) Publicly known varieties

(A) In general

A variety that is adequately described by a publication reasonably considered to be a part of the public technical knowledge in the United States shall be considered to be publicly known and a matter of common knowledge.

(B) Description

A description that meets the requirements of subparagraph (A) shall include a disclosure of the principal characteristics by which a variety is distinguished.

(C) Other means

A variety may become publicly known and a matter of common knowledge by other means.

7 U.S.C. § 2402

2402. Right to plant variety protection; plant varieties protectable

(a) In general

The breeder of any sexually reproduced or tuber propagated plant variety (other than fungi or bacteria) who has so reproduced the variety, or the successor in interest of the breeder, shall be entitled to plant variety protection for the variety, subject to the conditions and requirements of this chapter, if the variety is --

**\*8a** (1) new, in the sense that, on the date of filing of the application for plant variety protection, propagating or harvested material of the variety has not been sold or otherwise disposed of to other persons, by or with the consent of the breeder, or the successor in interest of the breeder, for purposes of exploitation of the variety --

(A) in the United States, more than 1 year prior to the date of filing; or

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(B) in any area outside of the United States --

(i) more than 4 years prior to the date of filing, except that in the case of a tuber propagated plant variety the Secretary may waive the 4-year limitation for a period ending 1 year after April 4, 1996; or

(ii) in the case of a tree or vine, more than 6 years prior to the date of filing;

(2) distinct, in the sense that the variety is clearly distinguishable from any other variety the existence of which is publicly known or a matter of common knowledge at the time of the filing of the application;

(3) uniform, in the sense that any variations are describable, predictable, and commercially acceptable; and

(4) stable, in the sense that the variety, when reproduced, will remain unchanged with regard to the essential and distinctive characteristics of the variety with a reasonable degree of reliability commensurate with that of varieties of the same category in which the same breeding method is employed.

**\*9a** (b) Multiple applicants

(1) In general

If 2 or more applicants submit applications on the same effective filing date for varieties that cannot be clearly distinguished from one another, but that fulfill all other requirements of subsection (a) of this section, the applicant who first complies with all requirements of this chapter shall be entitled to a certificate of plant variety protection, to the exclusion of any other applicant.

(2) Requirements completed on same date

(A) In general

Except as provided in subparagraph (B), if 2 or more applicants comply with all requirements for protection on the same date, a certificate shall be issued for each variety.

(B) Varieties indistinguishable

If the varieties that are the subject of the applications cannot be distinguished in any manner, a single certificate shall be issued jointly to the applicants.

7 U.S.C. § 2421

2421. Application for recognition of plant variety rights

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(a) An application for a certificate of Plant Variety Protection may be filed by the owner of the variety sought to be protected. The application shall be made in writing to the Secretary, shall be signed by or on behalf of **\*10a** the applicant, and shall be accompanied by the prescribed fee.

(b) An error as to the naming of the breeder, without deceptive intent, may be corrected at any time, in accordance with regulations established by the Secretary.

7 U.S.C. § 2422

2422. Content of application

An application for a certificate recognizing plant variety rights shall contain:

(1) The name of the variety except that a temporary designation will suffice until the certificate is to be issued. The variety shall be named in accordance with regulations issued by the Secretary.

(2) A description of the variety setting forth its distinctiveness, uniformity, and stability and a description of the genealogy and breeding procedure, when known. The Secretary may require amplification, including the submission of adequate photographs or drawings or plant specimens, if the description is not adequate or as complete as is reasonably possible, and submission of records or proof of ownership or of allegations made in the application. An applicant may add to or correct the description at any time, before the certificate is issued, upon a showing acceptable to the Secretary that the revised description is retroactively accurate. Courts shall protect others from any injustice which would result. The Secretary may accept records of the breeder and of any **\*11a** official seed certifying agency in this country as evidence of stability where applicable.

(3) A statement of the basis of the claim of the applicant that the variety is new.

(4) A declaration that a viable sample of basic seed (including any propagating material) necessary for propagation of the variety will be deposited and replenished periodically in a public repository in accordance with regulations to be established hereunder.

(5) A statement of the basis of applicant's ownership.

7 U.S.C. § 2483

2483. Contents and term of plant variety protection

(a) Certificate

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(1) Every certificate of plant variety protection shall certify that the breeder (or the successor in interest of the breeder), [FN1] has the right, during the term of the plant variety protection, to exclude others from selling the variety, or offering it for sale, or reproducing it, or importing it, or exporting it, or using it in producing (as distinguished from developing) a hybrid or different variety therefrom, to the extent provided by this chapter.

FN1. So in original. The comma probably should not appear.

(2) If the owner so elects, the certificate shall --

**\*12a** (A) specify that seed of the variety shall be sold in the United States only as a class of certified seed; and

(B) if so specified, conform to the number of generations designated by the owner.

(3) An owner may waive a right provided under this subsection, other than a right that is elected by the owner under paragraph (2)(A).

(4) The Secretary may at the discretion of the Secretary permit such election or waiver to be made after certificating and amend the certificate accordingly, without retroactive effect.

(b) Term

(1) In general

Except as provided in paragraph (2), the term of plant variety protection shall expire 20 years from the date of issue of the certificate in the United States.

(2) Exceptions

If the certificate is not issued within three years from the effective filing date, the Secretary may shorten the term by the amount of delay in the prosecution of the application attributed by the Secretary to the applicant, except that --

(A) in the case of a tuber propagated plant variety subject to a waiver granted under section 2402(a)(1)(B)(i) of this title, the term of the plant variety protection shall expire 20 years after the date of the original grant of the plant breeder's rights to the variety outside the United States; and

**\*13a** (B) in the case of a tree or vine, the term of the plant variety protection shall expire 25 years from the date of issue of

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

the certificate.

 (c) Expiration upon failure to comply with regulations; notice

 The term of plant variety protection shall also expire if the owner fails to comply with regulations, in force at the time of certificating, relating to replenishing seed in a public repository, or requiring the submission of a different name for the variety, except that this expiration shall not occur unless notice is mailed to the last owner recorded as provided in section 2531(d) of this title and the last owner fails, within the time allowed thereafter, not less than three months, to comply with said regulations, paying an additional fee to be prescribed by the Secretary.

                         7 U.S.C. § 2541
 2541. Infringement of plant variety protection

 (a) Acts constituting infringement

 Except as otherwise provided in this subchapter, it shall be an infringement of the rights of the owner of a protected variety to perform without authority, any of the following acts in the United States, or in commerce which can be regulated by Congress or affecting such commerce, prior to expiration of the right to plant variety protection but after either the issue of the certificate or the distribution of a protected plant variety with the notice under section 2567 of this title:

 **\*14a** (1) sell or market the protected variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it;

 (2) import the variety into, or export it from, the United States;

 (3) sexually multiply, or propagate by a tuber or a part of a tuber, the variety as a step in marketing (for growing purposes) the variety;

 (4) use the variety in producing (as distinguished from developing) a hybrid or different variety therefrom;

 (5) use seed which had been marked "Unauthorized Propagation Prohibited" or "Unauthorized Seed Multiplication Prohibited" or progeny thereof to propagate the variety;

 (6) dispense the variety to another, in a form which can be propagated, without notice as to being a protected variety under which it was received;

 (7) condition the variety for the purpose of propagation, except

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

to the extent that the conditioning is related to the activities permitted under section 2543 of this title;

 (8) stock the variety for any of the purposes referred to in paragraphs (1) through (7);

 (9) perform any of the foregoing acts even in instances in which the variety is multiplied other than sexually, except in pursuance of a valid United States plant patent; or

 (10) instigate or actively induce performance of any of the foregoing acts.

 **\*15a** (b) Uses authorized by owner

 (1) Subject to paragraph (2), the owner of a protected variety may authorize the use of the variety under this section subject to conditions and limitations specified by the owner.

 (2) In the case of a contract between a seed producer and the owner of a protected variety of lawn, turf, or forage grass seed, or alfalfa or clover seed for the production of seed ofthe protected variety, the producer shall be deemed to be authorized by the owner to sell such seed and to use the variety if --

 (A) the producer has fulfilled the terms of the contract;

 (B) the owner refuses to take delivery of the seed or refuses to pay any amounts due under the contract within 30 days of the payment date specified in the contract; and

 (C) after the expiration of the period specified in subparagraph (B), the producer notifies the owner of the producer's intent to sell the seed and unless the owner fails to pay the amounts due under the contract and take delivery of the seed within 30 days of such notification. For the purposes of this paragraph, the term "owner" shall include any licensee of the owner.

 (3) Paragraph (2) shall apply to contracts entered into with respect to plant varieties protected under this chapter as in effect on the day before the effective date of this provision as well as plant varieties protected under this chapter as amended by the Plant Variety Protection Act Amendments of 1994.

 **\*16a** (4) Nothing in this subsection shall affect any other rights or remedies of producers or owners that may exist under other Federal or State laws.

 (c) Applicability to certain plant varieties

 This section shall apply equally to --

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(1) any variety that is essentially derived from a protected variety, unless the protected variety is an essentially derived variety;

(2) any variety that is not clearly distinguishable from a protected variety;

(3) any variety whose production requires the repeated use of a protected variety; and

(4) harvested material (including entire plants and parts of plants) obtained through the unauthorized use of propagating material of a protected variety, unless the owner of the variety has had a reasonable opportunity to exercise the rights provided under this chapter with respect to the propagating material.

(d) Acts not considered infringing

It shall not be an infringement of the rights of the owner of a variety to perform any act concerning propagating material of any kind, or harvested material, including entire plants and parts of plants, of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States, unless the act involves further propagation of the variety or involves an export of material of the variety, that enables the propagation of the variety, into a country that does not protect **\*17a** varieties of the plant genus or species to which the variety belongs, unless the exported material is for final consumption purposes.

(e) Private noncommercial uses

It shall not be an infringement of the rights of the owner of a variety to perform any act done privately and for noncommercial purposes.

(f) "Perform without authority" defined

As used in this section, the term "perform without authority" includes performance without authority by any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in the official capacity of the officer or employee. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

7 U.S.C. § 2543

2543. Right to save seed; crop exemption

Except to the extent that such action may constitute an infringement under subsections (3) and (4) of section 2541 of this title, it shall not infringe any right hereunder for a person to

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

save seed produced by the person from seed obtained, or descended
from seed obtained, by authority of the owner of the variety for
seeding purposes and use such saved seed in the production of a
crop for use on the farm of the person, or for sale as provided
**18a** in this section. A bona fide sale for other than reproductive
purposes, made in channels usual for such other purposes, of seed
produced on a farm either from seed obtained by authority ofthe
owner for seeding purposes or from seed produced by descent on such
farm from seed obtained by authority of the owner for seeding
purposes shall not constitute an infringement. A purchaser who
diverts seed from such channels to seeding purposes shall be deemed
to have notice under section 2567 of this title that the actions of
the purchaser constitute an infringement.

7 U.S.C. § 2544

2544. Research exemption

The use and reproduction of a protected variety for plant breeding
or other bona fide research shall not constitute an infringement of
the protection provided under this chapter.

7 U.S.C. § 2567

2567. Limitation of damages; marking and notice

Owners may give notice to the public by physically associating
with or affixing to the container of seed of a variety or by fixing
to the variety, a label containing either the words "Unauthorized
Propagation Prohibited" or the words "Unauthorized Seed
Multiplication Prohibited" and after the certificate issues, such
additional **19a** words as "U.S. Protected Variety". In the event the
variety is distributed by authorization of the owner and is
received by the infringer without such marking, no damages shall be
recovered against such infringer by the owner in any action for
infringement, unless the infringer has actual notice of knowledge
that propagation is prohibited or that the variety is a protected
variety, in which event damages may be recovered only for
infringement occurring after such notice. As to both damages and
injunction, a court shall have discretion to be lenient as to
disposal of materials acquired in good faith by acts prior to such
notice.

35 U.S.C. § 101

101. Inventions patentable

Whoever invents or discovers any new and useful process, machine,
manufacture, or composition of matter, or any new and useful
improvement thereof, may obtain a patent therefor, subject to the
conditions and requirements of this title.

35 U.S.C. § 112

112. Specification

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact **\*20a** terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.

A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified **\*21a** function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 119

119. Benefit of earlier filing date; right of priority

(a) An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

patent shall be granted on any application for patent for an invention which had been patented or described in a printed publication in any country more than one year before the date of the actual filing of the application in this country, or which had been in public use or on sale in this country more than one year prior to such filing.

(b)(1) No application for patent shall be entitled to this right of priority unless a claim is filed in the Patent and Trademark Office, identifying the foreign application **\*22a** by specifying the application number on that foreign application, the intellectual property authority or country in or for which the application was filed, and the date of filing the application, at such time during the pendency of the application as required by the Director.

(2) The Director may consider the failure of the applicant to file a timely claim for priority as a waiver of any such claim. The Director may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed claim under this section.

(3) The Director may require a certified copy of the original foreign application, specification, and drawings upon which it is based, a translation if not in the English language, and such other information as the Director considers necessary. Any such certification shall be made by the foreign intellectual property authority in which the foreign application was filed and show the date of the application and of the filing of the specification and other papers.

(c) In like manner and subject to the same conditions and requirements, the right provided in this section may be based upon a subsequent regularly filed application in the same foreign country instead of the first filed foreign application, provided that any foreign application filed prior to such subsequent application has been withdrawn, abandoned, or otherwise disposed of, without having been laid open to public inspection and without leaving any rights outstanding, and has not served, nor thereafter shall serve, as a basis for claiming a right of priority.

**\*23a** (d) Applications for inventors' certificates filed in a foreign country in which applicants have a right to apply, at their discretion, either for a patent or for an inventor's certificate shall be treated in this country in the same manner and have the same effect for purpose of the right of priority under this section as applications for patents, subject to the same conditions and requirements of this section as apply to applications for patents, provided such applicants are entitled to the benefits of the Stockholm Revision of the Paris Convention at the time of such filing.

(e)(1) An application for patent filed under section 111(a) or

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

section 363 of this title for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in a provisional application filed under section 111(b) of this title, by an inventor or inventors named in the provisional application, shall have the same effect, as to such invention, as though filed on the date of the provisional application filed under section 111(b) of this title, if the applicationfor patent filed under section 111(a) or section 363 of this title is filed not later than 12 months after the date on which the provisional application was filed and if it contains or is amended to contain a specific reference to the provisional application. No application shall be entitled to the benefit of an earlier filed provisional application under this subsection unless an amendment containing the specific reference to the earlier filed provisional application is submitted at such time during the pendency of the application as required by the Director. The Director may consider the failure to submit such an amendment within that time period as a waiver of any benefit under this subsection. The Director **24a** may establish procedures, including the payment of a surcharge, to accept an unintentionally delayed submission of an amendment under this subsection during the pendency of the application.

(2) A provisional application filed under section 111(b) of this title may not be relied upon in any proceeding in the Patent and Trademark Office unless the fee set forth in subparagraph (A) or (C) of section 41(a)(1) of this title has been paid.

(3) If the day that is 12 months after the filing date of a provisional application falls on a Saturday, Sunday, or Federal holiday within the District of Columbia, the period of pendency of the provisional application shall be extended to the next succeeding secular or business day.

(f) Applications for plant breeder's rights filed in a WTO member country (or in a foreign UPOV Contracting Party) shall have the same effect for the purpose of the right of priority under subsections (a) through (c) of this section as applications for patents, subject to the same conditions and requirements of this section as apply to applications for patents.

(g) As used in this section --

(1) the term "WTO member country" has the same meaning as the term is defined in section 104(b)(2) of this title; and

(2) the term "UPOV Contracting Party" means a member of the International Convention for the Protection of New Varieties of Plants.

**25a** 35 U.S.C. § 154

154. Contents and term of patent; provisional rights

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(a) In General. --

(1) Contents. -- Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

(2) Term. -- Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c) of this title, from the date on which the earliest such application was filed.

(3) Priority. -- Priority under section 119, 365(a), or 365(b) of this title shall not be taken into account in determining the term of a patent.

(4) Specification and drawing. -- A copy of the specification and drawing shall be annexed to the patent and be a part of such patent.

    ***

                    **\*26a** 35 U.S.C. § 161

161. Patents for plants

Whoever invents or discovers and asexually reproduces any distinct and new variety of plant, including cultivated sports, mutants, hybrids, and newly found seedlings, other than a tuber propagated plant or a plant found in an uncultivated state, may obtain a patent therefor, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for plants, except as otherwise provided.

                    35 U.S.C. § 162

162. Description, claim

No plant patent shall be declared invalid for noncompliance with section 112 of this title if the description is as complete as is reasonably possible.

The claim in the specification shall be in formal terms to the plant shown and described.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

**\*27a** 35 U.S.C. § 163

163. Grant

 In the case of a plant patent, the grant shall include the right
to exclude others from asexually reproducing the plant, and from
using, offering for sale, or selling the plant so reproduced, or
any of its parts, throughout the United States, or from importing
the plant so reproduced, or any parts thereof, into the United
States.

35 U.S.C. § 164

164. Assistance of Department of Agriculture

 The President may by Executive order direct the Secretary of
Agriculture, in accordance with the requests of the Director, for
the purpose of carrying into effect the provisions of this title
with respect to plants (1) to furnish available information of the
Department of Agriculture, (2) to conduct through the appropriate
bureau or division of the Department research upon special
problems, or (3) to detail to the Director officers and employees
of the Department.

35 U.S.C. § 271

271. Infringement of patent

 (a) Except as otherwise provided in this title, whoever without
authority makes, uses, offers to sell, or sells **\*28a** any patented
invention, within the United States or imports into the United
States any patented invention during the term of the patent
therefor, infringes the patent.

 (b) Whoever actively induces infringement of a patent shall be
liable as an infringer.

 (c) Whoever offers to sell or sells within the United States or
imports into the United States a component of a patented machine,
manufacture, combination or composition, or a material or apparatus
for use in practicing a patented process, constituting a material
part of the invention, knowing the same to be especially made or
especially adapted for use in an infringement of such patent, and
not a staple article or commodity of commerce suitable for
substantial noninfringing use, shall be liable as a contributory
infringer.

 (d) No patent owner otherwise entitled to relief for infringement
or contributory infringement of a patent shall be denied relief or
deemed guilty of misuse or illegal extension of the patent right by
reason of his having done one or more of the following: (1) derived
revenue from acts which if performed by another without his consent
would constitute contributory infringement of the patent; (2)
licensed or authorized another to perform acts which if performed

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another **\*29a** patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

   \*\*\*

                              DIGEST


J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.


291    PATENTS
291I      Subjects of Patents
 Most Cited Cases
291k14   k. Compositions of matter. Most Cited Cases
Are patents granting the right to exclude others from sexually reproducing plants or plant varieties, or from selling or using plants or plant varieties reproduced by means of sexual reproduction by seed, invalid because the Plant Variety Protection Act of 1970 and the Plant Patent Act of 1930 are the exclusive means of obtaining a federal statutory right to exclude others from reproducing, selling, or using plants or plant varieties? Plant Variety Protection Act, § 1 et seq., 7 U.S.C.A. § 2321 et seq.; 35 U.S.C.A. § § 101, 161 et seq.

U.S.Pet.Brief,2001.
 2001 WL 499137 (U.S.Pet.Brief)
END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works