**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE CRUCIFEROUS SPROUT LITIGATION | ) ) ) ) | Civil Action No.:  MDL-1388 Hon. William M. Nickerson |

**PLAINTIFFS' MEMORANDUM ON CLAIM CONSTRUCTION AND IN OPPOSITION
TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT RE:
INVALIDITY OF THE PATENTS-IN-SUIT, AND PLAINTIFFS' MEMORANDUM IN
SUPPORT OF PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT THAT
THE PATENTS-IN-SUIT ARE NOT INVALID**

E. Anthony Figg
Joseph A. Hynds
Mark I. Bowditch
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
Suite 701 East Tower
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 783-6040
*Lead Counsel and Co-Liaison Counsel for Plaintiffs*

Co-Liaison Counsel for Plaintiffs:
Paul Mark Sandler
William Michael Mullen
Freishtat and Sandler
201 E. Baltimore Street
Suite 1500
Baltimore, MD 21202
(410) 727-7740

## **Table of Contents**

Table of Authorities
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.     The Brassica Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.     The Validity of the '895 Patent Was Re-Affirmed By the Patent and Trademark
            Office in the Reexamination Proceeding Over Virtually the Identical Prior Art
            Upon Which Defendants Rely . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.     The Prior Art upon Which Defendants Rely Was Considered  and Rejected by the
            Patent Office During the Prosecution of the '505 and '567 Patents . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     CLAIM CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A.     Claims Are to Be Construed as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     B.     There Is No Dispute Regarding Construction of Claims 1-6 of the '895 Patent . . . . . . . 13
            1.     Claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            2.     Claim 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            3.     Claims 3-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     C.     Defendants Improperly Construe Claims 1 and 8 of the '567 Patent . . . . . . . . . . . . . . 16
            1.     Claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            2.     Claim 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     D.     Defendants Improperly Construe Claims 1 and 16 of the '505 Patent . . . . . . . . . . . . . . 19
            1.     Claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            2.     Claim 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.     DEFENDANTS HAVE COMPLETELY FAILED TO SHOW THAT THE PRIOR ART
       ANTICIPATES THE CHALLENGED CLAIMS UNDER 35 U.S.C. §102 . . . . . . . . . . . . . . . 22

A. The Prior Art Does Not Disclose a Method of Making a Food Product Comprising Sprouts That Are "Rich in Glucosinolates" or Contain "High Levels of Phase 2 Enzyme-Inducing Potential" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. Defendants Cannot Show That the Prior Art Inherently Discloses a Method of Making a Food Product Comprising Sprouts That Are "Rich in Glucosinolates" or Contain "High Levels of Phase 2 Enzyme-Inducing Potential" . . . . . . . . . . . . . . 23
   1. Defendants Present No Evidence Showing Inherency . . . . . . . . . . . . . . . . . . . . . . 24
   2. The Uncontroverted Evidence of Record Shows That There Is No Inherency . . 25
   3. Defendants' Argument Regarding Unpatentability of "Natural" Products and Processes Is a Red Herring and Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   4. Defendants' Reliance on Titanium Metals Is Misplaced . . . . . . . . . . . . . . . . . . . 33
   5. Defendants' Ability to Meet Their Heavy Burden of Proof Is More Difficult Here Because Their Arguments Concerning Anticipation by Inherency were Rejected by the Patent Office During Reexamination of the '895 Patent . . . . . . . . . . . . . 37
      a. The Confirmation of Validity In the Reexamination Over Defendants' Inherent Anticipation Argument is Entitled to Deference . . . . . . . . . . . 38
      b. Brassica Did Not Misstate the Law During the Reexamination Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      c. The Cornucopia Reference Is Cumulative of References Considered in the Reexamination Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

C. Defendants' Motion Should Be Denied for the Additional Reason That Defendants Have Failed To Show that The Prior Art Discloses Several Other Elements of the Claimed Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

III. DEFENDANTS' ARGUMENT THAT THE BRASSICA PATENTS ARE INVALID UNDER 35 U.S.C. §101 IS MERITLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT OF NO ANTICIPATION . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## **Table of Authorities**

### **Cases**

American Hoist & Derrick Co. v. Sowa & Sons, Inc.,
725 F.2d 1350 (Fed. Cir.), cert denied, 469 U.S. 821(1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Applied Materials v. Advanced Semiconductor Materials Am.,
98 F.3d 1563 (Fed. Cir. 1996), cert. denied, 520 U.S. 1230 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Atlas Powder Co. v. IRECO Inc.,
190 F.3d 1342 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22, 36

Autogiro Co. of Am. v. United States,
384 F.2d 391 (Ct. Cl. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Beachcombers, Int'l v. Wildewood Creative Prods.,
31 F.3d 1154 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20, 21

Bird Provision Co. v. Owens Country Sausage, Inc.,
568 F.2d 369 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Brassica Protection Products et al. v. Sproutman et al.,
C.A. 99-350-SLR (D. Del.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Diamond v. Chakrabarty,
447 U.S. 303 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Digital Biometrics v. Identix, Inc.,
149 F.3d 1335 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

DMI, Inc. v. Deere & Co.,
755 F.2d 1570 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

E. I. Du Pont de Nemours & Co. v. Cetus Corp.,
19 U.S.P.Q.2d 1174 (N.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,
849 F.2d 1430 (Fed. Cir.), cert. denied, 488 U.S. 986 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 36

E. I. Du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,
706 F. Supp. 1135 (D. Del. 1989), aff'd, 887 F.2d 1095 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 38

Ex parte Hibberd,
227 U.S.P.Q. 443 (Bd. Pat. App. & Interferences 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Finnigan Corp. v. ITC,
180 F.3d 1354 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 23, 30

Funk Bros. Seed Co. v. Kalo Inoculant Co.,
333 U.S. 127, 68 S. Ct. 440 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 45, 46

Georgia Kaolin Co. v. Thiele Kaolin Co.,
228 F.2d 267 (5th Cir. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45, 47

Glaxo, Inc. v. Novopharm, Ltd,
830 F. Supp. 871 (E.D.N.C. 1993),
aff'd, 52 F.3d 1043 (Fed. Cir. 1995),
cert. denied, 516 U.S. 988 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 36

Hybritech, Inc. v. Monoclonal Antibodies, Inc.,
802 F.2d 1367 (Fed. Cir. 1986), cert. denied, 480 U.S. 947 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 32, 47

In re Application of Bergy,
596 F.2d 952 (C.C.P.A. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-45, 47

In re Etter,
756 F.2d 852 (Fed. Cir. 1985), cert. denied sub nom.,
Etter v. Commissioner of Patents and Trademarks, 474 U.S. 828 (1985) . . . . . . . . . . . . . . . . . . . . . . . 39

In re Kratz,
592 F.2d 1169 (C.C.P.A. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 47

In re Mancy,
499 F.2d 1289 (C.C.P.A. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44, 47

In re Schneider,
481 F.2d 1350 (C.C.P.A. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

iv

In re Schreiber,
128 F.3d 1473 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

In re Spada,
911 F.2d 705 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In re Woodruff,
919 F.2d 1575 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Intellicall, Inc. v. Phonometrics, Inc.,
952 F.2d 1384 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

Loctite Corp. v. Ultraseal, Ltd.,
781 F.2d 861 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Mahurkar v. C.R. Bard, Inc.,
79 F.3d 1572 (Fed. Cir. 1996), cert. denied, 525 U.S. 1106 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Markman v. Westview Instruments, Inc.,
52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370  (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

MEHL/Biophile Int'l Corp. v. Milgraum,
192 F.3d 1362 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 36

Merck & Co. v. Chase Chem. Co.,
273 F. Supp. 68 (D.N.J. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Merck & Co. v. Olin Mathieson Chem. Corp.,
253 F.2d 156 (4th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 47

Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,
976 F.2d 1559 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Scripps Clinic & Research Found. v. Genentech, Inc.,
927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 47

Senior Techs., Inc. v. R.F. Techs., Inc.,
2001 U.S. App. LEXIS 4179 (Fed. Cir. Mar. 12, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 20

Standard Oil Co. v. Montedison, S.p.A.,
664 F.2d 356 (3rd Cir. 1981), cert. denied sub nom.,
Montedison S.p.A. v. Phillips Petroleum Co., 456 U.S. 915 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Tandon Corp. v. U.S. Int'l Trade Comm'n,
831 F.2d 1017 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Telemac Cellular Corp. v. Topp Telecom, Inc.,
247 F.3d 1316 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Texas Instruments Inc. v. United States ITC,
988 F.2d 1165 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Titanium Metals Corp. v. Banner,
778 F.2d 775 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-37, 40

Transmatic, Inc. v. Gulton Indus.,
53 F.3d 1270 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 47

Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,
750 F.2d 1552 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Diebold, Inc.,
369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Verdegaal Bros., Inc. v. Union Oil Co.,
814 F.2d 628 (Fed. Cir. 1987), cert. denied, 484 U.S. 827 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Vitamin Technologists, Inc. v. Wisconsin Alumni Research Found.,
146 F.2d 941 (9th Cir. 1945), cert. denied, 325 U.S. 876 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Vitronics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,
520 U.S. 17, on remand, 114 F.3d 1161 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statutes**

35 U.S.C. §101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 42-45

35 U.S.C. §102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7, 8, 22, 37, 45

35 U.S.C. §103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 37, 44

35 U.S.C. §112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

35 U.S.C. §282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 37, 38

37 C.F.R. §1.111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-11

37 C.F.R. §1.510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

## INTRODUCTION

Plaintiffs, Brassica Protection Products LLC and Johns Hopkins University (collectively "Brassica"), respectfully submit this memorandum in opposition to the defendants' joint motion for partial summary judgment of invalidity of certain claims of U.S. Patent No. 5,725,895 (the "'895 patent"), U.S. Patent No. 5,968,567 (the "'567 patent") and U.S. Patent No. 5,968,505 (the "'505 patent") (collectively "the Brassica patents"), and in support of Brassica's cross motion for summary judgment that those claims of the Brassica patents are not invalid.

Defendants request judgment as a matter of law that claims 1-6 of the '895 patent, claims 1 and 8 of the '567 patent, and claims 1 and 16 of the '505 patent are invalid under 35 U.S.C. §102(b) as anticipated by several prior art references.  See Memorandum in Support of Defendants' Motion for Partial Summary Judgment Re: Invalidity of U.S. Patents Nos. 5,725,895, 5,968,567 and 5,968,505 ("Defendants' Memorandum I"),[1] p.1.  Claims 7-16 of the '895 patent, claims 2-7 and 9-22 of the '567 patent and claims 2-15 and 17-20 of the '505 patent are not at issue in the defendants' motion for summary judgment.[2]

Summary judgment is appropriate only if no material fact is genuinely disputed and judgment may be entered as a matter of law.  Fed. R. Civ. P. 56(c); Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d

---

[1]    Defendants also filed a first supplemental memorandum on March 1, 2001 and a second supplemental memorandum on June 7, 2001 in support of their summary judgment motion.  The first and second supplemental memoranda will be referred to herein as "Defendants' Memorandum II" and "Defendants' Memorandum III", respectively.

[2]    Contrary to the assertions of the defendants, because the present motion relates only to 10 out of 58 claims in the patents-in-suit, its determination will not be dispositive of all of the issues of this litigation.

1

1384, 1387 (Fed. Cir. 1992). To establish that defendants are entitled to summary judgment of invalidity under 35 U.S.C. §102(b), they must prove by clear and convincing evidence that a prior art reference discloses within its four corners each element of each claim, either expressly or inherently (<u>Atlas Powder Co. v. IRECO Inc.</u>, 190 F.3d 1342, 1347 (Fed. Cir. 1999)), and that there are no material questions of fact as to whether each of the prior art references contains this disclosure. Defendants do not come close to satisfying these burdens, and their motion should be denied for at least each of the following separate and independent reasons.

<u>First</u>, defendants fail to establish that the prior art references disclose each and every limitation of the claims being challenged, as required under 35 U.S.C. §102(b). For example, defendants fail to establish that the prior art discloses a method of making a food product comprising cruciferous sprouts that "are rich in glucosinolates" or contain "high levels of Phase 2 enzyme-inducing potential." <u>See</u> '895 patent (Ex. 1), claims 1-6; '567 patent (Ex. 2), claims 1 and 8; '505 patent (Ex. 3), claims 1 and 16. Defendants concede that the prior art references do not expressly disclose these limitations (Defendants' Memorandum I, p. pp. 8-9; Defendants' Memorandum II, pp. 10, 19; Defendants' Memorandum III, pp. 1, 11-12), but argue instead that these limitations are "inherently" present in the prior art disclosures. Defendants' Memorandum I, pp. 8-9; Defendants' Memorandum II, pp. 9-10; Defendants' Memorandum III, pp. 7-12. However, Defendants seriously misconstrue the law of inherency and the application of that law to the admitted facts of this case.

Under the principles of inherency, if the prior art <u>necessarily</u> functions in accordance with, or includes, the claimed limitations, it anticipates the claimed invention. <u>Atlas Powder</u>, 190 F.3d at 1347. Inherency cannot be established by possibilities or probabilities. <u>Finnigan Corp. v. ITC</u>, 180 F.3d 1354,

2

1365 (Fed. Cir. 1999).  Inherent anticipation requires that one following the teachings of the prior art must invariably produce the claimed invention.  <u>Applied Materials v. Advanced Semiconductor Materials Am.</u>, 98 F.3d 1563, 1576 (Fed. Cir. 1996), <u>cert. denied</u>, 520 U.S. 1230 (1997).  Defendants utterly fail to meet this high standard.  Indeed, defendants fail to provide this Court with any evidence whatsoever that the alleged prior art references disclose food products made with cruciferous sprouts that are inherently "rich in glucosinolates" or "high levels of Phase 2 enzyme-inducing potential." Defendants therefore have not carried their burden of establishing that the prior art references disclose each element of the challenged claims, and their motion should be denied for this reason alone.

<u>Second</u>, not only have defendants failed to provide any evidence establishing inherency, the evidence of record, which defendants do not dispute (Defendants' Memorandum II at 14-15; Defendants' Memorandum III, p. 11), establishes conclusively that food products made with cruciferous sprouts allegedly disclosed in the prior art references are <u>not</u> inherently "rich in glucosinolates" or inherently have "high levels of Phase 2 enzyme-inducing potential."  In particular, the evidence before the Patent Office forming part of the prosecution histories of the Brassica patents establishes that there is a wide variation in glucosinolate levels among various cultivars of cruciferous sprouts.  Some cultivars produce sprouts rich in glucosinolates, most do not.  Defendants' inherency argument is that one following the prior art would have a certain probability of selecting a cultivar that would produce glucosinolate-rich sprouts.  But the prior art provides no guidance or motivation for making such a selection.  This wide variation in glucosinolate levels is the very antithesis of "inherency," which requires that the property necessarily be present in the prior art disclosure, and not merely possibly or probably present.  <u>Finnigan</u>, 180 F.3d at 1365.  Indeed, the Patent and Trademark Office specifically found during the reexamination

3

of the '895 patent that the prior art -- <u>which is virtually the same prior art being relied upon by defendants in this case</u> -- did not inherently anticipate the Brassica patents. Thus, to the extent that defendants could produce any evidence that the prior art references disclose methods of making food products that are inherently rich in glucosinolates -- which they have not done and cannot do -- defendants <u>at best</u> would create a factual dispute on this issue, precluding summary judgment for yet another reason.

<u>Third</u>, defendants' request for summary judgment is also inappropriate because of their failure also to establish that the prior art discloses, either expressly or inherently, several other claim elements: (a) method of making a food product comprising sprouts having non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates (<u>see</u> '895 patent (Ex. 1), claim 2; '567 patent (Ex. 2), claims 1 and 8; and '505 patent (Ex. 3), claims 1 and 16); (b) the identification of seeds that produce sprouts rich in glucosinolates, or having high levels of Phase 2 enzyme-inducing potential, and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates (<u>see</u> '567 patent (Ex. 2), claims 1 and 8; and '505 patent (Ex. 3), claims 1 and 16); (c) any method using such sprouts to increase the chemoprotective amount of Phase 2 enzymes in a mammal (<u>see</u> '505 patent (Ex. 3), claim 1); and (d) any method using such sprouts to reduce the level of carcinogens in a mammal (<u>see</u> '505 patent (Ex. 3), claim 16). Defendants' motion should be denied for each of these additional reasons.

For these and other reasons that follow, defendants' motion for summary judgment should be denied. Moreover, because the record evidence is uncontroverted that the prior art references upon which defendants rely do not disclose methods for making food products with cruciferous sprouts that

are rich in glucosinolates, either expressly or inherently, Brassica is entitled to summary judgment that these references do not invalidate the challenged claims of the Brassica patents.

## BACKGROUND

**A.     The Brassica Patents**

The Brassica patents relate to a dietary approach for reducing the level of carcinogens in animals and their cells and thereby reducing the risk of developing cancer.  More specifically, the inventions are directed to methods of making food products comprised of cruciferous sprouts that are rich in compounds such as sulforaphane and its glucosinolate precursor, which induce the activity of Phase 2 enzymes that can inactivate carcinogens, without inducing biologically significant activities of Phase 1 enzymes that can activate carcinogens.  See '895 patent (Ex. 1), col. 7, line 63 - col. 8, line 2; col. 1, lines 8-17.[3]

The inventions of the Brassica patents are based, in part, upon co-inventor Dr. Paul Talalay's life-long study of cancer and pursuit of edible plants that have a chemoprotective effect against cancer. Chemoprotection is a means for preventing cancer by increasing the body's own cancer-fighting defense mechanisms by administration of anti-cancer agents delivered, ideally, in the diet.  Chemoprotection takes advantage of the ability of cells of the human body to produce a family of detoxification enzymes that neutralize highly reactive and dangerous forms of cancer-causing chemicals before those chemicals can damage DNA and initiate the process that can lead to malignancy.  By inducing the production of

---

[3]     Because the '567 and '505 patents are both divisions of the '895 patent, the specifications of the three patents (apart from the claims) are identical.  Unless a specific one of the Brassica patents is being discussed, for the sake of simplicity citations herein to the patents' specifications will recite the '895 patent only.

these detoxification enzymes in the body, protection against cancer can be achieved.  See Complaint, ¶ 14.

Dr. Talalay's examination of the chemoprotective properties of plants was initially focused on mature, market stage vegetables, such as broccoli.  However, Dr. Talalay and co-inventor Jed W. Fahey made the completely unexpected discovery that the concentrations of cancer-fighting compounds in cruciferous plants are considerably higher during the sprout stage than at later stages of development.  They discovered that sprouts of cruciferous seeds, such as broccoli sprouts, can be selected to produce food products that are rich in glucosinolates.  Glucosinolates are precursors of chemicals that induce production of cancer-preventing enzymes in the body.  See Complaint, ¶ 17.

Dr. Talalay and Mr. Fahey were awarded the '895, '567 and '505 patents for their important discoveries.  The '895 patent discloses and claims, inter alia, a novel method of preparing a food product which is rich in glucosinolates which involves germinating certain cruciferous seeds, such as broccoli seeds, and harvesting the sprouts prior to the two-leaf stage to produce a food product that is rich in glucosinolates.  See '895 patent (Ex. 1), claim 1.

The '567 patent discloses and claims, inter alia, a novel method of preparing a human food product comprising cruciferous sprouts containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, which involves identifying seeds which produce those sprouts, germinating the seeds, and harvesting the sprouts prior to the two-leaf stage to produce a human food product comprising such sprouts.  See '567 patent (Ex. 2), claim 1.  Each of the three patents discloses methods for analyzing

6

sprouts to enable the selection of seeds of cultivars that produce glucosinolate-rich sprouts.  See '895

patent (Ex. 1), col. 6, line 38 to col. 7, line 37.

The '505 patent discloses and claims, inter alia, a novel method of increasing the

chemoprotective amount of Phase 2 enzymes in a mammal which involves identifying certain seeds

which produce sprouts containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole

glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates,

germinating the seeds, harvesting the sprouts prior to the two-leaf stage to form a food product

comprising such sprouts, and administering the food product to a mammal.  See '505 patent (Ex. 3),

claim 1.

**B.    The Validity of the '895 Patent Was Re-Affirmed By the Patent and Trademark Office in the Reexamination Proceeding Over Virtually the Identical Prior Art Upon Which Defendants Rely**

In June of 1999, Brassica brought an action for infringement of the '895 patent against The

Sproutman, Inc. and Murray Tizer (collectively "Sproutman") in the U.S. District Court for the District

of Delaware, Brassica Protection Products et al. v. Sproutman et al., C.A. 99-350-SLR (D. Del.).[4]  In this

litigation, defendant, Sproutman, raised the defense that the '895 patent was invalid under 35 U.S.C.

§102(b) over virtually the identical prior art references upon which defendants rely in this consolidated

action.  Sproutman, also like the defendants in this action, conceded that the prior art references did not

expressly disclose the elements of the claimed invention, but argued anticipation through inherency.

_____

[4]    The '567 and the '505 patents issued on October 19, 1999 and therefore were not included in the original complaint.

7

On October 11, 1999, during the litigation with Brassica, Sproutman filed a request for reexamination with the U.S. Patent and Trademark Office pursuant to 37 C.F.R. §1.510.  See Ex. 4. Sproutman's reexamination request asserted that claims 1-6 and 9-13 of the '895 patent were anticipated under 35 U.S.C. §102(b) and/or rendered obvious under 35 U.S.C. §103 in view of 11 different prior art publications.  Ex. 4, pp. 4-21.  Sproutman, like the defendants here, tried to ignore the "rich in glucosinolates" limitation of the claims, treating it -- without evidentiary support -- as an inherent quality of sprouts suggested in the prior art references:

> The quality of being "rich in glucosinolates" is a natural quality of those cruciferous sprouts falling within the '895 Claims.  Patenting a method of producing a food product "rich in glucosinolates" by merely germinating notoriously well-known, existing cruciferous seeds and harvesting the sprouts within a time well-known in the art (prior to the 2-leaf stage) is no different than obtaining a patent on a method of producing a food product "rich in sulphoraphanes" comprising the steps of planting broccoli seeds and harvesting the mature market stage broccoli plants.

> The fact that certain cruciferous sprouts are "rich in glucosinolates" is essentially a law of nature.  Laws of nature and natural phenomena are in essence "manifestations of ... nature [i.e., not 'new'], free to all men and reserved exclusively to none."  Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130 (1948).

See Request for Reexamination (Ex. 4) at 8.

The Patent Office granted Sproutman's request for reexamination and rejected claims 1-6 and 9-13 of the '895 patent under 35 U.S.C. §§102 and 103 based on the prior art identified in Sproutman's request.  See Order Granting Reexamination (Ex. 5).  The Patent Office, in rejecting the '895 patent claims, adopted the Sproutman's argument that the "rich in glucosinolates" limitation was inherently disclosed in the prior art references.  See PTO Office Action in Reexamination (Ex. 6).

8

Brassica traversed the rejection by pointing out, inter alia, that the Patent Office had failed to establish a prima facie case for anticipation by inherency, because it failed to show that the prior art necessarily functioned in accordance with, or included, the claimed limitations.  In particular, Brassica argued that the Patent Office had failed to meet this burden because it had failed to make the required showing that the prior art methods necessarily produce food products comprising cruciferous sprouts that are rich in glucosinolates.  See Amendment and Request for Reconsideration Under 37 C.F.R. §1.111 (Ex. 7), pp. 4-6.

Brassica also submitted evidence establishing that not all cruciferous sprouts are inherently "rich in glucosinolates."  Specifically, Brassica submitted evidence, in the form of a declaration from co-inventor Jed W. Fahey, which established that different sprout cultivars contain different levels of glucosinolates.[5]  See Ex. 7, pp. 6-7; see also Declaration of Jed W. Fahey (Ex. 8), Tab A, ¶¶4-10.  Mr. Fahey's declaration also reported the results of tests conducted on a variety of different randomly selected commercial cultivars of broccoli, cauliflower, kale and Brussels sprouts which established that the Phase 2 inducer activity of these sprouts was highly variable and frequently not in a potent range.  Id.

The Patent Office was persuaded by the evidence and arguments submitted by Brassica, withdrew the rejections and re-affirmed the validity of claims 1-6 and 9-13 of the '895 patent without modification.  In its reasons for allowance of the claims, the Patent Office expressly determined that:

"a method of preparing a food product wherein cruciferous sprouts, with the exception of cabbage, cress, mustard, and radish sprouts, that are rich in glucosinolates or contain high levels

---

[5]     Defendants expressly do not dispute Mr. Fahey's declaration.  Defendants' Memorandum II, pp. 14-15; Defendants' Memorandum III, p. 11.

of phase 2 inducer activity are harvested prior to the 2-leaf stage is not taught nor fairly suggested by the prior art or any combination thereof."

Notice of Intent to Issue Reexamination Certificate (Ex. 9), p. 2.

In re-affirming the validity of the '895 patent claims, the Patent Office considered and rejected the very same arguments being made by defendants in their present motion for summary judgment over virtually the identical prior art references, including defendants' argument that the prior art inherently discloses cruciferous sprouts that are "rich in glucosinolates." See, generally, '895 Reexamination history (Ex. 16).

**C.    The Prior Art upon Which Defendants Rely Was Considered  and Rejected by the Patent Office During the Prosecution of the '505 and '567 Patents**

The '505 patent was allowed by the Patent and Trademark Office over virtually the same prior art being relied upon by defendants in the present motion.[6]  Specifically, during the prosecution of the application which issued as the '505 patent, Brassica submitted virtually all of that prior art to the Examiner reviewing these two applications.  See list of references on the face of the '505 patent (Ex. 3). The Patent Office found the claims of the '505 patent were patentable over this prior art, and in so finding, rejected the argument that these prior art references disclose sprouts that were rich in glucosinolates.  See Supplemental Response Under 37 C.F.R. §1.111, and attached Declaration by Paul Talalay (Ex. 10); see generally prosecution history of the '505 patent (Ex. 15).

---

[6]    Shortly after issuance of the '505 and '567 patents, Sproutman agreed to entry of a consent judgment which included a permanent injunction and a concession of the validity of all of the Brassica patents.

The '567 patent was allowed over the most relevant art cited by the defendants, Meyerowitz, 1993, Sprout It!.[7]  The Patent Office had rejected the claims of the '567 patent as being obvious over Meyerowitz, 1993, which the Examiner characterized as teaching that "the production of sprouts (e.g., broccoli) is notoriously well-known," in combination with a series of references that taught that consumption of market-stage broccoli reduced cancer risk.  Amendment and Request for Reconsideration Under 37 C.F.R. §1.111 (Ex. 11), pp. 2-4.  In response to the rejection, Brassica presented, and the Patent Office accepted, the argument and evidence that neither Meyerowitz nor any other reference cited by the Patent Office taught or suggested the claimed method of producing a food product.  Ex. 11, pp. 3-8, and attached Declaration by Paul Talalay; see, generally, prosecution history of the '567 patent (Ex. 14).

Defendants' present motion for summary judgment raises the same issues, based on virtually the same prior art, that have already been decided by the Patent Office on multiple occasions.  Defendants have provided no new evidence and no reason why these issues should be decided any differently by this Court.  For these and other reasons that follow, defendants' motion should be denied and the validity of the claims at issue affirmed.

## ARGUMENT

Summary judgment may be granted only if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Intellicall, 952

---

[7]    The Meyerowitz reference is representative of all of the 12 references cited by the defendants in their motion, and discloses all of the essential information disclosed in the other 11 references, thereby placing that information before the Patent Office for consideration.

F.2d at 1387.  An actual dispute is "material" if it affects the outcome of the suit.  <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  On summary judgment, the facts must be viewed in a light most

favorable to the party opposing the motion.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962);

<u>Transmatic, Inc. v. Gulton Indus.</u>, 53 F.3d 1270, 1274 (Fed. Cir. 1995) (all inferences must be drawn in

favor of the non-moving party, and the burden is on the movant to establish that summary judgment is

appropriate).

## I.    CLAIM CONSTRUCTION

### A.    Claims Are to Be Construed as a Matter of Law

A determination of patent validity, like infringement, must begin with a proper construction of

the claims at issue to establish their meaning and scope, so that a comparison to the prior art can be

made.  <u>Senior Techs., Inc. v. R.F. Techs., Inc.</u>, 2001 U.S. App. LEXIS 4179, at *5 (Fed. Cir. Mar. 12,

2001); <u>Markman v. Westview Instruments, Inc.</u>,  52 F.3d 967, 976 (Fed. Cir. 1995), <u>aff'd</u>, 517 U.S. 370

(1996); <u>Beachcombers, Int'l v. Wildewood Creative Prods.</u>, 31 F.3d 1154, 1163 (Fed. Cir. 1994).  This

first step, known as claim construction or claim interpretation, presents a question of law to be decided

exclusively by the court.  <u>Markman</u>, 52 F.3d at 977-78.

To ascertain the meaning of claims, three sources should be considered: the claims themselves,

the specification, and the prosecution history.  <u>Id.</u>, 52 F.3d at 979.  In construing a patent claim, the

Court should look first to the intrinsic evidence -- the claim language, the patent specification and the

prosecution history.  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing

<u>Markman</u>, 52 F.3d at 979).  "Only if there were still some genuine ambiguity in the claims, after

consideration of all available intrinsic evidence, should the trial court [resort] to extrinsic evidence, such

as expert testimony...." Id. at 1584. The actual words of the claim are the most important tools for understanding the meaning of the claim. Digital Biometrics v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). The specification may be consulted to determine whether the patentee ascribed a particular meaning to language used in the claim. Id. The construction of the claims at issue in the present motion is readily established from the unambiguous claim language itself, and is confirmed by both the specification and the prosecution histories of the respective patents.

### B.     There Is No Dispute Regarding Construction of Claims 1-6 of the '895 Patent

#### 1.     Claim 1

Claim 1 of the '895 patent recites:

> "A method of preparing a food product rich in glucosinolates, comprising germinating cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds, and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts."

Thus, claim 1 contains three elements: (1) preparation of a food product rich in glucosinolates, (2) germination of cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds, (3) harvest of the resulting sprouts prior to the 2-leaf stage to form a food product rich in glucosinolates. The plain language of the claim thus requires germination of cruciferous seeds selected from the group of "cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds," that further result in sprouts that are "rich in glucosinolates" when harvested "prior to the 2-leaf stage," such that a food product rich in glucosinolates and comprising a plurality of such sprouts can be prepared. One skilled in the art would understand that, in the context of the patent specification, "rich in glucosinolates" means that the sprouts comprising the food product have 200,000 units per gram fresh weight or more of Phase

13

2 enzyme-inducing potential at 3 days following incubation under conditions in which cruciferous seeds germinate and grow.  See '895 patent (Ex. 1), col. 7, lines 49-53.

Defendants do not dispute this construction of claim 1 of the '895 patent.  See Defendants' Memorandum I, pp. 7-9.  Instead, defendants urge that the limitation "rich in glucosinolates" is a "result" of the method, and immaterial to patentability because it is an inherent property of cruciferous sprouts. Id.  This argument, however, addresses the substantive issue of anticipation by inherency, not the predicate issue of claim construction, and is addressed below in Section II.B.

### 2.    Claim 2

Claim 2 of the '895 patent depends from claim 1, and thus contains all of the limitations of claim 1 (35 U.S.C. §112, ¶4) with the additional limitation:

> "wherein said sprouts contain non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucose isolates [sic, glucosinolates]."

Indole glucosinolates and their breakdown products are undesirable in a food product because they are so-called "bifunctional" inducers, which induce both Phase 1 and Phase 2 enzyme.  '895 patent (Ex. 1), col. 11, lines 10-13 (see col. 6, lines 15-22 for a definition of a bifunctional inducer).  Phase 1 enzymes may lead to carcinogen activation.  See Cho, et al., U.S. Patent No. 5,411,986, col. 6, lines 45-48 (Ex. 12), of record in the prosecution of the '895 patent.  Goitrogenic hydroxybutenyl glucosinolates likewise are undesirable in a food product because of their adverse effect on thyroid function (goiter).  Thus, claim 2 further limits the scope of claim 1 by specifying further that the resulting sprout contain low levels of these harmful compounds.  The Patent Office found that this aspect of the invention, like the

14

presence of high levels of glucosinolates, was "neither taught nor fairly suggested by the prior art or any combination thereof." Notice of Intent of Issue Reexamination (Ex. 9), p. 2.

Again, defendants do not dispute this construction of claim 2, instead arguing (without citing any supporting authority) that "[s]pecifying that the sprouts include these naturally occurring substances has no patentable significance." Defendants' Memorandum I, pp. 12-13. This argument again is directed to the issue of anticipation by inherency, not claim construction, and is addressed below in Section II.B.

      **3.     Claims 3-6**

The remaining claims of the '895 patent depend from claim 1, and further limit the claim by specifying particular varieties, and groups of varieties, of Brassica oleracea. Claim 3 recites selection of sprouts from Brassica oleracea varieties consisting of acephala, alboglabra, botrytis, costata, gemmifera, gongylodes, italica, medullosa, palmifera, ramosa, sabauda, sabellica and selensia. The varieties are identified in the '895 patent as preferred sources of sprouts for use in the invention. '895 patent (Ex. 1), col. 10, lines 34-42. Claim 4 specifically recites selection of sprouts from the variety Brassica oleracea italica (broccoli), and claim 5 recites selection of sprouts from the variety Brassica oleracea botrytis (sprouting cauliflower broccoli). Claim 6 depends from claim 5, and further specifies sprouts selected from the subvariety Brassica oleracea botrytis subvar. cauliflora (cauliflower).

Defendants acknowledge that claims 3-6 further restrict the selected Brassica oleracea seeds "to those that when germinated produced the higher levels of the naturally occurring substance." Defendants' Memorandum I, pp. 13-14. Thus, there is no dispute that these claims recite selection of seeds from these varieties that produce sprouts rich in glucosinolates, as required by claim 1.

**C.    Defendants Improperly Construe Claims 1 and 8 of the '567 Patent**

    **1.    Claim 1**

Claim 1 of the '567 patent recites:

"A method of preparing a human food product comprising cruciferous sprouts containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, comprising the steps of:

    (a) identifying seeds which produce said sprouts, with the exception of <u>Brassica oleracea capitatia</u>, <u>Lepidium sativum</u>, <u>Sinapis alba</u>, <u>Sinapis nigra</u>, and <u>Raphanus sativus</u> sprouts;

    (b) germinating said seeds; and

    (c) harvesting said sprouts between the onset of germination up to and including the 2-leaf stage, to form a human food product comprising a plurality of said sprouts."

Claim 1 of the '567 patent, similar to claim 1 of the '895 patent, comprises three elements: (1) identification and selection of seeds that produce sprouts that are high in Phase 2 enzyme-inducing potential, and having non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, (2) germination of these seeds and (3) harvesting the sprouts between the onset of germination up to and including the 2-leaf stage, to form a human food product comprising a plurality of the sprouts which are high in Phase 2 enzyme-inducing potential, and having non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates.

    Defendants proposed construction of this claim is incorrect in that they attempt to read the first claim element, the identification of the particular claimed seeds, out of the claim.  <u>See</u> Defendants'

16

Memorandum I, p. 14 ("Stripped of the assay results, this claim is also limited to the two actions steps of 'germinating said seeds,' and 'harvesting said sprouts between the onset of germination up to and including the 2-leaf stage.'"); Defendants' Memorandum I, p. 15 ("The assaying steps or acts are not true method steps in a method of preparing a food product.")  Defendants' attempt to read this element out of claim 1 is absolutely <u>prohibited</u> under the rules of claim construction set forth by the Federal Circuit. <u>Texas Instruments v. United States ITC</u>, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("We will not [read an express limitation out of a claim] because courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.") (quoting <u>Autogiro Co. of Am. v. United States</u>, 384 F.2d 391, 396 (Ct. Cl. 1967)).  Indeed, each and every limitation of a claim must be given effect. <u>See</u> <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 29, <u>on remand</u>, 114 F.3d 1161, 1163-1164 (Fed. Cir. 1997) (per curium).

Thus, in construing claim 1 of the '567 patent, the court <u>must</u> give meaning and effect to the first method step of identifying/selecting specified seeds.  The meaning of this claim element is clear and unambiguous on its face:  it requires that a person practicing the invention first identify cruciferous seed, with the exception of cabbage (<u>Brassica</u> <u>capitata</u>), cress (<u>Lepidium</u> <u>sativum</u>), mustard (<u>Sinapis</u> <u>alba</u>, <u>Sinapis</u> <u>nigra</u>) and radish (<u>Raphanus</u> <u>sativus</u>), that will yield sprouts having high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates.  The '567 patent specification emphasizes the importance of this identification step stating "[a]lthough inducer activity has been found in many different families of edible plants, the amounts are highly variable, depending on family, genus, species, variety, or cultivar of the plant selection and on growth and harvesting conditions."  '567 Patent (Ex. 2), col. 2, lines 21-25.

17

Even among cruciferous plants "[t]he level of inducing activity and inducing potential has been found to vary among crucifers and even among cultivars." Id., col. 11, lines 14-16. Thus, the step of identifying appropriate seeds is necessary for carrying out the method of claim 1.

Claim 1 of the '567 patent should thus be construed as requiring first, the identification and selection of cruciferous seeds (with the exception of cabbage, cress, mustard and radish seeds) that, when germinated, provide cruciferous sprouts having high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, second, the germination of these seeds, and third, harvesting the resulting sprouts from the onset of germination up to and including the two-leaf stage to provide a human food product having high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates comprising a plurality of those sprouts.

### 2.    Claim 8

Claim 8 of the '567 patent recites:

"A human food product comprising cruciferous sprouts made according to the method of claim 1."

The construction of claim 8 of the '567 patent is straightforward; it covers a human food product comprising cruciferous sprouts that were made by first identifying and selecting cruciferous seeds (with the exception of cabbage, cress, mustard and radish seeds) that produce sprouts that are high in Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, then germinating these seeds, and then harvesting the

18

resulting sprouts between the onset of germination up to and including the 2-leaf stage. As with claim 1, the important first step of identifying/selecting seed is a necessary and meaningful limitation to the claim. The construction of this product-by-process claim is only disputed to the extent that the construction of claim 1, to which it refers, is disputed. Defendants' Memorandum I, pp. 15-16.

### D.    Defendants Improperly Construe Claims 1 and 16 of the '505 Patent

#### 1.    Claim 1

Claim 1 of the '505 patent recites:

"A method of increasing the chemoprotective amount of Phase 2 enzymes in a mammal, comprising the steps of:

> (a) identifying seeds which produce cruciferous sprouts, with the exception of <u>Brassica oleracea capitatia</u>, <u>Lepidium sativum</u>, <u>Sinapis alba</u>, <u>Sinapis nigra</u>, and <u>Raphanus sativus</u> sprouts, containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates;

> (b) germinating said seeds;

> (c) harvesting said sprouts between the onset of germination up to and including the 2-leaf stage to form a food product comprising a plurality of sprouts; and

> (d) administering said food product, or non-toxic extract of said food product, to said mammal."

The only dispute regarding the meaning of claim 1 of the '505 patent is the significance of the preamble, "a method of increasing the chemoprotective amount of Phase 2 enzymes in a mammal," and whether or not it has meaning in the claim. Defendants' argue that the preamble statement is a result of the sprouts being eaten by a mammal and has no significance. Defendants' Memorandum I, p. 16. Defendants are wrong. A term in the preamble should be considered a necessary limitation when it "breathes life and

meaning" into the claim.  Loctite Corp. v. Ultraseal, Ltd., 781 F.2d 861, 866 (Fed. Cir. 1985).  In this

case, the limitation "increasing the chemoprotective amount of Phase 2 enzymes in a mammal" is

necessary to give meaning to the claim, in that it specifically limits the claim to those methods that will

achieve the recited result.  Furthermore, this limitation gives meaning to the later claim element "high

Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown

products and goitrogenic hydroxybutenyl glucosinolates" by indicating what levels are contemplated, i.e.

a level that will increase the chemoprotective amount of Phase 2 enzymes in a mammal.

Further, the preamble also distinguishes claim 1 of the '505 patent from claim 16, which

otherwise has identical recitations of elements.  The Federal Circuit has articulated this "doctrine of

claim differentiation" as follows:

> "There is presumed to be a difference in meaning and scope when different words or
> phrases are used in separate claims.  To the extent that the absence of such a difference in
> meaning and scope would make a claim superfluous, the doctrine of claim differentiation
> states the presumption that the difference between claims is significant."

Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (citing DMI, Inc. v.

Deere & Co., 755 F.2d 1570, 1574 (Fed. Cir. 1985)).  Any interpretation of a claim that would render

another claim in the patent superfluous is presumptively unreasonable.  Senior Techs., 2001 U.S. App.

LEXIS 4179, at *19 - 20; Beachcombers, 31 F.3d at 1162.  Defendants' construction of claim 1, which

excludes the preamble as a limitation, would render claim 16 (which differs from claim 1 only in the

preamble) superfluous, a construction that is presumptively unreasonable.  Id.

Thus, the proper construction of claim 1 of the '567 patent is a method comprising the steps of

first, identifying specific cruciferous seeds (with the exception of cabbage, cress, mustard and radish

seeds) that have the specified properties of "high Phase 2 enzyme-inducing potential" and "non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates," second, germinating these seeds, third, harvesting the resulting sprouts at any time after the onset of germination up to and including the 2-leaf stage to form a food product comprising a plurality of these sprouts, fourth, administering the food product, or a non-toxic extract of the food product, to a mammal, such that the chemoprotective amount of Phase 2 enzymes is increased in the mammal.

### 2.    Claim 16

As acknowledged by the defendants, claim 16 of the '505 patent differs from claim 1 only in the preamble, which specifies "a method of reducing the level of carcinogens in a mammal."  Defendants' Memorandum I, p. 17.  As with claim 1, Defendants' construction of claim 16 ignores the preamble, a presumptively unreasonable construction in view of the fact that the preamble is necessary to give meaning to claim 16, and to distinguish it from claim 1.  See Loctite, 781 F.2d at 866; Tandon, 831 F.2d at 1023; Beachcombers Int'l, 31 F.3d at 1162.

The proper construction of claim 16 of the '505 patent is a method comprising the steps of first, identifying specific cruciferous seeds (with the exception of cabbage, cress, mustard and radish seeds) that have the specified properties of "high Phase 2 enzyme-inducing potential" and "non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates," second, germinating these seeds, third, harvesting the resulting sprouts at any time after the onset of germination up to and including the 2-leaf stage to form a food product comprising a plurality of these

sprouts,  <u>fourth</u>, administering the food product, or a non-toxic extract of the food product, to a mammal, <u>such that</u> the level of carcinogens in the mammal is reduced.

## II.    DEFENDANTS HAVE COMPLETELY FAILED TO SHOW THAT THE PRIOR ART ANTICIPATES THE CHALLENGED CLAIMS UNDER 35 U.S.C. §102

A claim is anticipated, and therefore invalid, if the invention "was patented or described in a printed publication in this or a foreign country...more than one year prior to the date of the application for patent in the United States."  35 U.S.C. §102(b).  To anticipate, a single prior art reference must disclose each and every limitation of the claim.  <u>See</u> <u>Atlas Powder</u>, 190 F.3d at 1347; <u>Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.</u>, 730 F.2d 1452, 1458 (Fed. Cir. 1984).  "However, a prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it."  <u>Atlas Powder.</u>, 190 F.3d at 1347 (citations omitted).  "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates."  <u>Id.</u>; <u>In re King</u>, 801 F.2d 1324, 1326 (Fed. Cir. 1986).  The defendants carry the burden of proving that the Brassica patents are invalid by clear and convincing evidence.  35 U.S.C. §282; <u>Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.</u>, 750 F.2d 1552, 1559-1560 (Fed. Cir. 1984); <u>Mahurkar v. C.R. Bard, Inc.</u>, 79 F.3d 1572, 1578 (Fed. Cir. 1996), <u>cert. denied</u>, 525 U.S. 1106 (1999).

### A.    The Prior Art Does Not Disclose a Method of Making a Food Product Comprising Sprouts That Are "Rich in Glucosinolates" or Contain "High Levels of Phase 2 Enzyme-Inducing Potential"

Defendants argue that the claims of the Brassica patents are anticipated by twelve different prior art references.  Defendants' Memorandum I, pp. 6-7; Defendants' Memorandum III, pp. 11-12.  However,

22

defendants concede, as they must, that each of these prior art references lacks the express disclosure of several critical limitations in each of the Brassica patents.  See Defendants' Memorandum I, pp. 8-9; Defendants' Memorandum II, pp. 10, 19; Defendants' Memorandum III, pp. 1, 11-12.  For example, defendants concede that the prior art nowhere discloses that selected cruciferous sprouts are "rich in glucosinolates" or contain "high levels of Phase 2 enzyme-inducing potential," as required by the claims.[8]  The defendants argue instead that these claim limitations are "inherently" disclosed in each of the twelve prior art references.  As set forth below, defendants have not, and cannot, show these claims are anticipated by inherency.

### B.    Defendants Cannot Show That the Prior Art Inherently Discloses a Method of Making a Food Product Comprising Sprouts That Are "Rich in Glucosinolates" or Contain "High Levels of Phase 2 Enzyme-Inducing Potential"

For a claim to be inherent in the prior art, it is not sufficient that a person following the disclosure sometimes obtain the result set forth in the claim, it must invariably happen.  Glaxo, Inc. v. Novopharm, Ltd., 830 F. Supp. 871, 874 (E.D.N.C. 1993), aff'd, 52 F.3d 1043 (Fed. Cir.), cert. denied 516 U.S. 988 (1995). (citing Standard Oil Co. v. Montedison, S.p.A., 664 F.2d 356, 372 (3rd Cir. 1981), cert. denied sub nom., Montedison S.p.A. v. Phillips Petroleum Co., 456 U.S. 915 (1982)); accord MEHL/Biophile Int'l Corp. v. Milgraum, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("Occasional results are not inherent.")  Thus, inherency must be established as a certainty, not merely as a possibility or a probability.  Finnigan, 180 F.3d at 1365.

---

[8]    Other claims elements missing from prior art references are identified below in Section II.C.

### 1.    Defendants Present No Evidence Showing Inherency

Defendants' inherency argument is predicated on the unsupported assertion that claim limitations such as "rich in glucosinolates" and "containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates" are nothing more than inherent properties of the claimed food products. See Defendants' Memorandum III, pp 7-9; Defendants' Memorandum I, pp. 1-2.  Defendants argue that these limitations are "characteristics of a naturally occurring substance in the sprouts created by natures [sic] process of germinating the seeds to produce the sprouts."  Defendants' Memorandum I, pp. 1-2.

When alleging anticipation through inherency, the burden is on the challenger to prove by clear and convincing evidence that the prior art process or product possessed the specified property.  See E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1435  (Fed. Cir.), cert. denied, 488 U.S. 986 (1988).   Whether or not a claim limitation is inherently disclosed in the prior art is a question of fact.  Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1329 (Fed. Cir. 2001). Here, defendants present not a single piece of evidence to support their factual assertion that the claim limitations "rich in glucosinolates" and "containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates" are nothing more than inherent properties of the claimed food products.  Defendants' failure of proof on this issue is critical, and their summary judgment motion should be denied for this reason alone.  Furthermore, as set forth below, the evidence of record is uncontroverted that the prior art does not inherently disclose food products that are, inter alia, "rich in glucosinolates" and "containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates."

24

### 2.    The Uncontroverted Evidence of Record Shows That There Is No Inherency

As stated above, the Patent Office during the reexamination of the '895 patent considered and rejected defendants' inherency argument over the same prior art teachings as those upon which defendants rely.[9] In response to the Patent Office's rejection of the '895 patent on grounds that the prior art inherently discloses food products that are "rich in glucosinolates" and contain "high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates," Brassica presented evidence, through the declaration of co-inventor Jed W. Fahey, which established that glucosinolate and Phase 2 enzyme-inducing potential levels vary greatly even within cruciferous species and cultivars. See Fahey Decl. (Ex. 8), Tab A, ¶¶7-10; see also '895 patent (Ex. 1), col. 2, lines 19-23, col. 11, lines 8-10 and Example 2. Mr. Fahey's declaration states clearly that "[i]mportantly, not all cruciferous sprouts have

_____

[9] The cited references that were before the Patent Office during the reexamination of the '895 patent and upon which defendants rely in their motion, cross-referenced by their exhibit number to Defendants' Memorandum I, are:  Whyte, The Complete Sprouting Cookbook, 1973 (Ex. E), cited during the '895 reexamination and during the '505 patent prosecution; Munroe, Sprouts to Grow and Eat, 1974 (Ex. F), cited during the '895 reexamination and during the '505 patent prosecution; Wigmore, The Sprouting Book, 1986 (Ex. H), cited during the '895 reexamination;  Clement, Hippocrates Health Program, 1989 (Ex. I), cited during the '895 reexamination; Meyerowitz, Growing Vegetables Indoors, 1990 (Ex. J), cited during the '895 reexamination and during the '505 patent prosecution; Meyerowitz, Sprout It!, 1993 (Ex. M), cited during the '895 reexamination and during both the '567 and '505 patent prosecutions; Coop. Ext. Serv. of U. of Ill., Growing Sprouts Indoors (Ex. N), cited during the '895 reexamination and during the '505 patent prosecution; and Coop. Ext. Serv. of NE, Growing Sprouts, cited during the '895 reexamination. Three of the remaining three references, Blauer, 1981, The Miracle of Sprouting (Ex. G), Bittman, 1992, The Salad Lovers Garden (Ex. K), and Larkcom, 1991, Oriental Vegetables (Ex. L), are entirely cumulative with the eight references cited to the Patent Office.  Compare Defendants' characterization of the references, Defendants' Memorandum I, pp. 20-22.  The last reference, Cornucopia (Ex. L to Defendants' Memorandum III), is also cumulative and is addressed in detail below.

high levels of Phase 2 enzyme inducer activity.  Among those species of crucifers which <u>do</u> produce sprouts with high levels of Phase 2 inducer activity, *not all plant selections or cultivars within a given species, have the high levels of inducer activity*."  Ex. 8, Tab A, ¶7 (italics added).  Defendants do not dispute the correctness of the Fahey Declaration.  Defendants' Memorandum II, pp. 14-15; Defendants' Memorandum III, p. 11.

Furthermore, the Brassica patents themselves teach that glucosinolate levels in cruciferous plants are highly variable:  "There is variation in inducer potential among different broccoli cultivars" ('895 patent (Ex. 1), Example 2); "[a]lthough inducer activity has been found in many different families of edible plants, the amounts are highly variable, depending on family, genus, species, variety, or cultivar of the plant selection and on growth and harvest conditions" (<u>id</u>., col. 2, lines 19-23); "[t]he level of inducing activity and inducing potential has been found to vary among crucifers and even among cultivars" (<u>Id</u>., col. 11, lines 8-10).

Thus, if glucosinolate levels in cruciferous sprouts can be said to have any inherent property, they are inherently <u>variable</u>, the antithesis of the legal standard for anticipation through inherency under the patent laws.  The Patent Office agreed and found that the prior art cited here by the defendants did <u>not</u> inherently disclose food products that are "rich in glucosinolates" and contain "high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates."  Notice of Intent to Issue Reexamination Certificate, (Ex. 9) p. 2.  This finding by the Patent Office is entitled to deference by the court (<u>see</u> Section II.B.5 below).

In Defendants' Memorandum III, defendants argue that the teachings of an alleged "new" reference, <u>Cornucopia: A Source Book of Edible Plants</u> (Exhibit L to Defendants' Memorandum III),

26

purportedly "contradict" the arguments made by Brassica to the Patent Office during the '895 reexamination, and that the "rationale used by the Plaintiffs to overcome the rejection of their patent application by the PTO Examiner no longer exists."  Defendants' Memorandum III, pp. 11-12. This assertion is wrong.

First, the Cornucopia reference is entirely cumulative with art that was already before the Patent Office during the reexamination of the '895 patent.  In other words, while the specific reference may not have been before the Patent Office, the information disclosed in this reference was, in fact, before the Examiner during reexamination of the '895 patent.  Defendants allege that Cornucopia discloses that seeds of "the group" Brassica oleracea botryis (i.e., broccoli and cauliflower) are sprouted and eaten. Defendants' Memorandum III, p. 11.  So does Whyte[10] (Ex. E) (at page 57), a reference before the Patent Office during reexamination.  See also, Request for Re-Examination (Ex. 4), p. 6.  Defendants allege that Cornucopia discloses that seeds of "the group" Brassica napus (i.e., rape or colza) are sprouted and eaten.  So do Meyerowitz, 1993 (Ex. M) (at page 58), and Meyerowitz, 1990 (Ex. J) (page 8 and 61-62), both before the Patent Office during reexamination.  See also, Request for Reexamination (Ex. 4), p. 6. Likewise with Brassica rapa pekinensis (Chinese cabbage, celery cabbage, Napa, etc.) (Meyerowitz, 1990, (Ex. J), pages 8, 9 and 61; Wigmore (Ex. F), page 33; Whyte (Ex E), page 57) and Brassica rapa rapifera (turnip) (Meyerowitz, 1993, (Ex. M), pages 19 and 58; Meyerowitz, 1990, (Ex. J), pages 8, 9; and Whyte (Ex. E), page 57).  See also, Request for Re-Examination (Ex. 4), p. 6.  Accordingly, the Cornucopia reference is entirely cumulative with art already before the Examiner.

_____

[10]    Citations to these prior art references are to the Exhibits to Defendants' Memorandum I.

Second, nothing in the Cornucopia reference contradicts the arguments made by Brassica to the Patent Office. The Cornucopia reference discloses, at best, sprouting and eating particular cruciferous sprouts like cauliflower and broccoli (i.e. , Brassica oleracea botryis) without more which, as explained in the Sproutman's Request for Reexamination, is the same information contained in several other references. See Ex. 4, pp. 5-7, 9-13. There is no inconsistency between this disclosure and Brassica's evidence and arguments before the Patent Office that even among specific cultivars of broccoli and cauliflower, a wide variation in glucosinolate levels exists, and that a prior art disclosure of a particular cruciferous sprout, without more, could not anticipate the claimed invention. The Cornucopia reference simply does not address this issue.

The evidence of record is uncontroverted that the prior art references being relied upon by defendants do not inherently disclose the challenged claims of the Brassica patents. Defendants' motion for summary judgment should be denied for this separate and independent reason.

### 3.    Defendants' Argument Regarding Unpatentability of "Natural" Products and Processes Is a Red Herring and Incorrect

The defendants' argument that the challenged claims of the Brassica patents are invalid because Brassica (with the help of the Patent Office on four separate occasions) has done nothing more than patent a "natural" product or process is a red herring and incorrect. See Defendants' Memorandum II, p. 16; Defendants' Memorandum III, p. 1. Defendants repeatedly mischaracterize the issues to be decided in their motion with statements such as:

"The legal question that this motion presents can be stated:

28

> Has congress seen fit to permit the patenting of nature's process of germinating cruciferous seeds to make sprouts, known to others through printed publications and otherwise ..."  Defendants' Memorandum II, p. 16.
>
> "The case presents a fundamental question of patent law: Can a plant (broccoli sprouts), long well known in nature and cultivated and eaten by humans for decades, be patented merely on the basis of a recent realization that the plant *has always* had some heretofore unknown but naturally occurring beneficial feature?"  Defendants' Memorandum III, p.1.

What Congress saw fit or did not see fit to permit the patenting of is precisely <u>not</u> the issue presented by defendants' motion.  Rather, the issue to be decided by this Court is whether or not defendants can prove by clear and convincing evidence that the prior art references disclose, either expressly or inherently, each and every claim element of the challenged claims.  There can be no serious dispute that the claims in issue define patentable subject matter under 35 U.S.C. §101.  <u>See</u> Section III below.  Defendants are seeking to confuse this issue by mischaracterizing the claims, and presenting irrelevant rhetorical questions and argument.  By repeatedly and incorrectly characterizing the claims as relating to "natural" products or processes, or merely sprouts and methods for sprouting seed (Defendants' Memorandum I, pp. 12, 15, 19-20, 23; Defendants' Memorandum II, pp. 12-13, 16; Defendants' Memorandum III, pp. 1, 9-10, 12), defendants ignore specific claim limitations which are not disclosed in the prior art references.  Whether or not certain cruciferous sprouts have "*always had* some hereto unknown but naturally occurring beneficial feature," defendants completely fail to provide any evidence that <u>the prior art references</u> upon which they rely disclose, expressly or inherently, methods of preparing food products that are, <u>inter</u> <u>alia</u>, made from sprouts that are rich in glucosinolates or that contain high Phase 2 enzyme-inducing potential, as required by the claims.

29

Defendants also argue that a glucosinolate level in a given sprout variety is a property of the sprout, or result, and is therefore an inherent or natural quality of that sprout.  Defendants' Memorandum I, p. 8; Defendants' Memorandum II, pp. 2-15; Defendants' Memorandum III, pp. 9-12.  This argument confuses what may be scientific characterization of sprouts in general with the legal concept of anticipation by "inherency."  Whether or not a glucosinolate level in an individual sprout is a natural or inherent property of that sprout, anticipation by "inherency" requires that prior art necessarily disclose what is set forth in the claims.  Thus, inherency must be established as a certainty, not merely as a possibility or a probability.  Finnigan, 180 F.3d at 1365.  As Brassica has established, cruciferous sprouts are not necessarily or inherently rich in glucosinolates.  See Fahey Decl. (Ex. 8), Tab A, ¶¶4-10.  The prior art references cited by defendants, which disclose no more than eating certain cruciferous sprouts, cannot inherently disclose this limitation.

Defendants also allege that statements made in Brassica's BroccoSprouts® promotional literature (Exs. I and J to Defendants' Memorandum III) are relevant to the validity of the Brassica patents, because they concede that the seeds used in the methods are natural and not genetically modified.  Defendants' Memorandum III, pp. 6 and 13; see also Defendants' Memorandum II, pp. 12-13.  These so-called "admissions" in the BroccoSprouts® literature regarding the nature of the patented food products (that they are made from natural seed) are meaningless in the context of anticipation.  Brassica never argued, and indeed did not have to, that the seeds used in the claimed invention were anything other than natural.  As detailed above, the fact that the starting material used in the claimed invention is natural in no way precludes patentability, because the invention lies, in part, in the identification and selection of seed for

30

use in producing a new food product that is, inter alia, rich in glucosinolates.  The defendants' emphasis on "natural" starting materials is a red herring.

The type of "selection" invention represented by they claims of the Brassica patent has been held patentable time and again by both the Patent Office and the courts.  For example, in In re Kratz, 592 F.2d 1169 (C.C.P.A. 1979), the Court of Customs and Patent Appeals reversed a Patent Office holding of unpatentability for a claim directed to the use of a naturally-occurring compound identified in strawberries to impart a flavor to a foodstuff.  The court held that the PTO had provided no basis in the prior art for either selecting 2M2PA or thereafter using it to enhance strawberry flavor and taste.  Id. at 1175.  The court observed that in order for such a selection invention to be anticipated, the natural composition "must inherently contain the naturally occurring compound ... [and] the claim must be of sufficient breadth to encompass both the known natural composition and the naturally occurring compound."  Id. at 1174.  As in Kratz, the present claims do not recite a naturally-occurring composition -- they recite methods for making food products (and food products made by these methods) that use as a starting material selected cruciferous sprouts meeting very specific criteria.  The claims are not directed to cruciferous sprouts, per se, nor do they encompass the use of all cruciferous sprouts within any art-recognized group (i.e., genus, species, subspecies, variety, cultivar, etc.).  Like the inventor in Kratz, the Brassica inventors identified a desirable substance in nature (i.e., sprouts, inter alia, containing high levels of glucosinolates/Phase 2 enzyme-inducing potential, and non-toxic amounts of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates) and used this discovery to create a novel method of making food products.

31

In Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367 (Fed. Cir. 1986), cert. denied, 480 U.S. 947 (1987), another case involving a "selection" invention, the invention related to a sandwich immunoassay that used monoclonal antibodies to detect the presence of a target antigen, the improvement being the use of monoclonal antibodies of a specified affinity. See Id. at 1370. The claims at issue were challenged as being inherently anticipated in part by prior work at Stanford University involving a process called "epitope mapping," which uses monoclonal antibodies in a sandwich configuration to locate antibody binding sites on a known quantity of antigen, as opposed to detecting the presence of the antigen. See Id. at 1373. The Stanford researchers did not determine the affinities of the monoclonal antibodies they were using. The Federal Circuit determined that the Stanford work did not anticipate the Hybritech work because the Stanford work, though it used monoclonal antibodies in a "sandwich" configuration, (1) did not involve detection of an antigen (the purpose of the Hybritech assay), and (2) did not identify or assess the affinity of the antibodies used (a critical limitation to the Hybritech claims describing a quality of the antibodies used). Id. at 1379. The Federal Circuit held that the lack of either of these elements in the prior work precluded a finding of anticipation. Id.

The holding in Hybritech is closely analogous to the present situation, where the prior art does not disclose production of a food product rich in glucosinolates, or with high Phase 2 enzyme-inducing potential, and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates. Nor does the prior art disclose that cruciferous sprouts can (or do) contain the high levels of glucosinolates, or high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, recited in the claims.

32

Another example of the patentability of "selection" inventions are the well-known vitamin B-12 cases.  See Merck & Co. v. Olin Mathieson Chem. Corp., 253 F.2d 156 (4th Cir. 1958); Merck & Co. v. Chase Chem. Co., 273 F. Supp.  68 (D.N.J. 1967).  In these cases, the courts upheld the patentability of vitamin B-12, purified from natural sources, because the claimed substance was not known in the prior art, though it occurred naturally in liver and it was known that liver extracts were active in combating pernicious anemia.  These cases also are analogous to the present claims, wherein the claimed methods and food products made with the specific sprouts were not known in the art, though the source from which they are selected (i.e., the entire universe of cruciferous sprouts) may have been known.

Other examples of inventions involving "products of nature" that were held patentable by the courts can be found in Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565 (Fed. Cir. 1991) (purified human Factor VIII:C), and  Ex parte Hibberd, 227 U.S.P.Q. 443 (Bd. Pat. App. & Interferences 1985) (maize seeds high in tryptophan levels), and any of the numerous patents relating to particular genes identified in various organisms.

### 4.        Defendants' Reliance on Titanium Metals Is Misplaced

The defendants place particular emphasis on Titanium Metals Corp. v. Banner, 778 F.2d 775 (Fed. Cir. 1985), in support of their inherent anticipation argument.  Defendants' Memorandum I, pp. 11-12; Defendants' Memorandum II, pp. 16, et seq.  This reliance is misplaced.  In Titanium Metals, the invention related to a titanium-molybdenum-nickel alloy of a specifically-defined composition which was characterized by good corrosion resistance in hot brine environments.  Titanium Metals, 778 F.2d at 776.  The prior art was a Russian article which disclosed the titanium-molybdenum-nickel alloy having the very same specifically-defined composition as the claimed invention.  In fact, expert evidence was

33

submitted showing that the titanium-molybdenum-nickel ingredients in the Russian article were the same as in the claimed composition. Id. at 781. However, the Russian article did not disclose that the titanium-molybdenum-nickel composition was characterized by good corrosion resistance in hot brine environments as claimed. The Federal Circuit held that because the Russian article disclosed the identical titanium-molybdenum-nickel alloy, the claimed invention was not new and therefore was invalid. The Court held that it did not matter if the claim recited a previously unknown characteristic of the prior art because the claimed alloy was not new. Id. at 782.

Titanium Metals is readily distinguishable from the present case. The alloy claimed in Titanium Metals had been previously disclosed in the prior art. Patentability of this old alloy could not be predicated on the discovery of a previously unappreciated property -- corrosion resistance. The invention claimed in the Brassica patents is not a newly-discovered result or benefit of an old process (see Defendants' Memorandum III, pp. 8-9) -- it is a new process. In contrast to the prior art in Titanium Metals, nowhere does the prior art relied upon by defendants disclose a processes for making a food product involving, inter alia, (a) the selection of sprouts rich in glucosinolates/Phase 2 enzyme-inducing potential, (b) any method of increasing the chemoprotective amount of Phase 2 enzymes in a mammal comprising administering a food product comprised of selected sprouts, or (c) any method of reducing the level of carcinogens in a mammal comprising administering a food product comprised of a plurality of selected sprouts. C.f. In re Spada, 911 F.2d 705, 708 (Fed. Cir. 1990) ("the initial inquiry is to the novelty of the composition"). In contrast to Titanium Metals, defendants here provide no evidence that the method of making the food products disclosed in the prior art is the same method of making the food products as claimed. In fact, the uncontroverted evidence of record establishes that there is great

variation in glucosinolate/Phase 2 inducer enzymes in cruciferous sprouts.  See Section II.B.2 above.

Defendants have not -- and cannot show -- that the methods of making food products allegedly disclosed

in the prior art is the same as the claimed methods of making food products.

    In <u>Titanium Metals</u>, unlike the present case, it could be objectively seen that the claimed alloy

fell within the chemical parameters of the prior art alloy, making it possible to conclude definitively that

the identical compositions shared the identical physical characteristics (in that case, a particular

corrosion resistance).   This same distinction exists with <u>Vitamin Technologists, Inc. v. Wisconsin</u>

<u>Alumni Research Found.</u>, 146 F.2d 941 (9th Cir. 1945), <u>cert. denied</u>, 325 U.S. 876 (1945); <u>Bird</u>

<u>Provision Co. v. Owens Country Sausage, Inc.</u>, 568 F.2d 369 (5th Cir. 1978); <u>Verdegaal Bros., Inc. v.</u>

<u>Union Oil Co.</u>, 814 F.2d 628 (Fed. Cir. 1987), <u>cert. denied</u>, 484 U.S. 827 (1987) and <u>In re Woodruff</u>, 919

F.2d 1575 (Fed. Cir. 1990) identified by defendants in their opening brief.  Defendants' Memorandum I,

pp. 10-14.

    In <u>Verdegaal Brothers</u>, both the prior art and the claimed invention related to a manufacturing

process for making liquid fertilizer, that employed a "heel" (a left-over portion of a previous batch) as a

starting component in the method.  The prior art process and the claimed process used the same

ingredients, the same reaction conditions, and the same steps, including the "heel."  It was possible to

objectively determine that the "heel" of the prior art process in fact worked as a heat sink, the function

later asserted as a basis for the patentability of the claims in suit.  814 F.2d at 632-633.

    In <u>Vitamin Technologists</u>, the claim simply recited a method of "imparting antirachitic

properties" to organic substances by exposing them to ultraviolet rays.  There was no definition or

limitation on "antirachitic properties" in the claim, and the court correctly found that this claim was

35

inherently anticipated by the prior art practice of drying hay and coconut in the full sun, which in fact

will impart some level of "antirachitic properties" to the dried material. 146 F.2d at 948-949. Unlike the

claims of the Brassica patents, which define and limit the scope of the claims in ways not disclosed or

inherent in the prior art, the claims in <u>Vitamin Technologists</u> were completely co-extensive with prior art

methods, and it was again possible to make a definitive finding that the effect relied upon for

patentability was occurring with the prior art methods. Likewise, in <u>Bird Provision</u> and <u>Woodruff</u>, every

step in the claimed methods was old and co-extensive with the prior art. <u>Bird Provision</u>, 568 F.2d at

369; <u>Woodruff</u>, 919 F.2d at 1575.

　　　　Unlike the prior art at issue in <u>Titanium Metals</u>, and in similar cases cited by the defendants, in

the present case the prior art only discloses generally some members of the broad class from which the

starting materials for the invention are derived (<u>i.e.</u>, various cruciferous sprouts), without any degree of

specificity. Furthermore, the claims of the Brassica patents specifically define the invention in ways

(<u>i.e.</u>, specific properties not shared by all "cruciferous sprouts, with the exception of cabbage, cress,

mustard and radish") that defendants have not shown to be disclosed in the prior art.

　　　　As with any attack on the validity of an issued patent, the burden is on the defendants to <u>prove</u>

that the prior art product or method possessed the specified property. <u>See</u> <u>Du Pont de Nemours</u>, 849

F.2d at 1435. As already indicated above, the defendants have utterly failed to provide any evidence

supporting their assertion that the cruciferous sprouts disclosed in the prior art necessarily and inevitably

possessed the properties recited in the claims of the Brassica patents. <u>See</u> <u>Atlas Powder</u>, 190 F.3d at

1347; <u>Glaxo</u>, 830 F. Supp. at 874; <u>Mehl/Biophile</u>, 192 F.3d at 1365. Furthermore, all of the evidence of

record, and indeed biological reality, shows that the level of glucosinolates in cruciferous sprouts of any

variety is inherently variable.  See Fahey Decl. (Ex. 8), Tab A, ¶¶7-10; '895 patent (Ex. 1), col. 2, lines

19-23, col. 11, lines 8-10, Example 2.  Given this variability inherent in cruciferous sprouts, coupled

with the total lack of disclosure regarding any glucosinolate levels or Phase 2 enzyme-inducing potential

of the specific sprouts disclosed therein, cases such as Titanium and Verdegaal are inapposite.

> **5.    Defendants' Ability to Meet Their Heavy Burden of
> Proof Is More Difficult Here Because Their Arguments
> Concerning Anticipation by Inherency were Rejected
> by the Patent Office During Reexamination of the '895
> Patent**

The "clear and convincing evidence" standard is impossible for defendants to sustain in this case

because the Patent Office has already rejected, during the course of extensive reexamination of the '895

patent, the same anticipation arguments now made by defendants.  See American Hoist & Derrick Co. v.

Sowa & Sons, Inc., 725 F.2d 1350, 1364 (Fed. Cir.), cert denied, 469 U.S. 821(1984).  As described

above, Sproutman requested reexamination of the '895 patent asserting that claims 1-6 and 9-13 of the

'895 patent were anticipated under 35 U.S.C. §102(b) and/or rendered obvious under 35 U.S.C. §103 in

view of virtually the same prior art being relied upon by defendants.  The Patent Office, in re-affirming

the validity of the '895 patent, rejected defendants argument that claims were inherently anticipated by

the prior art.

Defendants do not deny that these issues were considered and rejected by the Patent Office.

Instead, defendants argue that the reexamination procedure should not be accorded any deference

because: (1) the presumption of validity afforded by 35 U.S.C. §282 applies to patents that have been

reexamined the same way that it applies to patents that have not been reexamined; (2) Brassica allegedly

37

misstated the law during the reexamination process; and (3) defendants additionally rely on the

Cornucopia reference which was not before the Patent Office during reexamination.  All of these

arguments fail.

> a.    The Confirmation of Validity In the Reexamination Over
> Defendants' Inherent Anticipation Argument is Entitled to
> Deference

Defendants' argument that the presumption of validity afforded by 35 U.S.C. §282 applies to

patents that have been reexamined the same way that it applies to patents that have not been reexamined

is misplaced.  Defendants' Memorandum II, p. 6-7.  Brassica is not arguing that the presumption of

validity changes, or is higher, when a patent is reexamined.  Instead, Brassica contends that when, as

here, a reexamination certificate has been issued, the court owes deference to the Patent Office's decision

(Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1572 (Fed.

Cir. 1992) ("[w]here the PTO has considered a piece of prior art, and issued a patent notwithstanding

that prior art, a court owes some deference to the PTO's decision")), therefore making it more difficult

for defendants to satisfy their heavy burden by clear and convincing evidence.  See E. I. Du Pont de

Nemours & Co. v. Polaroid Graphics Imaging, Inc., 706 F. Supp. 1135, 1141 (D. Del. 1989), aff'd, 887

F.2d 1095 (Fed. Cir. 1989) ("because the PTO issued a Reexamination Certificate, Polaroid's burden is

more difficult to satisfy, especially because all the prior art upon which it bases its anticipation defense,

including the Law patent, was before the examiner at both the original and the reexamination

proceeding.") (citations omitted); E. I. Du Pont de Nemours & Co. v. Cetus Corp., 19 U.S.P.Q.2d 1174,

1179 (N.D. Cal. 1990) ("[t]he court therefore regards the PTO's reexamination findings of validity for all

38

claims of the '202 and '195 as highly probative on the issues considered and with respect to the prior art considered during reexamination.") (citations omitted).

The reasons for allowing deference to the Patent Office's determination in a reexamination proceeding are obvious. The Patent Office is the expert body charged by Congress with the task of reviewing patent applications for validity, and like any administrative body applying such expertise, its views must be accorded deference. American Hoist, 725 F.2d at 1359-60. In addition, in the context of a reexamination proceeding, the examiner is required to apply a much higher standard of validity than is the case in litigation. Rather than the presumption of validity applicable in litigation, the examiner reviews the patent with no presumptions at all. See In re Etter, 756 F.2d 852, 856-57 (Fed. Cir. 1985), cert. denied sub nom., Etter v. Commissioner of Patents and Trademarks, 474 U.S. 828 (1985). Thus, in the reexamination in this case, the Examiner considered de novo whether the '895 patent was valid in light of the "substantial new question of patentability" that gave rise to the reexamination. Id. The Dupont v. Cetus case cited above found it "highly significant that the patents were upheld by the PTO against a higher standard than that to be applied by this court." E. I. Du Pont de Nemours & Co. v. Cetus Corp., 19 U.S.P.Q.2d at 1179. The result is that in the reexamination, Brassica had to satisfy, and did satisfy, a higher standard than the validity standard applicable in this case.

### b.    Brassica Did Not Misstate the Law During the Reexamination Proceeding

Defendants' assertion that Brassica misrepresented the law on inherency to the Patent Office is frivolous. Defendants' Memorandum II, pp. 6-7. Brassica cited In re Schreiber, 128 F.3d 1473 (Fed. Cir. 1997), for the black-letter definition of anticipation. See Ex. 7, p. 4. Brassica did not cite this case

39

"for a rule contrary to the actual ruling in the case ...."  Defendants' Memorandum II, pp. 6-7.

Defendants also complain that Brassica did not cite <u>Titanium Metals</u>, but then assert that "a reading of <u>In re Schreiber</u> would show [<u>Titanium Metals</u>] to be very much on point to the issue of law created by the claim language in this case."  <u>Id</u>., p. 7.  For reasons stated above, Brassica contends that <u>Titanium Metals</u> is irrelevant.  However, Brassica's citation to <u>In re Schreiber</u>, according to defendants, would have made the examiner aware of <u>Titanium Metals</u>.  Furthermore, most of the cases which defendants claim Brassica did not cite to the examiner had in fact already been cited by Sproutman in its Request for Reexamination.  <u>See</u> Ex. 4, pp. 7-8.

Defendants also misrepresent the sequence of the reexamination proceeding itself, stating that the interview with the Examiner occurred <u>after</u> the Amendment and Request for Reconsideration was filed (Defendants' Memorandum II, page 7), making it appear that the Examiner required some additional "showing" over and above that made in the Amendment and Request for Reconsideration.  Defendants are wrong.  The record reveals that the interview occurred first, on May 3, 2000, followed by the filing of the Amendment and Request for Reconsideration (with supporting Declarations) on May 8, 2000.  The requested showing of a lack of inherency was in fact made to the Examiner's satisfaction through the Declarations of Jed Fahey and Paul Talalay, and the accompanying discussion of the relevant case law.  <u>See</u> Notice of Intent to Issue Reexamination Certificate (Ex. 9).  The defendants' inflammatory statement that "the Brassica inventors should have been candid with the Examiner rather than continuously arguing that they had invented a new method of making a food product" (Defendants' Memorandum II, page 9), is simply untrue and rather absurd in view of the detailed description in the specifications of the Brassica patents that sets out <u>exactly</u> what the inventors did in arriving at the claimed invention.

40

> c.    The <u>Cornucopia</u> Reference Is Cumulative
> of References Considered in the
> Reexamination Proceeding

Defendants' allegation that <u>Cornucopia</u> purportedly "contradicts" the arguments made by Brassica

to the Patent Office during the '895 reexamination, and that the "rationale used by the Plaintiffs to

overcome the rejection of their patent application by the PTO Examiner no longer exists" is baseless.

Defendants' Memorandum III, pp. 11-12.  The <u>Cornucopia</u> reference is entirely cumulative with art

already before the Patent Office during the reexamination of the '895 patent, does not conflict with any

argument made to the Examiner, and in no way undermines the evidence submitted by Brassica

establishing that "rich in glucosinolates" is not inherently disclosed in the prior art.  See Section II.B.2,

<u>supra</u>.

> C.    Defendants' Motion Should Be Denied for the Additional Reason That
> Defendants Have Failed To Show that The Prior Art Discloses Several
> Other Elements of the Claimed Invention

Defendants' summary judgment motion should be denied for the additional reasons that

defendants have failed to establish that the prior art disclose several other elements of the claimed

invention.  For example, defendants cannot show that the prior art discloses: (a) method of making a

food product comprising sprouts having non-toxic levels of indole glucosinolates and their breakdown

products and goitrogenic hydroxybutenyl glucosinolates (<u>see</u> '895 patent (Ex. 1), claim 2; '567 patent

(Ex. 2), claims 1 and 8; and '505 patent (Ex. 3), claims 1 and 16); (b) the identification of seeds that

produce sprouts rich in glucosinolates, or having high levels of Phase 2 enzyme-inducing potential, and

non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl

glucosinolates, an element of all the claims (<u>see</u> '567 patent (Ex. 2), claims 1 and 8; and '505 patent (Ex.

41

3), claims 1 and 16); (c) any method using such sprouts to increase the chemoprotective amount of Phase 2 enzymes in a mammal (see '505 patent (Ex. 3), claim 1); and (d) any method using such sprouts to reduce the level of carcinogens in a mammal (see '505 patent (Ex. 3), claim 16).

Furthermore, defendants provide no evidence that any of these claim limitations is inherently disclosed in the prior art.  Defendants' motion should be denied for each of these additional reasons.

## III.   DEFENDANTS' ARGUMENT THAT THE BRASSICA PATENTS ARE INVALID UNDER 35 U.S.C. §101 IS MERITLESS

Defendants introduce for the first time in Memorandum III the issue of invalidity under 35 U.S.C. §101.  Defendants allege that "[t]he patent law is clear:  where no modification of a plant has occurred, but only the identification of a naturally occurring feature of the plant, then any patent based upon claiming either the plant or the methodology for making the plant is invalid by law."  Defendants' Memorandum III, p. 13.  Defendants' assertion is wrong both factually and legally and should be rejected.

First, defendants' argument is premised on the erroneous assertion that the invention is merely "sprouts" (Defendants' Memorandum II, p. 12).  The claim language and specification of the patents make abundantly clear that the claimed invention relates to methods of making food products that use as a starting material certain specifically defined cruciferous sprouts, and to food products comprising these sprouts.  See Section II.B., above.  Defendants point to no evidence that a food product rich in glucosinolates, prepared by selecting cruciferous sprouts rich in glucosinolates and harvesting them prior to the two-leaf stage ever existed in nature.  Such a food product is a product of man, not a product of

nature.  Defendants' argument that such a product and the claimed method for its preparation do not constitute subject matter that is eligible for patent protection under §101 is frivolous.

Second, defendants' argument is premised on their erroneous *ipse dixit* that Brassica has done nothing more than patent an inherent quality of a plant.  However, there are many claim limitations in the Brassica patents that are not inherent in cruciferous sprouts (see Sections A and B above) and that involve the "hand of man" in their use in the claimed invention.  For example, the claims involve the step of selecting sprouts that are rich in glucosinolates for use in the claimed methods.  Contrary to defendants' assertion, a food product comprising a plurality of these sprouts, for example, is not a "product of nature" as the term is used in patent law, because the property of being "rich in glucosinolates" is not shared by all cruciferous sprouts.  Human intervention is required in order to achieve the subset of sprouts having the properties required by the claims.  The selection step alone is sufficient to place the food products of the Brassica patent claims within the §101 definition of a "manufacture," or combination.  Diamond v. Chakrabarty, 447 U.S. 303, 308 (1980) ("this Court has read the term 'manufacture' in §101 in accordance with its dictionary definition to mean "the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery."); In re Mancy, 499 F.2d 1289 (C.C.P.A. 1974) (method of producing an antibiotic utilizing a purified strain of Streptomyces patentable); In re Application of Bergy, 596 F.2d 952 (C.C.P.A. 1979) (purified bacterial strain patentable); Georgia Kaolin Co. v. Thiele Kaolin Co., 228 F.2d 267 (5th Cir. 1955) (specified particle size fraction of natural kaolin clay, and methods for making the same, patentable).

43

Furthermore, defendants are wrong with regard to the law.  An invention is not unpatentable under 35 U.S.C. §101 merely because it uses or incorporates unmodified "natural" materials.  Congress intended the patent laws to "'include anything under the sun that is made by man" as statutory subject matter.  Diamond, 447 U.S. at 309 (quoting legislative history of the 1952 Patents Act).  There are numerous reported cases holding that such "selection" inventions are eligible for patent protection.  In Mancy, for example, the invention related to a method of producing the antibiotic daunorubicin, using a newly-discovered and isolated species of Streptomyces bacteria.  See Mancy, 499 F.2d at 1294.  The bacterium itself was unaltered.  In reversing a holding of unpatentability by the Board of Patent Appeals, the Court of Customs and Patent Appeals (a predecessor court of the Federal Circuit), stated that

> "Here appellants not only have no allowed claim to the novel strain of Streptomyces used in their process but would, we presume (without deciding), be unable to obtain such a claim because the strain, while new in the sense that it is not shown by any art of record is, as we understand it, a "product of nature." However, it is not required for unobviousness of the method-of-use claims that the new starting material be patentable.  In re Schneider, [481 F.2d 1350 (C.C.P.A. 1973)]; 35 U.S.C. §103.
>
> The process of using the new Streptomyces strain which appellants have discovered is clearly within 35 U.S.C. 101, and we note the ready willingness of the board here, as in Ex parte Arzberger and Ex parte Kropp, to allow appellants to claim it if they show unexpected results from the use of this new strain."

Id. at 1294 (emphasis added).

In a later decision, In re Application of Bergy, 596 F.2d 952 (C.C.P.A. 1979); vacated as moot, 444 U.S. 1028, 100 S. Ct. 696 (1979), the same court clarified the Mancy dictum, stating that,

> "we now make it explicit that the thought underlying our presumption that Mancy could not have obtained a claim on the strain of microorganism he had described was simply that it *lacked novelty*.  We were thinking of something preexisting and merely plucked from the earth and claimed as such, a far cry from a biologically

44

> pure culture produced by great labor in a laboratory and so claimed. Furthermore, it now appears to us, in light of what we have learned in this case about the separation and identification of new strains of *Streptomyces*, that our dictum was ill-considered. Had we known what we now know, we would likely have abjured the stated presumption."

Id. at 976 (emphasis original). The court in Bergy made absolutely clear its opinion that substances or organisms found in nature can be patented, so long as they are sufficiently altered in their properties or form (for example, through selection based on a desired quality) to place them within the definition of a "manufacture" under §101, and otherwise meet the novelty requirements of §102. See Georgia Kaolin, 228 F.2d 267.

In Georgia Kaolin, the invention related to a process for treating raw kaolin clay to obtain a clay fraction "containing colloidal particles and non-colloidal smaller particles at least about 80% of which are of a size between 0.1 and 2 microns and adapted to impart gloss and color when applied to paper." 228 F.2d at 270. The process did not alter the clay particles, but merely separated the identified size fraction from the raw clay, yet the court determined it to be eligible for patent protection because it "produc[ed] an improved clay fraction which imparted greater gloss and color than possible with theretofore known 'H.T. clay', so as to render its use commercially more advantageous to the paper coating industry and justify its patentability." Id. at 272.

Defendants' reliance on Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 68 S. Ct. 440 (1948) is also misplaced. This case does not stand for the cited proposition that any product or process employing natural materials is unpatentable as defendants suggest. In Funk Bros., the claimed invention related to a mixture of known strains of so-called "nodule-forming" bacteria, used in agriculture to innoculate legume plant roots and improve their nutrient-absorbing capacity. 68 S. Ct. at 440-441.

What the inventor discovered was that certain strains of these bacteria did not inhibit one another's ability to infect plant roots as had been previously thought, and so developed a mixed culture inoculum comprising a number of known bacterial strains, each of which infected a particular plant or range of plants (a known property of each strain), to form an inoculum that could be used in inoculating a broader range of plants.  The Supreme Court held this product claim unpatentable because

> "however ingenious the discovery of that natural principle may have been, the application of it is hardly more than an advance in the packaging of the inoculants. Each of the species of root-nodule bacteria contained in the package infects the same group of leguminous plants which it always infected.  No species acquires a different use.  The combination of species produces no new bacteria, no change in the six species of bacteria, and no enlargement of the range of their utility.  Each species has the same effect it always had.  The bacteria perform in their natural way.  Their use in combination does not improve in any way their natural functioning.  They serve the ends nature originally provided and act quite independently of any effort of the patentee."

Id. at 442.

This is unlike the invention of the Brassica patents, where the sprouts used in the methods acquire a different use (chemoprotection) through the selection and cultivation process recited in the claims.  The new use goes beyond "convenient packaging" --  the resulting food product possesses distinctly different qualities and characteristics than any prior art food product comprising a plurality of cruciferous sprouts (it is rich in glucosinolates, for example).  In other words, there is no evidence that anyone, prior to Mr. Fahey and Dr. Talalay, selected sprouts rich in glucosinolates and prepared a food product using those sprouts.  The prior art provided no motivation for doing so, and the novel product and method discovered by Mr. Fahey and Dr. Talalay did not (and do not) exist in nature.

46

Courts have long recognized the patentability of inventions employing "natural" products or processes (Georgia Kaolin, 228 F.2d 267; Merck & Co. v. Olin Mathieson Chem Corp., 253 F.2d 156; Mancy, 499 F.2d 1289; Kratz, 562 F.2d 1169; Bergy, 596 F.2d 952; Hybritech, 802 F.2d 1367; Scripps, 927 F.2d 1565).

## IV.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT OF NO ANTICIPATION

As set forth above, all of the evidence of record indicates that claims 1-6 of the '895 patent, claims 1 and 8 of the '567 patent and claims 1 and 16 of the '505 patent are not invalid as anticipated by the prior art. This evidence is uncontradicted by the defendants. Because there are no material facts in dispute, plaintiffs are entitled to summary judgment that these claims of the Brassica patents are not invalid. See Transmatic, 53 F.3d at 1274-1275.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment should be denied. Furthermore, plaintiffs are entitled to summary judgment that the claims at issue are valid, and plaintiffs' cross-motion should therefore be granted.

Respectfully submitted,

_____

E. Anthony Figg
Joseph A. Hynds
/s/Mark I. Bowditch
ROTHWELL, FIGG, ERNST & MANBECK, P.C.
Suite 701 East Tower
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 783-6040 (Tel)
(202) 783-6031 (Fax)

47

*Lead Counsel and Co-Liaison Counsel for Plaintiffs*

*Co-Liaison Counsel for Plaintiffs:*
Paul Mark Sandler (Fed. Bar. No. 00145)
William Michael Mullen (Fed. Bar. No. 11015)
Freishtat and Sandler
201 E. Baltimore Street
Suite 1500
Baltimore, MD 21202
(410) 727-7740 (Tel)
(410) 727-7356 (Fax)