1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MARYLAND

 3   BRASSICA PROTECTION          *

 4   PRODUCTS LLC, et al.,        *

 5        Plaintiffs             *

 6   vs.                         *   1-01-01388

 7   SUNRISE FARMS, et al.       *

 8        Defendants            *

 9                    + + + + + + + +

10       A hearing was held in the above referenced case on

11   July 23, 2001 before the Honorable William N.

12   Nickerson.

13   A P P E A R A N C E S

14   For the Plaintiffs:

15          Anthony Figg, Esquire

16          W. Michael Mullen, Esquire

17          Joseph Hynds, Esquire

18          Tony Tallay, Company Representative

19   For the Defendants:

20          Delbert Bernard, Esquire

21          Joseph Kromholz, Esquire

22          Phillip Andrews, Esquire

23          Donald Ullrich, Esquire

24   Reported by:

25   Barbara J. Shaulis, Official Court Reporter
```

2

```
 1                        July 23, 2001

 2          THE CLERK:    The matter now pending before the

 3  Court is is a multi district litigation case,

 4  1-01-01388 Brassica Protection Products, et al versus

 5  Sunrise Farms, et al. Counsel for plaintiff are

 6  Anthony Figg, Joseph Hynds and William Michael

 7  Mullen.

 8          Counsel on behalf of the defendants are

 9  Delbert Barnard, Joseph Kromholz, Philip Andrews and

10  Donald Ullrich, and this matter comes before the Court

11  for a Markman hearing.

12          THE COURT:    Counsel, before I turn it over to

13  you, I am somewhat concerned about getting lost in the

14  patent law forest in all of this.  It is a different

15  looking forest than most forests that I see on a

16  day-to-day basis, a lot of strange looking trees and

17  the thickets from which people don't return.  I hope

18  we can keep the proceedings here in one of the

19  clearings.

20          After going through all this, there are a

21  number of questions that I have in my mind and I don't

22  know if it will assist you all or make things more

23  difficult by simply telling you some of those

24  questions, and then I will turn it over to you for

25  however you want to proceed.
```

3

1        Some of the questions, not all of the

2   questions, have come to my mind in simple and in law

3   terms.

4        What is the method and what is the process

5   that plaintiff' claim is patentable.

6        Does the method or the process manipulate or

7   alter or modify the select germination sprout

8   harvesting of broccoli sprouts, and if so, how

9   specifically.

10        And how are the patent methods or processes

11   not newly discovered results of old methods or

12   processes, and is the court issue plaintiffs' claim to

13   a method or to the process which teaches that one can

14   consistently produce broccoli sprouts and containing

15   at least two hundred thousand units per gram enzyme

16   and -- as opposed to production without this method or

17   process, that such a result would only be a randomly

18   occurring approximately 54 percent of the time

19   occurrence, and if so, what is it about the method or

20   the process or the means of manipulation that

21   accomplishes this.

22        Those are some of the questions that have been

23   going through my head, and I am trying to describe the

24   answers to, and I am having some difficulty, but I am

25   sure after you all present everything, it will all

4

1  become very clear.

2          One other thing I want to say is with regard

3  to the the Plaintiffs' Summary Judgment Motion,

4  defendants most recent rating which speaks to that, I

5  believe is correct, and that that motion should be

6  simply put on the shelf for the time being and we can

7  deal with it, if and when we get this.  That seems to

8  me, certainly the discovery process has to run out and

9  see where we are.

10          I don't know if you have considered among

11  yourselves how you want to proceed.

12          MR. FIGG:  We haven't talked about it, Your

13  Honor, but this is both a hearing on claims

14  construction on defendant's Motion for Summary

15  Judgment, so I think it would be appropriate, since it

16  is defendant's motion, if they want to proceed, and

17  then we will will respond to that.

18          MR. BARNARD:  That is the way we planned it.

19          THE COURT:  You agree?

20          MR. BARNARD:  We agree.

21          THE COURT:  That is the way to proceed?

22          MR. BARNARD:  Yes.

23          THE COURT:  All right.

24          MR. KROMHOLZ:  And, Your Honor, if I may, the

25  way the defense has set it up, Mr. Barnard will cover

5

1    the claim construction aspects and Mr. Kromholz will

2    cover the summary judgment aspects.

3        There probably will be some overlap as we go

4    through the thicket, but we will proceed in that order

5    if that is all right with Your Honor.

6        MR. MULLEN:   Your Honor, on the plaintiffs'

7    side Mr. Figg will be doing the argument.  I want to

8    introduce Mr. Tony Tallay who is the representative

9    from Brassica Protection Products who is here this

10   morning.

11       THE COURT:   Glad to have you here.

12       MR. BARNARD:   Thank you, Your Honor.  I have

13   given the Court three sheets with some data on them

14   that I think we can use to follow the argument as

15   opposed to taking the extra time that we would have to

16   use if we are going to show it on the screen, plus it

17   is not quite as easy to read on the screen as I

18   thought it would be.

19       We do have one document up on the screen that

20   isn't among the ones that I copied, and so I will just

21   refer to it first, and then get into my presentation.

22   It is relative to what we are going to be talking

23   about, the first patent.

24       The 5725859 or 859 patent, went through a

25   reexamination where a party requested it and then that

1   party steps out of the proceeding, and there is

2   another ex parte examination between the applicant and

3   the patent office, and during the course of that ex

4   parte proceeding there were documents filed by the

5   applicant to the patent office, and an oral interview

6   with the patent examiner, and the patent examiner did

7   reaffirm the patentability of the claims.

8         And as she is required to do by the procedure,

9   she then issued a statement as to her reasons for

10  doing this, and what she said was that the method of

11  preparing -- I have to move over here just a little

12  bit.

13        The method of preparing a food product wherein

14  cruciferous sprouts with the exception of cabbage,

15  cress, mustard and radish sprouts that are rich in

16  glucosinolates or contain high levels of Phase 2

17  enzyme inducing are harvested prior to the 2-leaf

18  stage is not taught nor fairly suggested by the prior

19  art or any combination thereafter.

20        The examiner felt that it was necessary for

21  her to actually find the results that are mentioned in

22  her statement in the prior art as opposed to in some

23  other way.

24        Your Honor asked for a simple layman term, you

25  know, there is a little problem here, but we will take

1  care of it.

2       A layman term of the process involved, and the

3  best source of that is in the patent document itself.

4       Now, there are three patents in suit, but they

5  all came from the same application.  They have then a

6  common description drawing.  The only thing that is

7  different is the claims.

8       The first application was filed and the

9  examiner said, you are claiming more than one

10  invention.  Let's restrict this first application to

11  one enbaney subject matter and then you can file some

12  continuing applications to present the other subject

13  matter and that is what was done.

14       Now, in the application itself, there is a

15  reference to sprouting, and it is in column 10, and

16  the handout sheet I have is the top part on the right

17  column and column 10 and in the patent starting on

18  line 9, it says typically the sprouts are grown on a

19  non-nutritive solid support and I will read down, with

20  water and light supplied.

21       And then starting on line 21 it says numerous

22  methods for the cultivation sprouts are known and then

23  there is some examples presented by way of reference

24  to patents falling down on the right side column under

25  the patent number 4,086,725 is an excerpt from one of

1    the patents listed.  That is Exhibit P in the record.

2         Ant it says here, plant sprouts are commonly

3    grown for human and animal consumption by subjecting

4    them to controlled temperatures of light and

5    humidity.  Plant sprouts grown by conventional

6    procedures usually require about 5 or more days of

7    growth before they are ready for harvesting.

8         Now, what is really mentioned here is the

9    process of germination, and in Mr. Greg Lyons

10   (phonet.) declaration, it is in the record, he has a

11   statement that I think is undisputable.

12        The sprouting process, germination is an act

13   of nature when seeds are placed in the ground and are

14   watered, they first germinate into a sprout, and then

15   the sprout grows into a plant.  The sprout grower

16   germinates the seeds only to the sprout stage usually

17   out of the ground in a sprouter.  They are then

18   harvested, so it is a very simple process.

19        We have made reference in the record to quite

20   a number of texts, most of which start out by making

21   reference to the practice of the Chinese over two

22   thousand years ago doing this, the same thing.  Taking

23   a seed, putting moisture on it and then set and watch

24   it until it becomes a sprout, and then harvest it

25   while it is still a sprout before it becomes something

9

1   else, and now you have a good source of food.

2          Going back to the document here that I just

3   referred to, on the left column at the top is claim 1

4   of the patent and I will read it for the record even

5   though you have that in front of you.

6          A method of preparing a food product rich in

7   glucosinolates comprising germinating cruciferous

8   seeds with the exception of cabbage, cress and mustard

9   and radish seeds, and harvesting sprouts prior to the

10  2-leaf stage to form a food product comprising a

11  plurality of sprouts.

12         What I did there was underline what I termed

13  to be the solid action steps of the method.  Patent

14  claims aren't just a set of words.  They are supposed

15  to be a description of an actual thing.  In this case,

16  a method, and as it says here, you start out with

17  cruciferous seeds, and you germinate them, and then

18  you harvest the sprouts prior to the 2-leaf stage.

19         If you follow it down on the left-hand column,

20  second paragraph from the bottom, it says by growing

21  these plants only to the seedling or sprout stage,

22  that is between the onset of germination and the

23  2-leaf stage, so I don't think it is in dispute that

24  there is nothing magic on the 2-leaf stage.  It just

25  means that you harvest the sprouts while they are

10

1  still sprouts.

2       Now, the part of claim one up there that is

3  not underlined, it is our position that just the

4  statement of an inherent result found by the assayor

5  was done and the interesting part of this case I think

6  that distinguishes from most other cases, particularly

7  inherency cases is the fact that it does involve a

8  germination.

9       And going over again to the right-hand column

10  where there is the reference made to the numerous

11  methods are known, there is no indication in the

12  patent that the patentees did anything other than use

13  this known process.  There is nothing disclosed that

14  they added some material that would enhance anything

15  in the formation of the sprouts.  There is no extra

16  steps without those disclosed they wouldn't be able to

17  support claims, and of course, the claims just

18  strictly says germinating, and it is our position is

19  that what the patentees did here was to practice the

20  prior art.

21       They went out and they found a number of

22  cruciferous seeds that were regular seeds, were not

23  genetically engineered, they have admitted that, and

24  they went and set about and they made some sprouts,

25  and then at the end of making of the sprouts using the

1    public domain prior art method, they did their assay,

2    so before they ever did the work that led to their

3    discovery they had practiced a method in the prior

4    art.

5         And so from then on, since there was no

6    addition of material or steps to that method, I think

7    the only conclusion that there is, is that whatever

8    they find by way of the assay is the finding of the

9    inherent result, and when it comes to burden of proof

10   here, we recognize that as the challenger to these

11   patents that we have the burden of presenting our

12   case, the patentees don't have to do anything.

13        We have to show up and say, Your Honor, these

14   patents are invalid for these reasons, and we have a

15   clear and convincing burden of proof when it comes to

16   proving the facts that are necessary to set up our

17   position, and we submit that the patent document

18   itself with the admissions in it is the clear and

19   convincing burden of proof, that the use of a prior

20   art method of germinating cruciferous sprouts will

21   inherently result in some of the sprouts having lower

22   amounts of these substances and other of the sprouts

23   having higher amounts, and in each case, whether it is

24   a lower or higher, it is an inherent result of

25   practicing just plain old common nature's germination

12

1  of the seeds.

2       Now, the text that we have of record includes

3  Larcum (phonet.), that is Exhibit L, and on page

4  HF0153, she makes the statements, the seeds of any

5  Brassicas can be sprouted providing they have not been

6  treated or dressed in any way, so that is any, and, of

7  course, that makes sense, because every seed, I don't

8  think there is a single exception, every seed goes

9  through the stage of a sprout to a plant when it

10  germinates.  I don't think there is any plant that is

11  grown that doesn't germinate.

12       Monroe Exhibit F on page HP0052, she -- I have

13  an excerpt on the bottom of the left column that is

14  out of her text, ant it refers to the cabbage family

15  of which broccoli, brussel sprouts, cabbage,

16  cauliflower and so forth are a part, and she says all

17  are easy to sprout and each one produces a tasty

18  sprout of a slightly different flavor.

19       Now, the problem here is, and this is

20  addressed in the Titanium case among others, is that

21  if these claims are allowed to stand, they could be

22  used to stop people from following the teachings here

23  of Larcum (phonet.), and of Monroe, and going out and

24  acquiring ordinary cruciferous seeds and using just

25  nature's method of germination to make sprouts, and

1  package them for sale in the stores as a food product,

2  because the steps to making them remain the same.

3      There is absolutely no change, no

4  additional -- no reduction in steps or addition to

5  steps, and so regardless of what you get in them, if

6  anything, the steps remain the same, so in this case

7  we have the example of the plaintiffs bringing suit

8  against six sprout farmers who have been sprouting for

9  many years in a sense, saying you can't sprout

10  cruciferous seeds because we have made these

11  discoveries relating to the content of these cancer

12  fighting substances.

13      Now, in the Titanium Metals case which is a

14  composition case, but the rule is still the same, the

15  court early on said the question therefore is whether

16  claims 1 and 2 encompass, and if allowed would enable

17  plaintiff appellee to exclude others from making,

18  using or seeing an alloy described in the Russian

19  article.

20      And then later on, they say after making

21  reference to the arguments and evidence that has been

22  produced to the court below that, but the trial

23  counsel never came to grips with the real issues,

24  number one, what did the claims cover, and what they

25  cover now.

14

1          And then Titanium went on to say that this is

2     really a question of claim construction, and that is

3     the logical starting point, and they looked at the

4     claims describing the claims into the elements of the

5     alloy versus the results.  There is another parallel

6     in this case to our case that is interesting.

7          The prior art in the Titanium case was a

8     German patent, and it disclosed a number of alloys,

9     the particular alloy was made up of titanium, nickel

10    and melenium, and as you vary the percentages, the

11    relative percentage of those elements you create a

12    different alloy, so it had quite a range of alloys in

13    the reference.

14         And one of the arguments that was made by the

15    patentees here, or actually the applicant they haven't

16    got a patent yet, was that they had discovered this

17    particular range where you got this result of good

18    cross resistance, and outside of the limits of this

19    particular range this resistance diminishes.

20         And the court in answering this says, it is

21    immaterial on the issue of their novelty, what

22    inherent properties the alloys have or whether these

23    applicants discovered certain inherent properties, so

24    they just put that caveat into an interior category.

25         Going back to the sheet that has the reference

15

1   to 895 patent on it, just for identification purposes

2   for the record, at the top left is Claim 1, Claim 2,

3   Claim 9, and then a reference to a cruciferous sprout

4   is a plant or seedling that is at an early stage of

5   development following seed germination.

6        There again, was a spot that something could

7   have been said if these patentees had done something

8   different than just following the usual method of

9   germinating seeds.

10       Now, claim 9 is interesting when compared to

11  claim 1, again I have underlined the action steps and

12  not underlined the inherent result language, and so

13  when you compare the action steps between claims 1 and

14  9 they are the same.  A similar situation existed in

15  the Bristol Myers case that is mentioned in the

16  brief.

17       Bristol Myers does relate to a method and it

18  answered that the doctrine of claim differentiation,

19  there is a doctrine in the patent law, if you have

20  plural claims that you are intended to make each one

21  of them be different than the other, but of recent

22  times the federal circuit has said you can use

23  different words to, in effect say the same thing, and

24  so they will say you can't use the doctrine of claim

25  differentiation to block the claim construction

16

1    inquiry that the law requires.

2         So again, the plaintiffs here, in answering

3    the defendant's brief, say that rich in glucosinolate

4    which is really the only thing in claim 1 that would

5    distinguish it over 1, either the prior art admitted

6    by the plaintifs or the prior art in one of the

7    references that we found.  That is the only thing

8    mentioned in the claim.

9         In claim 9 they get into talking about the two

10   hundred thousand units, and so plaintiffs inform us

11   that they mean the same thing.  That rich in

12   glucosinolates means you have at least two hundred

13   thousand units of this enzyme inducing substance.

14        Over on the right side again, oh, below the

15   reference in the 725 patent, I quoted from Exhibit M

16   which is the Meyerowitz and it does make reference to

17   glucosinolates and sulphoraphane, the crucifers

18   contain a compound called glucosinolates which block

19   the development of cancer, sulphoraphane stimulates a

20   cell production of certain protective enzymes that

21   resist tumor growth, and it also says that foods that

22   contain sulphoraphane are the sprouts of broccoli,

23   kale, turnip, garlic, onion and Chinese cabbage, so I

24   think the result would still be the same if that

25   wasn't in the prior art.

1       But that is not prior art which kind of

2  narrows discovery down even further to being just that

3  when you lay out a large number of cruciferous seeds

4  and sprout them and then assay them, you are going to

5  find that some of them have higher levels and some

6  lower levels of this enzyme creating substance.

7       The last thing on the handout sheet here at

8  the bottom is a quote out of Atlas Powder.  Atlas

9  Powder was also a composition case, and it starts out

10 here in the quote I have here by a quote from

11 Titanium, and then it says, the same reasoning holds

12 true when it is not a property but an ingredient which

13 is inherently contained in the prior art.

14      The public remains free to make use or sell

15 prior art compositions or processes regardless of

16 whether or not they understand their complete makeup

17 or the underlying scientific principles that allow

18 them to operate.

19      Now, another important factor in this

20 situation is contrary to what the examiner said up

21 here in the reasons for allowance, it is not necessary

22 to find these inherent results or alleged to be

23 inherent results in the prior art or in the knowledge

24 of a person skilled in the art, the Titanium case

25 directed or addressed that, and says that the

18

1  discovery can be made by the person seeking the

2  patent, or in this case the people that have the

3  patent, the Brassica inventors.

4        In Titanium, there was this one reference to

5  the Russian article and it had some descriptions,

6  structural descriptions of an alloy in it, but nothing

7  said about the good cross resistance and it didn't

8  have the range that was being claimed, and the court

9  said that these teachings are very useful

10  information.  These things, the applicants teach the

11  art and the Russian article does not.

12        Then the court went on to say that Congress

13  has not seen fit to permit the patenting of an old

14  alloy known to others through a printed publication by

15  one who discovered cross resistance or other useful

16  properties, or has found out to what extent one can

17  modify the compositions of the alloy is losing such

18  properties, and that is the reference to the range

19  that was in the claim.

20        I will summarize now and say it is the

21  defendant's position that by the prior art references

22  that we have produced and by the patent documents

23  themselves, that we say, admit that just knowing

24  convention germination was used to produce the

25  sprouts, that is a clear and convincing way of showing

1  that the prior art included the action steps.

2        And since the patent is absolutely silent of

3  anything else being done, I think the legal conclusion

4  should be that any kind of results, including the

5  claimed result could only have been because they were

6  inherent in the operation of nature's process of

7  germination.

8        Thank you.

9        THE COURT:    Thank you.

10        Anything further on the defense side?

11        MR. KROMHOLZ:    Well, in addition to the

12  Markman issue, I think it is fair at this point to try

13  to summarize and stay in the clearing, as the Court

14  has directed us regarding patent law.

15        I thought all the questions the Court asked

16  were good questions.  I tried to write them down as

17  quickly as I could, and I am going to try to address

18  some of those, but if there is a question that the

19  Court wants addressed, please stop me and ask that

20  question, and I will gladly try to answer it, as best

21  as a patent attorney can make something clear perhaps,

22  but --

23        I am going to try to turn my argument around

24  here a little bit, Your Honor, on summary judgment.

25        The question I think that needs to be kept in

1  mind is that the law of anticipation as agreed upon

2  here requiring that the limitations of the claimed

3  invention be disclosed in one reference, so all that

4  is required to anticipate a claim of a patent is a

5  reference that meets those limitations.

6         And I think that the plaintiffs have turned

7  that requirement around when they represented to the

8  examiner the clear admission that 13 of 28 separate

9  cultivars they tested did not have the level that they

10  claimed of anti-carcinogenic material, but that means

11  that 15 cultivars known did have that level of

12  anti-carcinogenic material.

13         That means that each one of those references

14  disclose the level of anti-carcinogenic material.  It

15  is not that we need to show that every cruciferous

16  sprout contains this level of anti-carcinogenic

17  material.  It is that they need to show that no

18  cruciferous sprout but for the methodology that they

19  practice, contains this level of anti-carcinogenic

20  material.

21         One reference, one cultivar that is made by

22  this known process that contains and results in this

23  level of anti-carcinogenic term is an anticipation,

24  excuse me, the plaintiffs have already admitted that

25  the prior art discloses cultivars that result in the

1  claimed levels of anti-carcinogenic material.  They

2  did so in the prosecution history.  There is no

3  argument here.

4      And I think the last filing of the plaintiffs

5  in response to the cross motion, their reply and our

6  response to their cross motion for summary judgment at

7  the end of page 1 starting at page 2 asserts that we

8  present no evidence that the claimed limitations

9  requiring food properties produced by the claimed

10  method be rich in glucosinolates is inevitable.

11      And therefore, an inherent result of

12  practicing the prior art, but what they admit in their

13  patent methodology is an old methodology for

14  cultivating sprouts, and they cite at column 10 of the

15  895 patent a whole list of patents that say this is

16  how you cultivate sprouts so the process for the

17  cultivation of sprouts is known.  There is no dispute

18  about that.

19      Now, the consumption of sprouts as a food

20  product is known.  Yes, the consumption of sprouts as

21  a food product is known, and we site Meyerowitz

22  (phonet.).  We cite Cornucopia (phonet.).  We cite

23  Sprouts that Grow and Eat.

24      Our cruciferous sprouts known to be consumed

25  as a food product, yes, even Meyerowitz (phonet.),

1  Cornucopia, Sprouts that Grow and Eat, all identify it

2  as a healthy food product.

3       You sprout the sprouts and you consume them.

4  So you germinate the seed.  You harvest the seed, you

5  consume the sprouts.  If you germinate the type of

6  sprout that is disclosed in the patent, according to

7  the patent you will always get the level of

8  glucosinolates that is claimed.

9       The plaintiffs can't argue that by following

10 their methodology you get a random result.  That would

11 not be a patentable thing.  It would be like saying if

12 you build this engine it may work some days and it

13 might not work others.  You don't get patents on

14 things that don't have utility.

15      So by the admitted known process you use the

16 known seeds to achieve this new discovery.  In other

17 words, you are using an old methodology to achieve a

18 new discovery, and when you do that the law is clear

19 that that is not patentable.

20      The Cornucopia reference, which I know that

21 the plaintiffs want to say this is just a cumulative

22 reference and basically try to argue that the Court

23 should ignore it, discloses the exact type of sprout

24 that they claim in their patent, and if you follow the

25 Cornucopia reference and you sprout it and you eat it,

1   you are practicing their invention.

2           And I think the Court should ask the fair

3   question of the plaintiffs, can people practice

4   sprouting broccoli as disclosed in the Meyerowitz

5   (phonet.), can people still practice sprouting

6   cruciferous sprouts as disclosed in Cornucopia.  Can

7   people still practicing sprouting as disclosed in

8   Sprouts to Grow and Eat, and under their claims the

9   answer has to be no, and if that is the answer their

10  claims are invalid, and if the answer is yes, then

11  there is no problem with what any of our clients are

12  doing.

13          We know the sprouting process is old.  We know

14  that the prior art specifically discloses that you can

15  eat sprouts as a food product and we know that the law

16  says newly discovered results of an old process are

17  not patentable.

18          It is a very straight forward analysis, and if

19  reference is made to the prior art, it is the only

20  conclusion that you can come to when you apply the

21  law.

22          They also specifically admit that the sprouts

23  that they grow by the methodology are completely

24  natural.

25          There is no modification of the sprout that

24

1   results from their methodology, so you are planting a

2   natural seed that existed in nature before they made

3   the discovery.

4        You are producing a natural plant that existed

5   in nature before they made their discovery and you are

6   pursuing it.

7        Diamond versus Deere (phonet.) says you don't

8   get the patent to plant.

9        Now, you can always patent a new use for old

10  known substance, but the fact here is they are not

11  patenting a new use. The fact here is the methodology

12  is patenting the sprout.  These are saying, if you

13  grow sprouts, cruciferous sprouts, you are infringing

14  our methodology, and you can't do that.  You are

15  infringing our patent, and that is wrong.  That is

16  simply wrong.

17       It is a plant in nature and they are not

18  modifying it in any way, and if that is the case you

19  might as well go out, if the plaintiffs' position is

20  the case, you might as well go out and start analyzing

21  wheat crops, corn crops, every crop you can find, find

22  something that is unique about that, patent it, and

23  then start writing letters to every farmer in this

24  country and tell them to start paying the royalties,

25  because that is the end result of that line of

1  thinking.

2        And that is what Diamond versus Deere

3  (phonet.) stands against.  You cannot take out of

4  nature what is already there.  You can't take away

5  from the public what they already have.

6        I think Your Honor that I really don't know

7  how to make it much clearer than that.

8        THE COURT:   What about the selection of the

9  seeds, is that a process or method that is different?

10       MR. KROMHOLZ:   To me, and I am kind of, I

11  grew up in the south side of Milwaukee so I will kind

12  of respond to that and say, who cares, so what.  I

13  went out and tested a hundred seeds.  I found 40 of

14  them have this property which is a nice property, and

15  I think these 40 have this property, and therefore, my

16  claims now prevent anyone from sprouting any type of

17  cruciferous seed.

18       Even if it is limited to the 40 seeds, it is

19  still wrong, and the reason it is wrong is that they

20  are not changing the seed.  They are not changing the

21  methodology.  They are merely claiming the inherent

22  feature of the plant that results.

23       Now, if they were to have gone forward and

24  actually claimed a new use and specifically talked

25  about this being targeted as anti-carcinogens and

1    identify the process in the case by which these

2    anti-carcinogens methodologies worked and tried to

3    characterize this as new use for a known product in

4    the treatment of cancer, that might have worked, but

5    it would have left open for everyone else to continue

6    to grow sprouts and consume it as a food product in

7    any event.

8           It doesn't change the seed.  The act of

9    selection of a seed that they have now discovered that

10   heretofore unknown beneficial affect of something that

11   was already in nature doesn't make it patentable.

12   That is clear, because the prior art already included

13   all forms of broccoli root, and the fact you point out

14   this one may have a certain advantage doesn't make it

15   a patent distinction.  It is an inherent feature of

16   the plant.

17          THE COURT:   If they had come up with

18   selection process that allows them to select seeds

19   that will invariably produce these anti-carcinogenic

20   properties, that is not patentable?

21          MR. KROMHOLZ:   One, I don't think it is

22   patentable because inherent property of the plant, and

23   two, I don't think this is patentable because the

24   Cornucopia reference includes the exact type of sprout

25   they claim, so the idea of having these levels of

1  material produced is already contained within the

2  prior art reference.

3        The prior art very clearly says, you know

4  sprouting is old methodology.  Here is the exact kind

5  of sprout disclosed in the patent, and it says right

6  in the reference that you sprout it and you eat it, so

7  I don't think they make it on two separate grounds

8  then.

9        The act of selecting certain seeds that were

10  already available to the public and were already

11  commercially used or taught to be something that could

12  be used and taking it away from the public again, no,

13  it is not a patentable distinction.  Remember, these

14  are not methods directed towards any new use.  These

15  are methods that say, all use.  You are done.

16        You can't have any use of this for cruciferous

17  sprouts and you are infringing our patent, and I think

18  that what they do is they prevent people from

19  practicing the prior art, and I think again, it is a

20  fair question to ask the plaintiffs.

21        Can they practice the prior art that is

22  practiced under Meyerowitz, and can people still

23  practice the prior art under Cornucopia and people

24  practice the prior art as taught in Sprouts to Grow

25  and Eat.  Can people do that?  Because remember, those

1  references, for example, Sprouts to Grow and Eat says

2  broccoli.  Okay.  It doesn't give a list.  It doesn't

3  say this particular cruciferous or that.

4        But what it teaches generally all broccoli is

5  good for you.  All broccoli can be sprouted and all

6  broccoli can be eaten.  So inherent within that is you

7  are going to practice the process of the invention.

8        If there was something that said all broccoli,

9  but you never eat these seeds because they are bad for

10  you, then maybe there is something that they can point

11  to, but they don't have that.  The plaintiffs don't

12  have that.

13        Selection doesn't establish patentability in

14  this case.

15        I think the Court's other question was very

16  fair in that I think the plaintiffs need to answer

17  what do they do, if anything, to manipulate these

18  seeds.  I mean what do they do other than planting and

19  harvesting as they plant.

20        The seed doesn't change.  The plant doesn't

21  change.  The plant is the plant.  The admissions they

22  make is that these are natural plants, a hundred

23  percent natural plants.  They don't do anything to

24  it.  There is nothing that is manipulated there.

25        Again, I think we have laid out a complete

1  array of case law that supports our position that

2  these are inherent features that are not patentable.

3      We have laid out case law that demonstrates

4  that these claims go very far, in essence, prevent

5  people from using plants that were already available

6  in nature.

7      I think, Your Honor, if you look at the case

8  law you will see that the defendants are not asking

9  this Court to do anything different than any other

10  court has done in finding a patent claim invalid, and

11  all we are doing is we are coming here in a contested

12  case finally rather than an ex parte case, and we are

13  putting the plaintiffs' argument to the test and they

14  don't stand up under contested scrutiny.

15      THE COURT:  Well, Mr. Figg is going to clear

16  it all up for us.

17      MR. FIGG:  I hope that is so, Your Honor.

18      Your Honor, I have a power point presentation,

19  so I do intend to use the screen.  I don't know if

20  there is any way of dimming the light in the courtroom

21  a little bit.

22      THE COURT:  Unfortunately, we are

23  technologically deficient in that regard, but I think

24  we can turn them out.  We have a lamp here.  I don't

25  know what it will look like but we can try it.

1        MR. FIGG:   Why don't I do this.  I printed

2   out the slide.  If you have trouble, I have the

3   print-out of the slide.

4        THE COURT:   I have a monitor.  I guess it

5   won't be any trouble for me.  It may be trouble for

6   others.

7        MR. FIGG:   That does not come across too

8   well, Your Honor, but it will be more of a crutch for

9   us perhaps than for you.

10        THE COURT:   These are beautiful.  You can't

11   miss what is on them.

12        MR. FIGG:   The miracles of modern technology.

13        I think the Court is presented today with two

14   separate and distinct issues, the first issue is how

15   should the claims in the John Hopkins patents which

16   are licensed Brassica be construed.

17        And then the second question, are the properly

18   construed claims anticipated under section 102(b)

19   under principles of inherency.  I think that issue has

20   been, those two issues have been very much confused in

21   briefing.

22        The Court's responsibility is first to

23   construe the claims by reference to the patent,

24   specification, the prosecution history, and most

25   importantly the language of the claims themselves.

1  Then you look at the prior art.

2         So looking at -- I am going to talk about a

3  few representative claims here, but I think the

4  principles here are applicable to all of the claims in

5  issue, incidentally it is our position that claim 9 is

6  not an issue.  That was never the subject of the

7  motion for summary judgment and it wasn't raised until

8  the reply brief of the defendants.

9         The claim 1 is probably the broadest claim in

10 the three patents in suit and it is a method of

11 preparing a food product that is rich in

12 glucosinolates, and I would submit that that is a

13 limitation of the claim that the defendants have

14 ignored, but the Court can't ignore under the

15 applicable case law.

16        It comprises germinating seeds with the

17 exception of certain seeds which the inventors here

18 found not to be rich in glucosinolates.

19        Harvesting the sprouts prior to the 2-leaf

20 stage to form a food product comprising a plurality of

21 sprouts.  Plurality is one of the patent lawyers words

22 which means a lot of them.

23        Claim 2 is dependent on claim 1, and so I have

24 reproduced claim 1 in brackets, because under the

25 applicable claim construction rules, claim 2 contains

1   all of claim 1, but it adds to it an additional

2   limitation wherein the sprouts contain non toxic

3   levels of indole glucosinolates and other properties

4   and other chemicals that are mentioned there.

5          Claim 1 of the 567 patent defines the

6   invention in a different way.  A method of preparing a

7   human food product comprising cruciferous sprouts

8   containing high Phase 2 enzyme inducing potential.

9          The first step is identifying seeds that will

10  produce said sprouts.

11         This is the question that the Court asked Mr.

12  Kromholz.  Is there a selection step here?  It is our

13  position there is a selection step in all of these

14  claims.  The selection step is very explicit.

15         Identifying seeds that produce said sprouts

16  and said sprouts meaning those containing high Phase 2

17  enzyme production potential, germinating the seed,

18  harvesting the seeds to form a human food product.

19         Claim 1 of the 505 patent is method of

20  increasing the chemoprotective amount of Phase 2

21  enzymes in a mammal.  Again, it requires identifying

22  seeds which produce cruciferous sprouts, and what you

23  have there are the scientific names are the sprouts

24  that are excepted from this, but those sprouts that

25  are identified, the seeds that are identified have to

1  be those that produce sprouts containing high Phase 2

2  enzyme inducing potential and then germinating,

3  harvesting and administering the food product to an

4  individual.

5       There is one more claim in that patent which

6  is similar, but it is a method of reducing the level

7  of carcinogens in the individual.

8       Now, the claim construction issue I think with

9  respect to the claims of the 895 patent, is whether

10 the preamble term is rich in glucosinolates and high

11 Phase 2 enzyme inducing potential are claim

12 limitations, and when you look at the case law, the

13 case law tells you how to determine that.

14      Do the terms give meaning to the claims, and

15 do the terms define the invention.

16      I have chosen a couple of cases to talk about

17 today that I think helps illustrate where these terms

18 are appropriately regarded as claim limitations.

19      The first one is the Phillips Petroleum case,

20 a federal circuit case that issued in 1998 and here it

21 is like in this case.  It is a claim to a process of

22 making something and our claims is a process of making

23 a food product.

24      In the Phillips Petroleum case it is a process

25 of making a block copolymer.

1        The steps that follow the transitional phrase,

2   the transitional phrase is the word comprises, require

3   mixing and reacting monomers in the presence of a

4   catalyst, and the presence of this case was in

5   particular in these steps producing a copolymer, and

6   indeed the co-infringer here produced these and did

7   introduce a copolymer, but the issue of the case was,

8   what about the word block copolymer?

9        In case the patent owner wanted to read that

10  limitation out of the claim.  The patent owner wanted

11  to argue that block copolymer is in the preamble so

12  forget about it, and the defendant, who as you might

13  have guessed by now was making a copolymer, but not a

14  block copolymer.  The copolymer indisputably performed

15  the steps that followed the word comprises.

16       The federal circuit concluded that the term

17  block copolymer while it only appears in the preamble

18  of the claim is never a claim limitation.  It says a

19  term in the preamble is limiting, when as here it is

20  found to be required to confer meaning on the claim,

21  and it cited the Paulsen case which is an important

22  decision on this issue of whether or not a preamble

23  term is limitation or not.  And Paulsen says it is a

24  limitation if it gives meaning to the claim and

25  properly defines the invention.

1          An interesting aspect of the Phillips

2   Petroleum case is that the court looked to the

3   prosecution history to guide it in determining whether

4   or not the word block copolymer is a limitation.  The

5   patent owner in that case was saying ignore the word

6   block copolymer, or ignore the word block copolymer,

7   and the court looked at the prosecution history and

8   determined that the applicant had tried to omit that

9   term from the claim, but the examiner would not agree

10   to its omission because the examiner said that it was

11   necessary to point out that block copolymer were

12   produced to the exclusion of other products.

13          Now, if we apply the holdings of that case to

14   claims 1 and 2 of the 895 patent, the term rich in

15   glucosinolate or high Phase 2 enzyme inducing

16   potential define the invention.  They tell the reader

17   what sprouts are made by this process.

18          They are not just sprouts, as the defendants

19   would argue.  They are sprouts that are rich in

20   glucosinolates or they are sprouts that have high

21   Phase 2 enzyme inducing potential, and just as in

22   Phillips Petroleum, where the Court looked to the

23   prosecution history, this Court has help from the

24   prosecution history, and the reexamination of the

25   patent examiner explained why she was confirming the

1  patentability of these claims over the same prior art

2  teachings that are being asserted here in this Court.

3       And she said that method of preparing a food

4  product wherein the cruciferous sprouts that are rich

5  in glucosinolates or contain high levels of Phase 2

6  inducer activity are harvested prior to the 2-leaf

7  stage is not taught or fairly suggested in the prior

8  art, so the examiner relied on those limitations in

9  concluding that these claims were patentable.  That is

10 very strong evidence that these terms are limitations

11 in the claims.

12      Without belaboring this point, there is

13 another case, an old court custom and patent appeals

14 case, which again is one of real seminol decision in

15 an area of whether a preamble term is Kropa versus

16 Robie and there the claim was to a method of making a

17 dense abrasive article, and after the transitional

18 phrase, it describes mixing things with polyesters and

19 form an article.  And the Court succinctly asked

20 itself the question very thoroughly.  Is the phrase an

21 abrasive article a limitation upon what follows in the

22 count in issue.  This was an inference so the claims

23 are referred to as interference count.

24      Then the Court goes on to explain that

25 abrasive article is essential to point out what

1  invention is defined by the counts.  Those

2  introductory words give life and meaning to the claim,

3  because it is only by that phrase that it can be known

4  what subject matter is defined by the claims and to

5  know that the subject matter that is defined is an

6  abrasive article.

7        And they go on to say that not every way that

8  you would practice these steps of the method, you

9  ignore that term would necessarily mean an abrasive

10 article.  It tells it what the claim is.

11       Similarly here, this is not just a claim to

12 making sprouts.  This is a claim to making a food

13 product, a food product comprising a plurality of

14 sprouts and that food product must be rich in

15 glucosinolates.  This must have high Phase 2 enzyme

16 inducer activity.

17       Now, the defendants research wants to ignore

18 this limitations.  Mr. Kromholz responded to your

19 question about selection by saying, well, who cares,

20 well, I think that this Court should care.  I think

21 that the patent office cared, because it understood

22 that this was not a claim to make a food product out

23 of sprouts.  It was a claim to making a special kind

24 of food product.

25       The case law is very clear.  I hardly need to

1   cite authority for this, but it is well established

2   that express limitations in claims can't be read out

3   of the claims.  We can't read them out for purposes of

4   proving infringement.  They can't read them out for

5   purposes of trying to establish the invalidity.

6          If the Court agrees with me that rich in

7   glucosinolates and high Phase 2 enzyme inducer

8   activity are limitations in the claims then they are

9   in the claims.  You can't read them out either for us

10  or for them.

11         Now, in the briefing, and we heard a little

12  bit of discussion today, there was sort of a

13  prejorative use of the term, assay results.  Like the

14  fact that this invention was discovered as a result of

15  assaying a lot of products and sprouts somehow makes

16  it a method of assay which according to them is not

17  patentable.  I guess the first thing I would say is

18  none of the claims here are directed to a method of

19  assay.

20         Assaying was used as part of the process that

21  Dr. Talalay and Mr. Fahey used for making this

22  discovery, but that has nothing to do with whether the

23  claims that are before Your Honor are patentable or

24  not, or how they should be construed.  The statute is

25  very clear on this.

1        It is the only place in the world that I have

2   ever seen the word negative used as a verb, but in

3   section 103 of the patent statute Congress tells us

4   the patentability shall not be negative by the manner

5   in which the invention was made, and that is what I

6   think defendants are trying to do here.

7        They are trying to say, well, Dr. Talalay just

8   did some assays and that is how he discovered this

9   invention and so the invention is not patentable.  The

10  In re Kratz case which was a natural case involving

11  strawberries.  Here the patent challenger said all the

12  patentee did was assay strawberries and found

13  something in that made food taste good, and the Court

14  of Customs and Patent Appeals said, well, whether that

15  is true or not, how the inventors came up with the

16  invention has nothing to do with whether the invention

17  is patentable.

18       The last thing here is that prior art did not

19  teach or suggest that cruciferous sprouts contained

20  any appreciable glucosinolate.  Certainly prior art

21  taught that cruciferous sprouts contained beneficial

22  amounts of glucosinolates or Phase 2 enzymes are a

23  little greater than what are present in adult market

24  stage vegetables, so even if you accept the

25  defendant's argument on assaying has some relevance,

1   the prior art, gave the artisan or the public no

2   reason to do that assay.  Why assay?

3          There is nothing there that is motivating the

4   public to even look at this issue.  That was the

5   invention.  They are using the inventor's own

6   invention as prior art against him and that is not

7   appropriate.

8          Now, the defendants had a little bit of fun

9   with me in their brief because I was counsel in the

10  Bristol-Myers Squibb versus Ben Venue Labs case which

11  was published by the Third Circuit a few weeks ago,

12  but I would submit to you that the defendants are

13  misreading that case.

14         The claim in the Ben Venue Labs case was a

15  claim on a method of administering the drug Taxal

16  (phonet.), a cancer drug that has gotten a lot of

17  noteriety in recent times, and Bristol-Myers had a

18  claim that was directed to a method of treating a

19  patient by intravenously infusing Taxal (phonet.) over

20  a specific time period, three hours at a specific

21  dosage, and there was a piece of prior art which

22  described a clinical trial in which a physician

23  administered Taxal (phonet.) over three hours at that

24  same dosage.

25         Bristol-Myers said, well, yes, but that person

1    only looked at a few patients, and did not see a

2    beneficial result to the patients, and so the prior

3    art did not meet the phrase in the preamble of the

4    claim that said a method of reducing hematologic

5    toxicity.

6        Taxal (phonet.) is something that causes

7    toxicity to the blood.  It damages the blood and that

8    is called hematologic toxicity, and they said that

9    since the prior art didn't tell you that, when you

10   give the drug this way you reduce hematologic toxicity

11   the prior art doesn't anticipate the claim.

12       The Federal Circuit, at my urging and the

13   urging of others, said that's not a limitation in the

14   claim, and the reason it is not a limitation in the

15   claim is because it has no impact whatsoever on how

16   the method is performed.  You take the patient as you

17   find them, and the Federal Circuit concluded that it

18   was not a method limitation because the method is

19   performed in the same way, regardless of whether the

20   patient experiences a reduction in hematologic

21   toxicity or not.  So in that case the preamble term

22   was simply defining a goal that was hoped for.  That

23   is not the situation that we have here.

24       Here the requirement that the food product be

25   rich in glucosinolates determines how the method will

1  be performed, and Your Honor put your finger precisely

2  on why that is so, because if you are going to produce

3  a food product rich in glucosinolates you have to

4  start with seeds that will produce sprouts that will

5  allow you to achieve that purpose.

6       So the limitation rich in glucosinolates or

7  high in Phase 2 enzyme inducing potential tells you

8  how you initiate this process.

9       First, you have to find the seeds that will

10  provide you with that result.  Those are the seeds

11  that you germinate.  Those are the seeds that you

12  harvest, those are the sprouts that you put together

13  in a product.

14       Now, I have been talking about claims 1 and 2

15  of 895.  The claims of the other patents are even more

16  explicit on this.

17       They tell you identify seeds that produce

18  sprouts that are high in glucosinolates or identify

19  seeds that produce sprouts that are high in Phase 2

20  enzyme potential, and after you have identified those

21  seeds, germinate them to the 2-leaf stage.  Harvest

22  them and produce a food product from them.

23       So we are to the point then, if you accept

24  that rich in glucosinolates or high in Phase 2 enzyme

25  potential are claim limitations which we submit you

43

1   should, the next question is what do those terms

2   mean.

3           And here, Your Honor, there seems to be

4   agreement among the parties.  The patent specification

5   is quite explicit on this point and I have put up

6   column 7, lines 47 through 53 of the 895 patent, and

7   it says the cruciferous sprouts of the instant

8   invention have at least two hundred thousand units per

9   gram fresh weight of Phase 2 enzyme inducing potential

10  at three days following incubation.

11          Now, we heard an argument or what I thought

12  was going to be an argument.  I am not sure it was

13  fully developed from defense counsel today, that

14  perhaps it doesn't mean that because of the principle

15  of claim differentiation, but I didn't think that that

16  argument was made very enthusiastically, nor should it

17  be, because claim 9, which has a specific reference to

18  the two hundred thousand is not a claim that is

19  dependent on claim 1.

20          The principle of claim differentiation comes

21  into play, if claim 1 says rich in glucosinolates and

22  claim 2 says wherein it has fifty thousand units of

23  glucosinolate, then you would naturally infer that

24  claim 1 must mean something different than fifty

25  thousand.  That is not the situation we have here at

44

1   all.

2          Claim 9 is an inter-claim which stands on its

3   own, and as counsel pointed out it, has a lot of other

4   statements in it as well.  The patentees are entitled

5   to claim their inventions in alternative ways using

6   alternative wording.

7          See what we have here is the claims we submit

8   should be construed as a method of producing a food

9   product, that wherein that food product contains at

10  least two hundred thousand units of activity when

11  measured at three days, and producing that product by

12  germinating seeds that will yield those kind of

13  sprouts, harvesting them prior to 2-leaf stage and

14  producing a food product containing them.

15         That's the end of my discussion on claim

16  construction.

17         Now, I hope I have made it clear that I

18  haven't been talking about the prior art.  That is

19  what comes now.

20         Now, if you accept my argument on claim

21  construction, now the question you must answer is does

22  the prior art inherently disclose a method for making

23  a food product that is rich in glucosinolates that

24  meet those limitations.

25         Now, one of the things that I think must be

1   pointed out to the Court, there were references in

2   defendant's briefs to the fact that their clients have

3   been in the sprouting business for a long time, since

4   the 80s.

5          There have been references that people have

6   been producing sprouts since long before this patent,

7   and others have been producing sprouts.

8          But if you look at all of that language

9   closely, what is conspicuous with its absence, is any

10  allegations that any of them ever produced cruciferous

11  sprouts for any purpose.  Dr. Talalay and Mr. Fahey

12  established an industry here.  Nobody was producing

13  and selling cruciferous sprouts.  We can almost

14  pinpoint the exact day that the sprouting industry

15  suddenly realized the value of cruciferous sprouts,

16  and it was in September of 1997.

17         In September of 1997, Mr. Fahey and Dr.

18  Talalay's publication in the proceedings of the

19  National Academy of Science was published, and in that

20  paper it was disclosed that sprouts were discovered to

21  have extremely large levels of these cancer protective

22  substances.  Everybody jumps on the bandwagon then.

23  Everybody wants a free ride on the bandwagon.

24         But just so there is no mistake, there has

25  been no allegations here of any, what we would call

1  6102 prior art.  In other words, or 102 prior use or

2  sale prior art.  There is no evidence that anyone ever

3  did this prior to these patents.

4        What we have is a series of articles where

5  people say you can make sprouts from broccoli seed or

6  kale seed and you can eat them, and in a nutshell that

7  is what the prior art says.

8        I am going to go into the prior art in a

9  little more detail in a moment, but in a nutshell that

10  is what it says.

11        Now, there is no dispute, and frankly, Your

12  Honor, this is the reason we felt compelled to cross

13  move for summary judgment.  There is no dispute in

14  this case that cruciferous sprouts are not inherently

15  rich in glucosinolates.  In the prior art motivated

16  anyone to select for plant varieties or specific

17  cultivars of plants that produced plants high in

18  glucosinolates.

19        There was no teaching anywhere in the prior

20  art that immature plants or sprouts contain

21  significant or beneficial amounts of glucosinolates.

22  There was no teaching that sprouts contained much

23  higher levels of glucosinolates than the adult marked

24  stage vegetables.  And there are no teachings that the

25  concentrations of glucosinolates in sprouts can vary

47

1  over a range of almost a hundredfold.

2         During the prosecution of the reexamination

3  the request for reexamination submitted a detailed

4  brief, a detailed explanation of why they believed

5  that the claims of the 895 patent were invalid.  They

6  made the same arguments that you are hearing in this

7  case.

8         As is common in reexaminations, the first

9  thing that happened was the patent examiner rejected

10  all of the claims, and said, I am rejecting these

11  claims because it appears from what I have been told

12  by the requestor that the limitations rich in

13  glucosinolates is an inherent quality of sprouts, and

14  therefore, it would be an inherent quality of food

15  sprouted from those sprouts.

16         The patent owner, Johns Hopkins, responded to

17  that rejection and has submitted evidence of something

18  that is conspicuously missing from defendant's side in

19  this case.  Submitted evidence showing that sprouts

20  are not inherently rich in glucosinolates.  It was in

21  the form of declaration of Mr. Fahey who is a

22  co-inventor here.

23         Now, something that the Court will notice is

24  that this declaration by Mr. Fahey is not disputed by

25  the defendants.  It is expressly not disputed.  They

1  said, we are not disputing it.  They went beyond that,

2  and I will get to that in a moment.

3       Paragraph 7 of Mr. Fahey's declaration says

4  that not all plant selections or cultivars within a

5  given species have the high levels of inducer

6  activity.  So what he is telling you, that even within

7  the same species of plants you can find some cultivars

8  that produce high levels of glucosinolates and others

9  that do not.

10       Now, this is the point that the Court should

11  keep in mind with respect to the Cornucopia reference

12  which the defendants try to make much of because they

13  argue it wasn't before the examiner.

14       First of all, every species of seed that was

15  identified in the Cornucopia reference was also

16  identified in other prior art that was before the

17  examiner.

18       The Cornucopia reference says nothing more

19  than the other prior art which is you can sprout these

20  things and you can eat them.  It doesn't tell you to

21  select for anything.  It doesn't tell you anything

22  about glucosinolates or why one would be better than

23  the other.

24       But the point I am making here, is Mr. Fahey's

25  declaration was very pertinent on this point because

1   even within the same species of plants, some produce

2   high levels, some produce low levels.  We see this in

3   a lot of areas in plant biotechnology these days.

4   Some species of corn.  Some cultivars of corn produce

5   high levels of vegetable oils.  Some produce low

6   levels.  There are patents that are issued on the

7   identification of corn cultivars or hybrids that

8   produce high levels.

9        So this is part of the business of agriculture

10   these days is invest money into research to identify

11   plants that do things that are good for mankind, and

12   we have determined as a society that we reward people

13   that make those investments by giving them patents for

14   a limited period of time.

15        Mr. Fahey goes on to say that he had analyzed

16   28 different commercial cultivars of broccoli and that

17   the Phase 2 inducer activity ranged from as little as

18   ten thousand to as high as seven hundred and

19   sixty-nine thousand units.  He refers to an assay that

20   is described in the patents themselves.

21        Defendants treat this data almost as if it is

22   prior art.  This data wasn't from the prior art.  This

23   was data that the patentees developed after the patent

24   applications were filed to demostrate to the patent

25   examiner that rich in glucosinolates is not an

1   inherent characteristic.  And here is the chart that

2   accompanied Mr. Fahey's declaration, and it shows a

3   very wide range of concentrations.

4        Now, as I said, the defendants have gone even

5   beyond not disputing Mr. Fahey's declaration.  They

6   affirmatively stated in their last brief, Brassica's

7   assay results obtained from assay and sprouts produced

8   by practice of the prior art showed that some of the

9   sprouts have greater amount of glucosinolates than

10  others.  That is precisely our point.  I am stating

11  the obvious here, but anticipation requires proof by

12  clear and convincing evidence that the prior art

13  contains all of the limitations of the claim.

14       What do the defendants have to show to show

15  that rich in glucosinolates was an inherent property

16  of food products that had been produced before?  The

17  case law is very clear on this point.

18       Proving anticipation by inherency is a

19  difficult task for someone challenging a patent.  The

20  case law says that such evidence must make clear that

21  the missing descriptive matter is necessarily present,

22  and it goes on.

23       And I am citing here the Applied Materials

24  case, 96 Federal Circuit decision.  It is not enough

25  that the disclosure might obtain the result set forth

1   in the claim.  It must invariably happen.  A phrase

2   that is repeated often in these kind of cases.

3   Inherency may not be established by probabilities or

4   possibilities.

5        I would submit to Your Honor that this is

6   precisely the argument that the defendants are making

7   here.  They are saying well, the prior art taught you

8   how to make food products out of cruciferous sprouts

9   and some of them contained high levels of

10  glucosinolates, maybe, some of them did not.

11       So there was a probability that in 1994,

12  before you had any knowledge of the work that Dr.

13  Talalay and Mr. Fahey did.  Before you had any

14  information about that, there was a probability that

15  if you just followed what was in the prior art, you

16  might get a food product rich in glucosinolates.

17       The case law tells you that's not good

18  enough.  That is not anticipation.  And I would say

19  that is especially so here when the prior art gives

20  you no reason to even look for it.

21       That argument I just made will be more

22  appropriate if the defendants choose to challenge

23  these patents on the ground of obviousness.  It really

24  has nothing to do with anticipation.  Anticipation

25  sort of ends when you conclude that the rich in

1 glucosinolate limitations was not an inevitable result

2 of practicing the prior art.

3        The defendants place a lot of reliance on

4 Titanium Metals.  In Titanium Metals, as Mr. Barnard

5 said, the claim was to a composition of matter.  It

6 was to a metal alloy.  The alloy has previously been

7 disclosed in the prior art.  So the precise thing that

8 the patent owner was claiming was in the prior art.  A

9 metal alloy comprised of certain concentrations of

10 individual components.

11        It is something that patent lawyers learn in

12 their first year of practice that you can't patent

13 something that is old, simply because you have

14 discovered that it has qualities or characteristics

15 that have not previously been discovered.  And that is

16 really what the Titanium case stands for.

17        If Titanium Metals had obtained a patent on

18 the alloy, it would have covered the use of that alloy

19 for anything.  Now, they were saying, yes, but we

20 discovered it wasn't corrosive, but their claim would

21 have covered the use for applications where cross

22 resistance had no relevance.  So the problem that

23 Titanium had was it was pursuing the wrong kind of

24 claim.

25        The Court pointed out that Titanium's work was

1  beneficial, and had Titanium claimed the invention

2  properly, for example, in making a method of making an

3  article to be used in a cross environment, they

4  probably would have gotten that claim and it probably

5  would have held up in litigation.

6         Here, what has been discovered, is a novel way

7  to make a food product, there is no claim here to the

8  discovery of new qualities in an old substance.  We

9  are claiming the method which by performing the steps

10  of that method will lead you to a food product that

11  has very beneficial properties. It has these cancer

12  preventive agents in high concentrations.

13         Now, I am not going to talk about all the

14  prior art.  But I think that the examiner regarded as

15  the most pertinent prior art, the article by

16  Meyerowitz, sprout it, and this is sort of a cookbook

17  article on how you can make sprouts at home, and it

18  has a section that tells how you go about to do this.

19         You wash seeds and you put them in jar and

20  keep them wet, and nurture them and they germinate and

21  they produce sprouts and then you can eat the

22  sprouts.

23         This section, this article has a section that

24  talks about anti-oxidants and anti-carcinogens, and

25  the part of the article that the examiner focused on

54

1  and which the defendants focus on, is on I think page

2  121 and 122 of the article.

3       And there Meyerowitz is referring to the work

4  of Dr. Talalay and Mr. Fahey at Johns Hopkins Medical

5  School, and they are describing in the first part of

6  this excerpt the work that was published in the early

7  90s, showing that cruciferous vegetables such as

8  broccoli were found to contain these protective

9  enzymes or substances that stimulates the production

10 of the protective enzymes when you eat then.

11      I believe this was the work that actually led

12 to the news articles at the time about the fact that

13 President Bush didn't like broccoli.  I think the

14 publicizing of this work is what led to that little

15 flap of news stories.

16      At the bottom of this excerpt, Mr. Meyerowitz

17 goes on to speculate the foods that contain

18 sulphoraphane are cabbage, broccoli, kale and

19 cauliflower and turnip, and then he concludes by

20 saying, and the sprout of broccoli, kale, turnip,

21 garlic, onion and Chinese cabbage.

22      Now, we know that Mr. Meyerowitz didn't have

23 basis for saying that, and we know he is actually

24 wrong because he lists some things in there that don't

25 have sulphoraphanes or Phase 2 enzymes, but this is

1  what he said, and so this is prior art and the

2  examiner recognized that practices prior art.

3       But what does it not say?  Does it tell you

4  that sprouts contain any appreciable amount?  I mean

5  we know that some components are turned on at later

6  stages of plant development and some are turned on in

7  the early stages of plant development.  Does this tell

8  you that sprouts have beneficial quantities of Phase 2

9  enzyme inducing potential?  Does it tell you that

10  sprouts have considerably higher, hundredfold higher

11  level of glucosinolates than adult plants?  Does it

12  tell you that the range of glucosinolates in sprouts

13  varies over from ten thousand to seven hundred and

14  sixty thousand?  It doesn't tell you any of those

15  things.

16       Well, my picture doesn't show up at all here,

17  but I have put this picture up just to illustrate the

18  point, Your Honor.  We have two food products here.

19  The one on the left is the product that is sold under

20  the trademark broccoli sprouts and it contains

21  broccoli sprouts that are made by the process of the

22  Johns Hopkins' patents.  We know it is rich in

23  glucosinolates.  We know it is rich in glucosinolate

24  because the seeds that produce it were selected to

25  make sure it is.  And it was confirmed that it is high

1  in glucosinolates.

2      Now, on the right, I am asking you to use your

3  imagination, because we don't know that anyone ever

4  actually followed the prior art and made a food

5  product from that prior art.  All we know is that

6  there are cookbooks out there that tell you you can do

7  this, but let's assume that in September of 1994, more

8  than one year before the filing dates of our patents,

9  someone got the prior art, followed its teachings,

10 sprouted broccoli seeds and made a food product from

11 those seeds, and that is what is in the jar here to

12 the right (indicates.), and I would ask you to ask

13 yourself, is that food product rich in

14 glucosinolates?  Now, you can't answer that based on

15 what you know today.  You have to answer that based on

16 what you knew and what was available to you in 1994.

17     And the answer to the question is, we don't

18 know.  We don't know if it is rich in glucosinolates

19 or not.  It might be, it might not be.  It depends on

20 whether the person who made it through the laws of

21 chance was lucky enough to select seed cultivars that

22 produced a lot of glucosinolates.  I submit to Your

23 Honor, that in itself defeats any claim of

24 anticipation under principles of inherency.

25     I would like to conclude with a few brief

1  comments on the reexamination.

2      First of all, we do not argue that this Court

3  is bound by the reexamination.  We have never made

4  that argument.  An article three Court, and it

5  certainly has the power and authority to review what

6  the Patent Office has done.  But I would also submit

7  to you that the Federal Circuit and other courts have

8  made it very clear that the reexamination is highly

9  relevant to what you are doing, certainly if the

10  arguments for unpatentability that are being made here

11  are the same as the arguments for unpatentability that

12  were before the Patent Examiner, and that is the

13  case.

14      And the way the Court has expressed this is

15  the defendant's burden is more difficult to carry

16  because of the outcome of the reexamination.

17      Another case I was involved in, the

18  reexamination is highly probative of validity.

19      I would submit to Your Honor that the

20  defendants have not provided you with any reason to

21  reach a result that is different than the result the

22  examiner reached in looking at the same claims and the

23  same prior art that is being presented to you.

24      The reexamination certificate shows on its

25  face, that all of the prior art with the exception of

58

1  perhaps the Cornucopia article, was before the

2  examiner, and we have explained in our brief why the

3  Cornucopia article adds nothing to what was before the

4  examiner, and certainly the arguments that were made

5  to the examiner are precisely the same arguments that

6  are being made here.

7      The examiner reviewed the reexamination

8  certificate, concluded that no amendments need to be

9  made to the patent, and the patentability of claims 1

10  through 16 is confirmed.

11      The examiner then issued -- the Patent Office

12  then issued two other patents.  This was the 895

13  patent, the 537 and 505 patents subsequently issued,

14  and again all of these same arguments were aired, and

15  the examiner again found those claims to be

16  patentable.

17      I thank you, Your Honor.

18      MR. KROMHOLZ:   Your Honor, if I can just

19  offer just a short rebuttal and Mr. Bernard may have a

20  few comments also.

21      I guess what I would like to direct the Court

22  to is the misconception that rich in glucosinolates

23  has to be disclosed in the prior art.  Inherency

24  occurs when the invention described by the prior art

25  necessarily functions in accordance with a claim

1  limitation, even if limitation is not expressly

2  mentioned in the art, and that is right in our brief.

3  That is Bristol-Myers Squibb.  The District Court says

4  at 86 F. Sup. 2d 433, 436.

5          THE COURT:   Is that in your brief?

6          MR. KROMHOLZ:   Page 9 of the Defendant's

7  Supplemental Memorandum in support of their joint

8  motion.

9          I would also direct the Court to the Hughes

10  Aircraft versus United States case which we have cited

11  at, I will give you the Second Circuit -- I am not

12  sure if there is a typo.  It is 8ESPUS 158 and 1583.

13  Where the quote again on the same page, the mere fact

14  that a prior art reference fails to mention something

15  that undeniably existed is no consequence for the

16  element must have been there.  The Cornucopia

17  reference was never before the Patent and Trademark

18  office.

19          Now, to break apart that reference and say,

20  well, this seed was in a reference and that seed

21  another reference, that is not the full point.  The

22  full impact of that reference was never before the

23  Patent and Trademark office examiner.

24          The plaintiff's patent, which if you take the

25  895 patent and you go to column 10, and it says right

1  in there, right in the plaintiff's patent, sprouts

2  suitable, and starting at about line, I am going to

3  say 28, sprouts suitable as sources of cancer chemo

4  protectives are generally cruciferous sprouts.

5      Then it goes down and starting at about line

6  34, it says previously the sprouts are Brassica, or I

7  am going to mispronounce this, oleracea,

8  O-L-E-R-A-C-E-A, selected from the group varieties

9  consisting of, and they specifically identify

10  Botrytis, B-O-T-R-Y-T-I-S.  So cauliflower and

11  sprouting broccoli are specifically identified as

12  meeting the limitations of the claim in the patent.

13      If you look right at the Cornucopia reference,

14  it says Brassica, Oleracea, O-L-E-R-A-C-A Botrytis

15  group.  Cauliflower, (California broccili).  Sprouted

16  seeds are eaten.  You have the precise opinion point

17  reference in the prior art that meets only limitations

18  on the claim that the plaintiffs are able to identify

19  which is rich in glucosinolates, and it teaches you to

20  sprout the seeds and to eat them, and what else does

21  it teach?

22      It teaches you to select that seed and eat it,

23  so even if you want to say selection is a step which

24  doesn't show up in many of the claims, it is disclosed

25  in a single prior art reference, and for there to be

61

1    inherency, the law is clear, we don't have to show the

2    term rich in glucosinolates or that statement, because

3    it had to be there when these seeds were sprouted.

4        So if we take a jar of this product and we go

5    back to 1990, when this was produced, five years

6    before they applied for the patent, we grow this

7    product.  Their limitation inherently is present in

8    that product.  There is no patent here.  These claims

9    are invalid.

10        MR. BARNARD:   Your Honor, I submit that as we

11   have in our brief that it is inaccurate and misleading

12   for the plaintiffs to say they have invented a new

13   method of making a food product, and they made

14   representation to that effect to the examiner, and

15   they made the same argument to the examiner that they

16   make to this Court today, that somehow the knowledge

17   of this inherency must come out of the prior art.

18        Somebody must be motivated from the prior art

19   to take a look at this, in Atlas Powder, they

20   mentioned this area several times.  I am reading from

21   page 1947 from 51 USPQ, copy of the case where they

22   say artisans of ordinary skill may not recognize the

23   inherent characteristics or functioning of the prior

24   art.

25        However, the discovery of previously

1  unappreciated property of a prior art composition or

2  of a scientific explanation, nor the prior arts

3  functioning does not render the old composition

4  patentability new to the discoverer, so this

5  acknowledges that persons seeking to get the patent

6  protection as the discoverer, but they can't rely on

7  that if it is inherent and so we look at all the

8  facts.

9         Here there is common method of germination of

10  the seeds to make the sprouts.  Nothing else added, no

11  changes made, and then the sprouts were assayed, so

12  what they found in them had to have got in there by an

13  inherent process and just the way the seed operated

14  when it germinated.

15         The argument was made that we can't read

16  limitations out of a claim, well, we are not trying to

17  do that.  What the case law said is that there is

18  certain limitations even though they are in the claim

19  can't be relied upon to establish patentability, what

20  they are is just a statement of result.

21         Identification step again, I think we have to

22  look at it the way it happened, and this isn't a

23  violation of the statement in the statute that doesn't

24  make any difference how the invention is.  It is made

25  because in claim construction you are really trying to

1  find out what is the invention, the purpose of that

2  section of the statute was not to kind of cloud over

3  some of the facts that goes into the claim

4  constructions exercise here.  And the prior art method

5  of germinating, to make the sprouts was practiced and

6  then the assay was done to find the results.

7       In our brief, we make reference to an

8  analagous situation where a party goes out and selects

9  ten different types of apples and makes ten apple pies

10  and tastes them and finds that they taste extremely

11  good compared to the other seven, so they examine to

12  find out what is that.  There must be something in

13  here that makes these taste different.

14       So they go through and they assay the apple

15  pie and they find something in there and so they work

16  it into a patent claim.  Then they go out and they

17  tell people, now, in the future you have to make your

18  apple pies out of these other seven apples because we

19  are claiming exclusive rights under it to make the

20  apple pies that taste good.

21       Here the assay was done to find out what was

22  in these sprouts and how much, and it found some high

23  and some low, both inherent results, and now they are

24  saying that because we want to protect the higher

25  levels to get the better result from them, that is a

1  patentable discovery.

2        It is still, it is still down there.  It is

3  still there with discovery and inherent result, so the

4  selection process is an after the fact situation here,

5  where you look to see and analyze something that is

6  made by a prior art process and then make your

7  selection, so the next time you won't waste your time

8  using the seeds for the cruciferous vegetables that

9  have the lower levels of this material in them.

10        The question still remains, and as I didn't

11  hear the plaintiffs' answer it, would their claim

12  remove from the prior art the ability of the

13  defendants and other people in the public to practice

14  what Meyerowitz discloses in his text, and Monroe, and

15  Larcum (phonet.) and the other people.  I submit that

16  it still does.

17        Now, there was a question about why there

18  wasn't reference made to the actual uses by the

19  defendants or other people.  That is beyond the scope

20  of this motion for summary judgment.  There is a lot

21  of different reasons why patents can be found invalid

22  and different ways of producing your facts.

23        We would have to bring in fact witnesses to

24  testify when it comes to telling what they did and

25  when, and we feel strongly that we don't have to do

65

1   that.  That the printed prior art shows all that is

2   necessary to invalidate these claims.

3         Now, it was argued by the plaintiffs that,

4   argued that there is no evidence that anybody ever

5   practiced the methods in the text.  That is not

6   necessary.  They are known to the public, in the

7   public domain through the text, but the texts do talk

8   about the case.  How you use them and they got a zesty

9   flavor and that is why you would pick a broccoli

10  sprout and things like this.

11        And to me, that is an indication that they

12  were used, and in one of the texts, they actually have

13  photographs of the sprout, so they don't show

14  broccoli.  They show cauliflower which is also

15  included in the claimed group of sprouts.

16        Titanium was a composition case, but the Court

17  in Atlas Powder, and I made reference to that on my

18  handout sheet, over here in the lower right corner

19  said the same reasoning holds true when there is not a

20  property but an ingredient which is inherently

21  contained as prior art.

22        The public remains free to make use or sell

23  prior art compositions or processes, regardless of

24  whether or not they understand their complete makeup

25  or the underlying scientific principles which allow

1  them to operate. I think that brings the principles of

2  Titanium over to method claims.

3        Now, like I said, earlier, I believe there was

4  argument made in the reexamination, that were made

5  today that are misleading and that is reflected by the

6  examiner's reason for allowance.  There where she felt

7  it was necessary to find the inherency issue in the

8  prior art itself, and we heard those arguments today

9  that that is where they had to come from, they

10 couldn't come from the patent disclosure.

11        And in Titanium Metals are where the Federal

12 Circuit was reviewing a lower court's decision, they

13 made reference to, as we read the situation, the court

14 was misled by the argument and evidence, the effect

15 that the inventors here found out that, found out and

16 disclosed in their application many things that one

17 can't learn from reading the Russian article, and that

18 this was sufficient in law to justify granting them a

19 patent for their contributions.

20        Then they went on later on to say those

21 contributions were very useful information.  They just

22 aren't the type of things that Congress has provided

23 for patenting.

24        The Titanium court also said it is also

25 possible the trial court did not properly interpret

1    the claim and took them to be directed only to the

2    applicant's discoveries about the properties of the

3    alloys instead of the alloys themselves.

4          And they point out that there was no opinion

5    in the lower court, they did not construe the claims.

6    The examiner didn't construe the claims in the

7    reexamination, either.  I think in the reexamination

8    we had a little bit of both here.  The misleading

9    argument and evidence, and the fact that the examiner

10   just plain made an error in interpreting the claim as

11   a matter of law and didn't recognize that is

12   inherence, the result, the property or the composition

13   can actually be found by the party seeking to get a

14   patent on that discovery.  It is just that that is not

15   a patentable discovery.

16         MR. KROMHOLZ:   I think that is all rebuttal.

17   The only other point is a minor procedural one is that

18   I know the plaintiffs state they oppose having claim 9

19   considered, but they did argue claim 9 and

20   procedurally that puts it before the Court, and it

21   should be decided as part of the motion on summary

22   judgment.

23         I want to personally, and I know all the

24   defendants want to thank the Court very much for the

25   extended time we have been given to make this

1  presentation today.

2       THE COURT:   All right. I appreciate the

3  presentation.

4       Mr. Figg may have mentioned before I believe

5  somewhere in his presentation about some patents that

6  were issued with respect to a kind of corn.  Are you

7  familiar with these different kinds of oil or

8  something to that effect?

9       MR. BARNARD:   That sounds like the treaty of

10  1812 argument.  We don't know if that is right or not.

11  What the circumstances are.  It could be in there that

12  there are some very distinct manipulating things that

13  were added, and it wasn't any, just following a known

14  process that was in the prior art, so it is almost, I

15  don't know.

16       I didn't feel like commenting on it because I

17  have no knowledge whatsoever of this, and even if the

18  patents exist, they could be waiting for someone to

19  invalidate it, we just don't know.

20       MR. FIGG:   I did not intend to interject

21  something in that proceeding that is not in evidence.

22  I would just refer you to the case of In re Hibbert,

23  H-I-B-B-E-R-T in which the patent office determined

24  that claims to plants themselves are patentable based

25  upon the discovery of unexpected qualities of the

69

1   plant and the selection of the plants having those

2   qualities.

3        That case at the time which was back in the

4   early 1980s was considered a landmark decision that

5   followed on the heels of the Supreme Court decision in

6   Re Chacko Bartee (phonet.) that had found micro

7   organisms to be patentable.  Before that, it wasn't

8   clear that living things were patentable at all under

9   section 101.  Chacko Bartee (phonet.) cleared the way

10  for micro organisms and Hibbert cleared the way for

11  plants.

12       And they were not genetically engineering, but

13  plant sectioned.  In Re Allen later found that animals

14  are patentable subject matter.  That is all kind of an

15  academic discussion, but it has nothing to do with

16  what we are talking about here today, because what we

17  are talking about here today is a method of making a

18  food product that is rich in glucosinolates.

19       One more comment.  We will withdraw our

20  objection to the Court's consideration of claim 9.  I

21  think the defendants are right.  You have all the

22  information, and I think our arguments with respect to

23  claim 9 and this is a reply to that claim as well as

24  to the other claims.

25       THE COURT:   All right.  Well, thank you,

1  counsel.  Vacation time is upon us so you may not hear

2  from me in the next two weeks or so.  As soon as I can

3  get to it.

4          I appreciate your presentation.

5          MR. KROMHOLZ:   Your Honor, if I can raise

6  just one other issue, and I don't mean to rush the

7  Court or anything, but we are under a tight discovery

8  schedule and my clients are not millionaires.  They

9  are going to have to spend some serious funds here

10 shortly.

11         If the Court anticipates that its schedule

12 means that there will be a substantial period of time

13 before a ruling on this summary judgment motion

14 issues, I would like to propose that perhaps it would

15 be prudent to stay ongoing discovery until this issue

16 is resolved, since obviously this issue could resolve

17 the entire case, and further discovery, that effort

18 would not have been beneficial to my clients and the

19 monies that they expended would not have been

20 beneficial to my client.

21         THE COURT:   That is a reasonable request.  I

22 have forgotten where we are schedulewise.

23         MR. ANDREWS:   August 31st is the discovery

24 deadline for this litigation I believe.

25         MR. FIGG:   Your Honor, if I can weigh in on

1  this.

2        THE COURT:    Maybe we could have a telephone

3  conference.

4        MR. MULLEN:    We decided we would talk about

5  that at the conclusion of today's hearing and set a

6  new date, depending on what happened at the hearing.

7        MR. ANDREWS:    That is correct.

8        MR. FIGG:    I would have to two reactions.

9  You know, we arrived at this schedule.  I don't think

10  anyone anticipated that Your Honor could decide a

11  Motion for Summary Judgment overnight, and we all knew

12  that when the schedule was set, but having said that,

13  Your Honor anticipates a decision in the relatively

14  near future after vacation, I don't know that we would

15  have a particular objection, but I would like to add a

16  condition to that.

17        You indicated at the outset that you thought

18  it was premature to consider our Cross Motion for

19  Summary Judgment, but I think what you have heard here

20  today is that there is no dispute and there is not

21  going to be a dispute between the parties on whether

22  or not sprouts used for making food products

23  inherently rich in glucosinoate quality, and that is

24  at the core of this decision.

25        The parties dispute the significance of that,

1  the legal significance of it.  But they don't dispute

2  the fact, and I would think if this case were going to

3  be stayed, that the Court also could during its

4  deliberations, consider the cross motion as well as

5  the defendant's motion.

6         We are not bringing in anything outside of the

7  record.  We are relying on what is in the record and

8  the admissions the defendants have made.

9         THE COURT:   The defendants have pointed out

10  there are some other factual issues that could play in

11  your --

12         MR. FIGG:   We tried to make it clear.  If the

13  defendants think that they have a shot at invalidating

14  these patents based on on obviousness or based on what

15  patent lawyers call section 112 issues, definiteness

16  or enablement or things like that, those still are

17  available to them.

18         All we cross moved for was the mirror image of

19  their motion.  Their motion is the patents are invalid

20  because they are --

21         THE COURT REPORTER:  Please keep your voice

22  up.

23         MR. FIGG:   And it is by these differences

24  under print of inherency.

25         All I am asking now, that the Court has all

1  the evidence before it and all the argument, summary

2  judgment that the patents are not invalid as

3  anticipated over those fifteen references is

4  appropriate.  We dispose of that issue.

5         If we want to move on to obviousness, that is

6  where their discovery is going to be any way.  It is

7  going to be in the areas of obviousness and these

8  other issues.

9         The anticipation issue is there too and then

10  the Court could decide it up or down for one party or

11  another I believe.

12         THE COURT:   It makes sense.  Mr. Kromholz.

13         MR. KROMHOLZ:   Well, Your Honor, of course it

14  does.  The argument that their motion is the mirror

15  image of our motion.  Our motion that says based upon

16  this prior art, patents are invalid.  Their motion

17  comes back and says the patents are valid.

18         Well, they already have presumption of

19  validity which we have the right to continue to

20  challenge.  The agreement to say that, you know,

21  prevents us from taking further discovery on those

22  issues is one that preempts the factual inquiry of the

23  defendants in testing those issues if they go forward,

24  so it is not a mirror image situation.

25         We are saying if you consider that this is

74

1  inappropriate you are going to find the patent invalid

2  and we will not go forward, but if you do on this

3  state of the record and still something that has to be

4  contested either under 1 or 2B or 103 and it is not

5  something that will be a direct mirror image of what

6  is coming.

7          What we are proposing back, I think I am not

8  saying that as clear as I would like to, but the

9  bottom line is, we should have the right to fully test

10 their positions through discovery.

11         I am asking this Court, and I am asking the

12 plaintiffs also to recognize that my defendants are

13 again not people of tremendous means.  They are

14 fighting an economic battle as well as a legal one,

15 and if this Court is going to take some time to decide

16 this motion, be that the case simply be stayed, allow

17 discovery to go forward.

18         There is nothing that says the Court, at a

19 later date can't pick up the plaintiff' motion and

20 consider it.

21         The Court has simply said it is going to shelf

22 that motion for right now and consider it at a later

23 time.  There is nothing that will prevent the Court

24 from bringing that forward at a later time after the

25 defendants have had an opportunity to conduct

1  reasonable discovery.

2       But I think since this situation can be

3  dispositive of the entire case, I think a request for

4  a stay is a reasonable one, and I simply disagree with

5  this mirror image argument.  That is all I can really

6  say.

7       MR. FIGG:  If I can make clear, the motion we

8  filed, we did not file a motion asking this Court to

9  find that the patents are valid.  In fact, the Federal

10  Circuit has said it would be improper for a court to

11  issue such an order because you can only opine, you

12  can only issue a judgment on whether or not the patent

13  has been proved to be invalid over the evidence that

14  has been submitted to you, and that is all we are

15  asking.

16       We are asking that the Court enter Summary

17  Judgment, that the defendants have not met their

18  burden.  That the patent is invalid under 102(b) based

19  on the prior art references that they have put before

20  you.

21       Now, Your Honor they had the burden of proof

22  on this.  They have had notice of this for over a

23  year.  They have known exactly, Mr. Fahey's

24  declaration is not something we sprung on them in our

25  opposition brief.  It was in the reexamination

1  proceeding and they have expressly said they do not

2  dispute it, so they had the burden.

3      They have had well over a year to produce

4  whatever evidence they have.  You have seen their

5  evidence, or I should say you have seen the lack of

6  their evidence, and all I am saying is the Court can

7  decide either that they have met their burden, the

8  claims are invalid, or they have not presented any

9  evidence supporting a claim of invalidity, and

10  therefore, summary judgment can be entered that the

11  claims are not invalid under 102(b) over this prior

12  art.  That is all we are saying.

13      As to staying discovery, I understand that

14  defendants have limited means.  I would also point

15  out, so does my client.  It is a small start up

16  company.  It has tried to develop a business, and it

17  has been met with wholesale disregard of its patents.

18      These six defendants flaunt those patents.

19  They have known about those patents for years.  They

20  are not the only ones.  The industry has simply

21  flaunted these patents probably on the hope that my

22  client did not have the resources to pursue this

23  litigation, so that means a lot to both sides.

24      But we are following a schedule that the

25  defendants asked for.

77

1          Frankly, if I can just make one other comment.

2          You know, we haven't even gotten to the

3   infringement issue yet.  Normally, that is an issue

4   that the plaintiff has the burden on, and in most

5   cases the plaintiff goes first on that issue.  We were

6   somewhat chastised, because in our claims on

7   construction argument we only responded to the claims

8   that they raised in their invalidity motion, but there

9   hasn't even been any discovery on infringement yet.

10          And other than some obvious claims that will

11  be asserted, unless we have discovery of them we don't

12  even know which claims will be asserted, so they

13  really want to get the cart before the horse here on

14  all of these issues.

15          As I say, I am not adverse to a short stay of

16  discovery while the Court has this motion under

17  advisement, but I do think that while the Court is

18  considering it, it is appropriate to consider our

19  motion as well.

20          MR. KROMHOLZ:   Your Honor, I will conclude by

21  saying I know that poor old Johns Hopkins University

22  have had some reversals as of late.

23          MR. FIGG:   Johns Hopkins is not financing

24  this litigation, Your Honor.

25          MR. KROMHOLZ:   They are a plaintiff here.  In

1  Brassica, their company, I am sorry that their balance

2  sheet is in such trouble, but I represent a small

3  farmer, and all I am asking if we are going to have

4  these things reviewed that there be a stay so funds

5  don't get expended in a manner that is unnecessary,

6  and that is simply all I am asking.

7       As far as the plaintiffs motion goes, the

8  Court can pick that up and consider it at any time.

9       Thank you.

10      THE COURT:   I think a stay is appropriate

11  with respect to discovery pending my ruling on what is

12  before me.

13      I am not sure I appreciate what, given Mr.

14  Figg's comment about the plaintiffs' motion as to what

15  would flow from my decision on the matters that are

16  before me.  What would come out of it, that would be

17  different.

18      MR. FIGG:   Your Honor, two things would come

19  out of it.  First of all, if you resolve that issue it

20  would not be something that either side has to develop

21  a case for.  That is the main advantage of summary

22  judgment is we know that issue is behind us.

23      It is not case dispositive because as the

24  defendants say, they have other statutory basis that

25  they can perhaps try to put a case together on, but I

1    also think that from realistic standpoint, if the

2    Court were to indicate that it rejects the notion that

3    these patents are invalid and enters summary judgment

4    that they are not invalid, they probably would have a

5    good chance of having a dispositive impact on this

6    case.

7         Because frankly, that has been the theory of

8    these defendants.  It has been the theory of the

9    defendants in the prior litigation who requested

10   reexamination.  And quite frankly, if the anticipation

11   issue is resolved, the defendants have to know that

12   obviousness is going to be a very, very difficult

13   uphill battle for them.

14        And I think the Court's guidance on this

15   motion, be it one way or the other.  Obviously, if you

16   decide in their favor, it is dispositive and we go to

17   the Federal Circuit if it is decided in our favor.  It

18   is going to have a very big impact on what we have to

19   do is if the case does move forward and basically just

20   terminiating the case in its entirety.

21        MR. KROMHOLZ:   Your Honor, I will keep it

22   real brief.  I think Mr. Figg just said why it is not

23   a mirror image.

24        If you decide in favor of the defendant it is

25   dispositive.  If you decide the plaintiff's motion it

1  is not dispositive.  I think that is a pretty much cut

2  and dried comparison.  Thank you.

3      MR. FIGG:   Actually, I was just reminded by

4  my colleague, that even defendants' motion is not

5  dispositive here because they only included some of

6  the claims in their motion, but I think we all agree

7  that the claim 1, claim 2, claim 1, 537, they are

8  important claims, but we may take discovery and find

9  some of the lesser claims are infringed by defendants

10  and those are not part of their motion.

11      But nevertheless, it is a mirror image because

12  we are simply asking the Court to enter judgment on

13  the flip side of the motion the defendants have

14  brought.

15      MR. KROMHOLZ:   Your Honor, one, it is

16  dispositive.  Two, the fact that they say they need

17  discovery to find out if there are any other claims

18  infringed indicates there are no other claims at issue

19  here so it is a dispositive motion.

20      You will rule on this and the case is done and

21  there won't be anymore discovery.

22      Thank you.

23      THE COURT:   Well, I will consider everything

24  you have said with respect to this, and in determining

25  all the motions, I am wondering whether there is any

81

 1  need for us to have any further conferences until I

 2  rule on what is before me.  I think not.

 3       MR. ANDREWS:   I wouldn't think so, Your

 4  Honor.  I don't think we need to do that until Your

 5  Honor rules.

 6       MR. MULLEN:   I would agree with Mr. Andrews.

 7       THE COURT:   All right.  When I issue my

 8  ruling, I will also inquire of counsel with respect to

 9  the date and time for further discussions.  And if

10  there is anything that you all want to submit in the

11  meantime, I will hear from you.

12       MR. ANDREWS:   Thank you, Your Honor.

13       THE COURT:   All right.

14

15

16

17

18

19

20

21

22

23

24

25

82

1

2

3

4

5

6                                    CERTIFICATE

7

8            I, Barbara J. Shaulis, Official Reporter for

9    the United States District Court for the District of

10   Maryland, appointed pursuant to the provisions of

11   Title 28, United States Code, Section 753, do hereby

12   certify that the foregoing is a true and accurate

13   transcript of the proceedings made in the

14   aforementioned and numbered case on the date

15   hereinbefore set forth, and I do further certify that

16   the foregoing transcript has been prepared by me or

17   under my supervision.

18                         Barbara J. Shaulis

19

20                         Court Reporter

21

22

23

24

25