**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

|  |  |  |
|---|---|---|
| | * | |
| IN RE: | | |
| CRUCIFEROUS SPROUT | * | MDL Docket No. 1388 |
| PATENT LITIGATION | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' SUPPLEMENTAL FILING IN SUPPORT OF
ITS REQUEST FOR RECONSIDERATION OF THE ORDER
GRANTING DEFENDANTS' MOTION TO LIFT STAY**

As promised, Plaintiffs Brassica Protection Products LLC and Johns Hopkins

University provide the Court with a copy of its recently-filed "Petition for Writ of Certiorari."

The petition was filed and served on December 27, 2002.  A true and correct copy of the

petition and affidavit of service is attached hereto as Exhibit A.  In Plaintiffs' Request for

Reconsideration filed December 16, 2002, Plaintiffs said that they would be petitioning the

United States Supreme Court for a writ of certiorari of the decision of the United States Court

of Appeals for the Federal Circuit in connection with this matter.

Respectfully submitted,

Dated:  December 31, 2002
_____/ S /_____
Lisa S. Mankofsky (General Bar No. 04940)
Michael Kaminski
Anthony H. Son
Foley & Lardner
3000 K Street, N.W., Suite 500
Washington, D.C. 20007
Telephone:    (202) 672-5300
Facsimile:    (202) 672-5399

E. Anthony Figg
Joseph A. Hynds
Mark I. Bowditch
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W., Suite 800
Washington, D.C. 20005

*Counsel for Plaintiffs Brassica Protection Products
LLC and Johns Hopkins University*

Paul Mark Sandler
Shapiro Sher Guinot & Sandler
Suite 2000
36 South Charles Street
Baltimore, MD 21201

W. Michael Mullen
Freishtat, Burke, Mullen and Dubnow
1500 One Calvert Plaza
201 East Baltimore Street
Baltimore, MD 21202

*Liaison Counsel for Plaintiffs Brassica Protection
Products LLC and Johns Hopkins University*

# EXHIBIT A

IN THE
# Supreme Court of the United States

BRASSICA PROTECTION PRODUCTS LLC
AND JOHNS HOPKINS UNIVERSITY,
*Petitioners,*

v.

SUNRISE FARMS, BECKY CRIKELAIR, FRANK CRIKELAIR,
EDRICH FARMS, INC., EDWARD B. STANFIELD, III,
EDWARD F. STANFIELD, JR., RICHARD STANFIELD,
SALLY F. STANFIELD, BANNER MOUNTAIN SPROUTS,
BANNER MOUNTAIN SPROUTS INC., LAWRENCE RAVITZ,
HARMONY FARMS, GREG LYNN, LORNA LYNN,
INTERNATIONAL SPECIALTY SUPPLY AND ROBERT L. RUST,
*Respondents.*

On Petition for a Writ of Certiorari to the
United States Court of Appeals for the Federal Circuit

## PETITION FOR A WRIT OF CERTIORARI

GEORGE E. QUILLIN
*COUNSEL OF RECORD*
RICHARD C. PEET
RICHARD G. STOLL
R. ELIZABETH BRENNER
TODD SPALDING
FOLEY & LARDNER
3000 K Street, N.W.
Suite 500
Washington, DC 20009
(202) 672-5300

*Counsel for Petitioner*

## QUESTIONS PRESENTED

(1)  Whether the Court of Appeals for the Federal Circuit erred when, in a patent litigation context, it gave no deference to the United States Patent and Trademark Office's determination of patentability and findings in reaching such determination?

(2) Whether the Court of Appeals for the Federal Circuit erred in granting summary judgment of patent invalidity, when the grant was on grounds for which the PTO had made explicit findings to the contrary, and when the movant failed to present any evidence of an essential element of its affirmative defense?

## PARTIES

The parties to the proceeding in the court of appeals, whose judgment is sought to be reviewed, are the same as in the caption.

There is no parent corporation or publicly held company that owns 10% or more of the stock of Petitioners Brassica Protection Products LLC or Johns Hopkins University.

# TABLE OF CONTENTS

Questions Presented ................................................................ i

Parties ................................................................................. ii

Table of Authorities ............................................................. v

Opinions Below .................................................................... 1

Jurisdiction ......................................................................... 1

Statutes Involved ................................................................. 1

Statement of the Case ........................................................... 3

    Background of the Inventions .......................................... 3

    The Patent and Trademark Office's Decisions ................. 5

    Judicial Review of the Patent and Trademark Office's Decision ......................................................... 8

Reasons for Granting the Writ ............................................. 9

    I.  Summary of Argument ................................................. 9

    II. The Federal Circuit Erred in Giving No Deference to the United States Patent and Trademark Office's Patentability Decisions. ............. 12

    III. The Federal Circuit Erred in Attacking the Nonmovant's Credibility and in Granting Summary Judgment Despite the Fact that the Movant Presented No Evidence on an Essential Element of Its Affirmative Defense........................... 15

        A. The Federal Circuit Decision Directly Conflicts with This Court's Holding in *Celotex Corp. v. Catrett* ....................................... 16

        B. The Federal Circuit Decision Directly Conflicts with *Anderson v. Liberty Lobby, Inc.* ....................................................................... 18

Conclusion ........................................................................ 20

## Table of Contents Continued

Appendix A: Decision of the Court of Appeals (Decided August 21, 2002) .............................................1a

Appendix B: Memorandum Opinion of the District Court (August 8, 2001)..................................................16a

Appendix C: Order of the District Court (August 8, 2001)........................................................................27a

Appendix D: Order of the Court of Appeals (September 30, 2002) ...................................................28a

Appendix E: Notice of Allowability of the PTO for U.S. Patent No. 5,725,895 (August 14, 1997)...............30a

Appendix F: Notice of Allowability of the PTO for U.S. Patent No. 5,968,567 (January 27, 1999)..............33a

Appendix G: Notice of Allowability of the PTO for U.S. Patent No. 5,968,505 ..............................................34a

Appendix H: Notice of Intent to Issue Reexamination Certificate of the PTO for U.S. Patent No. 5,725,895 (July 12, 2000)..............................................35a

Appendix I: U.S. Patent No. 5,725,895 Claims at Issue ....38a

Appendix J: U.S. Patent No. 5,968,567 Claims at Issue....39a

Appendix K:   U.S. Patent No. 5,968,505 Claims at Issue.............................................................................41a

Appendix L:   Sworn Declaration of Jed W. Fahey (May 8, 2000)...............................................................42a

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Altoona Publix Theatres, Inc. v.  American Tri-ergon Corp.*
294 U.S. 477 (1935) ..........................................................5

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ......................................16, 18, 19, 20

*Aro Mfg. Co. v. Convertible Top Replacement Co.*
365 U.S. 336 (1961) ..........................................................5

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ...........................................16, 17, 18

*Cleveland v. Policy Management System Corp.*
526 U.S. 795 (1999); ......................................................16

*Cohn v. U.S. Corset Co.*
93 U.S. 366, 370 (1876) ....................................................6

*Continental Can Co. v. Monsanto Co.*
948 F.2d 1264 (Fed. Cir. 1991) ........................................6

*Control Resources, Inc. v. Delta Electronics, Inc.*
133 F. Supp. 2d 121 (D. Mass. 2001).............................11

*Crawford-El v. Britton*
523 U.S. 574 (1998) ..................................................18, 19

*Dennison Manufacturing Co. v. Panduit Corp.*
475 U.S. 809 (1986) ..................................................10, 14

*Dethmers Mfg. Co. v. Automatic Equipment Co.*
293 F.3d 1364, 1365 (Dyk, J., concurring in part,
dissenting in part), *reh'g en banc denied*, 293 F.3d
1364 (Fed. Cir. 2002) (Linn, J., dissenting), *petition
for cert. filed*, 71 U.S.L.W. 3191 (Sept. 11, 2002)
(No. 02-429) ...................................................................12

*Diamond v. Chakrabarty*
447 U.S. 303 (1980) .......................................................10

v

**Table of Authorities Continued**

*Page(s)*

Dickinson v. Zurko
  527 U.S. 150 (1999) ......................................11, 13, 14, 15

The Driven-Well Cases
  122 U.S. 40 (1887) .........................................................6

Finnigan Corp. v. ITC
  180 F.3d 1354 (Fed. Cir. 1999) ......................................20

General Electric Co. v. Jewel Incandescent Lamp Co.
  326 U.S. 242 (1945) ........................................................6

Glaxo, Inc. v. Novopharm Ltd.
  52 F.3d 1043 (Fed. Cir. 1995) .........................................6

Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.
  535 U.S. 826 (2002) ......................................................10

Hunt v. Cromartie
  526 U.S. 541 (1999) ................................................16, 19

Lujan v. National Wildlife Federation
  497 U.S. 871 (1990) ................................................16, 17

Markman v. Westview
  517 U.S. 370 (1996) ........................................................5

McGinley v. Franklin Sports, Inc.
  262 F.3d 1339 (Fed. Cir. 2001) ......................................14

MEHL/Biophil International Corp. v. Milgraum
  192 F.3d 1362 (Fed. Cir. 1999) ........................................6

Purdue Pharma, L.P. v. Faulding, Inc.
  230 F.3d 1320 (Fed. Cir. 2000) ................................13, 14

Reeves v. Sanderson Plumbing Products, Inc.
  530 U.S. 133 (2000) ......................................................19

Schumacher v. Cornell
  96 U.S. 549 (1877) ..........................................................5

**Table of Authorities Continued**

*Page(s)*

*Titanium Metals Corp. v. Banner*
    778 F.2d 775 (Fed. Cir. 1985)............................................6

*United States v. Mead Corp.*
    533 U.S. 218 (2001) ............................................13, 14, 15

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*
    520 U.S. 17 (1997) ............................................................5

**U.S. CONSTITUTION**

U.S. Constitution, Art. I, § 8, cl. 8 ......................................10

**STATUTES & FEDERAL RULES**

5 U.S.C. § 706............................................................1, 2, 13

28 U.S.C. § 1254 ..............................................................1

28 U.S.C. 1295(a)............................................................10

35 U.S.C. § 102(b) ..........................................2, 3, 5, 6, 8, 20

35 U.S.C. § 141 ..............................................................13

35 U.S.C. § 145 ..............................................................13

35 U.S.C. § 282............................................3, 13, 14, 15, 17

35 U.S.C. § 302 ..............................................................7

Fed. R. Civ. P. 52(a)........................................................10

Fed. R. Civ. P. 56(c)....................................................3, 16

**OTHER AUTHORITIES**

S. Rep. No. 97-275, at 1-6 (1981), *reprinted in* 1982
    U.S.C.C.A.N. 11, 11-16 ................................................10

Ted D. Lee & Michelle Evans, *The Charade: Trying a
    Patent Case to All "Three" Juries*, 8 Tex. Intell.
    Prop. L.J. 1 (1999)..........................................................11

**Table of Authorities Continued**

*Page(s)*

William C. Rooklidge & Mathew F. Weil, *Judicial Hyperactivity: The Federal Circuit's Discomfort With Its Appellate Role*, 15 Berkeley Tech. L.J. 725 (2000) ........................................................................... 11

Douglas A. Strawbridge et al., *Patent Law Developments in the United States Court of Appeals for the Federal Circuit During 1986*, 36 Am. U. L. Rev. 861 (1987)............................................................... 11

The United States Court of Appeals for the Federal Circuit, *A History 1982-1990*, 1-14 (1991) ..................... 10

Petitioners Johns Hopkins University ("Johns Hopkins") and Brassica Protection Products LLC ("Brassica") respectfully pray that this Court grant a writ of certiorari to review the judgment and opinion of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") entered on August 21, 2002.

## OPINIONS BELOW

The August 21, 2002 opinion of the court of appeals, which is reported at 301 F.3d 1343 (Fed. Cir. 2002), is set out at pp. 1a-15a of the Appendix to this petition.  The August 8, 2001 memorandum opinion of the district court, which is reported at 168 F. Supp. 2d 534 (D. Md. 2001), is set out at pp. 16a-26a of the Appendix.  The August 8, 2001 order of the district court, which is also reported at 168 F. Supp. 2d 534 (D. Md. 2001), is set out at p. 27a of the Appendix.  The September 30, 2002 order of the court of appeals, which is unreported, is set out at pp. 28a-29a of the Appendix.  The August 14, 1997, January 27, 1999, March 1, 1999, and July 12, 2000 United States Patent and Trademark Office decisions are set out at pp. 30a-37a of the Appendix.

## JURISDICTION

The decision of the court of appeals was entered on August 21, 2002.  *See* App. A, at p. 1a. The court of appeals denied Petitioner's request for rehearing on September 30, 2002.  *See* App. D, at pp. 28a-29a.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1254.

## STATUTES INVOLVED

Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, states in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant

1

questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Section 1 of the Patent Act of 1952, 35 U.S.C. § 102(b), states in pertinent part:

A person shall be entitled to a patent unless—
                                  ***
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the

2

United States….”

Section 1 of the Patent Act of 1952, 35 U.S.C. § 282, states in pertinent part:

A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid though dependent upon an invalid claim….   The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity….

Rule 56(c) of the Federal Rules of Civil Procedure states in pertinent part:

The [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

## STATEMENT OF THE CASE

### Background of the Inventions

This case relates to significant discoveries in human cancer prevention that the United States Patent and Trademark Office (“PTO”) deemed worthy of patent protection.   In 1998 and 1999, the PTO granted three patents relating to these discoveries.[1]  Dr. Paul Talalay and his colleagues at the Johns Hopkins University School of Medicine discovered that certain cruciferous vegetables[2] contain chemical com-

---

[1] U.S. Patent Nos. 5,725,895 (issued Mar. 10, 1998), 5,968,505 (issued Oct. 19, 1999); 5,968,567 (issued Oct. 19, 1999).

[2] Cruciferous vegetable varieties include broccoli (*Brassica oleracea*

*footnote continued on next page*

pounds that induce the body to make enzymes that neutralize cancer-causing chemicals. They isolated these compounds, called "Phase 2 enzyme-inducers," and found them to prevent cancer in laboratory animals. Dr. Talalay and his research associate, Jed Fahey, developed a quantitative assay for measuring Phase 2 enzyme inducers, and discovered that at the sprout stage[3], some cultivars[4] contained between 10 and 100 times higher concentrations of inducers than at the mature plant stage, as well as lower concentrations of certain cancer-causing compounds. They further discovered that among different cruciferous sprout cultivars, concentrations of Phase 2 enzyme inducers varied from very low to very high. Based on these findings, the scientists determined that making and consuming food products from cruciferous sprouts containing high concentrations (*i.e.*, at least 200,000 units per gram fresh weight sprouts) of Phase 2 enzyme inducers would be an effective way to prevent cancer in humans.

Johns Hopkins' work was met with widespread acclaim. It was published in a prestigious scientific journal, *Proceedings of the National Academy of Sciences USA*, cited in more than 100 peer-reviewed journal articles, and featured in numerous television, magazine, and newspaper reports.

### The Patent and Trademark Office's Decisions

All three patents granted by the PTO are directed to methods for making food products from sprouts that have high concentrations, or at least 200,000 units per gram fresh

---

*italica*), cauliflower (*Brassica oleracea botrytis*), and kale (*Brassica olearcea acephala*).

[3] The patents define a sprout as "harvested following seed germination through and including the 2-leaf stage."

[4] For each cruciferous vegetable variety there are numerous, sometimes several hundred, genetically distinct subgroups known as "cultivars." For example, "Saga" is a popular cultivar of the broccoli variety.

weight sprouts, of Phase 2 enzyme inducers.[5]  In determining whether to grant these patents, the PTO specifically considered the issue raised in the case below—whether the claimed inventions were described in prior printed publications.

Section 102(b) of the patent statute, 35 U.S.C., states that a patent may not be granted for an invention if it was described in a printed publication more than one year prior to the date on which the application for the patent was filed. Under section 102(b), a patent claim is "anticipated" by a prior printed publication if the publication describes all the elements of the invention, as defined by that patent claim. Every element of a patent claim is material because the patent claims define the scope of a patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372-73 (1996); *Schumacher v. Cornell*, 96 U.S. 549, 554 (1877); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961) ("[T]he claims made in the patent are the sole measure of the grant."); *Altoona Publix Theatres, Inc. v. American Tri-ergon Corp.*, 294 U.S. 477, 487 (1935) ("[I]t is the claims of the patent which define the invention.").

When comparing the description of the prior publication to the patent claims, it has been the law for over 100 years that:

---

[5] The patent claims at issue recite methods for preparing food products comprising sprouts that are "rich in glucosinolates" or that contain "high Phase 2 enzyme-inducing potential".  *See* Apps. I-K, at pp. 38a-41a.  Glucosinolates are compounds that indirectly induce the production of Phase 2 enzymes and, therefore, have a Phase 2 enzyme-inducing potential.  For simplicity of discussion, all compounds with a Phase 2 enzyme inducing potential are herein referred to as "Phase 2 enzyme inducers."  Some claims require the concentration of glucosinolates or Phase 2 enzyme inducers to be at least 200,000 units per gram fresh weight sprouts.  *Id.*

> Unless the earlier printed and published description [ ] exhibit[s] the later patented invention in such full and intelligible manner as to enable persons skilled in the art to which the invention is related to comprehend it without assistance from the patent, or to make it, or repeat the process claimed, it is insufficient to invalidate the patent.

*Cohn v. U.S. Corset Co.*, 93 U.S. 366, 370 (1876), *quoted in The Driven-Well Cases*, 122 U.S. 40, 66 (1887).

It is also well-settled that even when a prior publication is silent about one or more elements of the claimed invention, it may nevertheless anticipate the patent claim if the missing elements are "inherent" in the subject matter described in the publication. *General Elec. Co. v. Jewel Incandescent Lamp Co.*, 326 U.S. 242, 247 (1945). The Federal Circuit has elaborated on this general rule by stating that inherency may be proved by extrinsic evidence demonstrating that the missing element is "necessarily" (*i.e.*, always) present in the subject matter described in the publication. *MEHL/Biophil Int'l Corp. v. Milgraum*, 192 F.3d 1362 (Fed. Cir. 1999); *Glaxo, Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047-48 (Fed. Cir. 1995); *Continental Can Co. v. Monsanto Co.,* 948 F.2d 1264, 1268-69 (Fed. Cir. 1991); *Titanium Metals Corp. v. Banner*, 778 F.2d 775, 781 (Fed. Cir. 1985). Thus, evidence establishing only a possibility or probability that the missing element was present in the thing described does not establish inherency. *Continental Can*, 948 F.2d at 1269.

In its initial determination of patentability, the PTO found that the methods claimed in the patent applications were not described in prior printed publications, including publications that generally describe eating cruciferous vegetable sprouts. The PTO also found no evidence of prior public use in this country, and therefore determined that the claimed inventions overcame section 102(b)'s hurdle. *See* App. E-G, at pp. 30a-35a.

In 2000, the PTO reconfirmed the patentability of one of these patents in a reexamination proceeding[6] during which it considered additional prior publications that generally describe eating vegetable sprouts, including cruciferous sprouts. The PTO found that although the publications generally describe eating vegetable sprouts, they do not mention the critical claim limitation, *i.e.*, Phase 2 enzyme inducers, and do not describe eating any particular cultivars of cruciferous sprouts that contain Phase 2 enzyme inducers, either at high or low levels. *See* App. H, at p. 37a.

During the PTO's reexamination proceeding, Johns Hopkins submitted a sworn declaration by Jed Fahey on this issue. Mr. Fahey's declaration described the wide variation in Phase 2 enzyme inducer concentrations among various cruciferous cultivars. For example, the declaration stated that inducer potential ranged from 10,000 to 769,000 units in broccoli cultivars, from 50,000 to 560,000 units in cauliflower cultivars, and from 10,000 to more than 200,000 units in kale cultivars. *See* App. L, ¶¶ 7-10, at pp. 44a-45a. As a result, the PTO determined that "a method of preparing a food product wherein cruciferous sprouts, with the exception of cabbage, cress, mustard, and radish sprouts, that are rich in glucosinolates or contain high concentrations of Phase 2 inducer activity are harvested prior to the 2-leaf stage is not taught nor fairly suggested by the prior art or any combination thereof." *See* App. H, at p. 37a.

---

[6] Before initiating the present litigation, Petitioners sued another company for infringement of the '895 patent in 1999. That case was settled. During the course of that litigation, the defendants filed a request for reexamination with the PTO. Reexamination is a procedure by which the PTO reexamines an issued patent based on prior art patents and/or printed publications that it did not previously consider. 35 U.S.C. § 302.

7

### Judicial Review of the Patent and
### Trademark Office's Decision

After the widespread publication of Johns Hopkins' discoveries, Respondents began copying the university's patented inventions, making and selling sprouts of the cultivars that Johns Hopkins had identified as having high concentrations of Phase 2 enzyme inducers.  In 2000 Johns Hopkins and its exclusive patent licensee, Brassica, sued Respondents for patent infringement in several federal district courts.  The actions were consolidated by the Judicial Panel for Multidistrict Litigation to be heard in the District of Maryland.

Respondents moved for summary judgment on the affirmative defense that the patents were invalid under 35 U.S.C. § 102(b).  Respondents argued that the inventions were described in prior printed publications more than one year prior to the date of the application.  In support of their summary judgment motion, Respondents submitted 12 publications, most of which the PTO had considered and found not to anticipate the patent claims.  The publications offered by Respondents contain essentially the same subject matter as the references previously before the PTO, *i.e.*, growing and eating cruciferous sprouts, and like the previous references, do not mention Phase 2 enzyme inducers.  Respondents never presented any evidence that any of the sprouts described in those publications contain Phase 2 enzyme inducers at high concentrations, or at least 200,000 units per gram fresh weight sprouts, or at any particular concentration whatever.  Their publications never even described Phase 2 enzyme inducers or anything related to this concept.

Because Respondents failed to present any evidence that all of the elements of the patent claims were expressly or inherently described in the prior publications, Johns Hopkins and Brassica filed a cross-motion for summary judgment, submitting Mr. Fahey's sworn declaration that demonstrates that high concentrations, or at least 200,000 units per gram

8

fresh weight sprouts, of Phase 2 enzyme inducers are not an inherent property of all cruciferous sprouts.

The district court granted summary judgment in favor of Respondents, incorrectly stating that the concentrations of Phase 2 inducers recited in the claims were not elements of Petitioners' patent claims.  App. B, at p. 25a.  Petitioners thereafter appealed to the Federal Circuit.

Unlike the district court, the Federal Circuit recognized that the concentrations of Phase 2 inducers were indeed elements of the patent claims, App. A, at p. 7a, but affirmed the district court's summary judgment.  Despite the fact that Respondents did not even argue that the patents were invalid due to prior public use[7], the Federal Circuit stated:

> Brassica cannot *credibly* maintain that no one has heretofore grown and eaten one of the many suitable cultivars identified by its patents.

*Id.* at p. 14a (emphasis added).  This petition followed.

### REASONS FOR GRANTING THE WRIT

### I.    Summary of Argument

In the case below, the Federal Circuit affirmed summary judgment to Respondents declaring invalid patents that had been duly issued by the PTO without any deference to the PTO's determinations, despite the fact that Respondents failed to provide any new evidence that could establish an essential element of their invalidity defense.  In so doing, the Federal Circuit made factual and credibility determinations against the nonmovant.

This case presents important questions regarding whether,

---

[7] As explained below, prior "public use" and prior "printed publication" are entirely separate and independent grounds for patent invalidity.  Respondents never asserted a prior public use defense in this litigation.

and the degree to which, the Federal Circuit, in deciding patent cases, must follow traditional and well-settled rules of jurisprudence as articulated by this Court.[8]   As will be explained and is manifest from the opinion below, there has been a clear tendency in the Federal Circuit's patent cases to disregard standards established through this Court's long-standing precedents regarding (1) judicial deference to agency decisions and (2) application of the Federal Rules of Civil Procedure relating to summary judgments.  In doing so, the Federal Circuit has appeared to perceive of its role not so much as an appellate court but more of a *de novo* trier of fact and weigher of evidence—even with regard to facts in the summary judgment context.

The Federal Circuit's failure to apply traditional jurisprudence regarding the role of appellate courts vis-à-vis federal agencies and civil procedure is not infrequent.  This Court corrected the Federal Circuit's failure to follow Rule 52(a) of the Federal Rules of Civil Procedure in substituting its view of facts for that of the district court in *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809 (1986).  The Federal Circuit has

---

[8] The patent laws promote scientific progress by offering inventors exclusive rights for a limited period as an incentive for their inventiveness and research efforts.  U.S. Const., Art. I, § 8, cl. 8; *Diamond v. Chakrabarty*, 447 U.S. 303, 307 (1980).  The Federal Circuit was created in 1982 to provide uniformity and predictability in the development and application of the patent laws and thereby to maintain the incentive for scientific innovation and research that the patent system was created to provide.  S. Rep. No. 97-275, at 1-6 (1981), *reprinted in* 1982 U.S.C.C.A.N. 11, 11-16; The United States Court of Appeals for the Federal Circuit, *A History 1982-1990*, 1-14 (1991).  The role of the Federal Circuit in the implementation of the patent laws is critical, as it has exclusive appellate jurisdiction over any case in which the complaint alleges a cause of action arising under them and, therefore, reviews most district court decisions regarding patent rights.  28 U.S.C. 1295(a); *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826 (2002).

10

been criticized for its fact-finding and other forms of "hyper-active judging" on numerous occasions by commentators and district courts alike, particularly in the last few years. *See Control Resources, Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121 (D. Mass. 2001); William C. Rooklidge & Mathew F. Weil, *Judicial Hyperactivity: The Federal Circuit's Discomfort With Its Appellate Role*, 15 Berkeley Tech. L.J. 725 (2000); Ted D. Lee & Michelle Evans, *The Charade: Trying a Patent Case to All "Three" Juries*, 8 Tex. Intell. Prop. L.J. 1 (1999); Douglas A. Strawbridge et al., *Patent Law Developments in the United States Court of Appeals for the Federal Circuit During 1986*, 36 Am. U. L. Rev. 861 (1987).

This Court recently reversed the Federal Circuit's expansive approach to its scope of judicial review of PTO patent decisions in *Dickinson v. Zurko*, 527 U.S. 150 (1999). This Court held that the standard the Federal Circuit had been applying was not sufficiently deferential to the PTO.

The *Zurko* case related to the issue of appeals brought by parties whose patent applications had been denied by the PTO. The case below presents this Court with the opportunity to review the Federal Circuit's expansive approach on two related and important matters: (1) whether and to what extent judicial deference is owed to the PTO's decisions when the validity of a patent issued by the PTO is subsequently challenged in litigation, and (2) under what circumstances the federal courts may grant summary judgment of invalidity, on substantially the same facts considered by the PTO.

A petition for *certiorari* is now pending before this Court in another patent infringement case in which the Federal Circuit has refused to give any deference to decisions of the PTO. This pending case arises in the context of whether judicial deference is owed to the PTO's interpretation of its regulations regarding the issuance of patents. Even after *Zurko*, this pending case shows that the Federal Circuit has

11

still refused to give deference to the PTO's interpretation of its own regulations. *Dethmers Mfg. Co. v. Automatic Equipment Co.*, 293 F.3d 1364, 1365 (Dyk, J., concurring in part, dissenting in part), *reh'g en banc denied*, 293 F.3d 1364 (Fed. Cir. 2002) (Linn, J., dissenting), *petition for cert. filed*, 71 U.S.L.W. 3191 (Sept. 11, 2002) (No. 02-429).

The Federal Circuit's failure to follow traditional jurisprudence regarding the role of appellate courts vis-à-vis federal agencies and the Federal Rules in this case and others has prevented it from properly administering the patent laws. This failure resulted in a grave injustice to both the patentee and the patent system, whose strength and vitality depend as much upon the Federal Circuit's assumption of its proper role with regard to deference and the Federal Rules as it does upon the Federal Circuit's development of the substantive law, if not more. The Federal Circuit's failure to follow this Court's precedent in these areas has the pernicious effects of diminishing predictability in patent administration and adjudication, eroding the public's confidence in the value of patents generally, and undermining the incentive for scientific innovation for which the patent system was Constitutionally created.

## II.  The Federal Circuit Erred in Giving No Deference to the United States Patent and Trademark Office's Patentability Decisions

Judicial review of PTO patent decisions may arise in two basic contexts:  (1) when an applicant challenges the PTO's denial of a patent on direct judicial review; and (2) when a patent is the subject of infringement litigation and the accused infringer argues that the patent issued by the PTO is invalid. This case presents an important question, never addressed by this Court, of how much deference the federal courts should give to the PTO's patent decisions in the second context.

Just three years ago, this Court resolved the first issue in

12

*Dickinson v. Zurko*, 527 U.S. 150 (1999), by holding that the PTO's patentability decisions are findings of fact by an agency subject to the "arbitrary and capricious" and "substantial evidence" standards of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706. The Federal Circuit in that case, as it did in the case below, had been applying a standard of review that gave less deference to the decisions of the PTO. In reversing the Federal Circuit, this Court held that the APA standards for judicial review apply regardless of whether the patent applicant seeks review directly at the Federal Circuit under 35 U.S.C. § 141 or in federal district court under 35 U.S.C. § 145. *Zurko*, 527 U.S. at 164. The Court also held that the standard applies to district court review even though section 145 "permits the disappointed applicant to present to the court evidence that the applicant did not present to the PTO." *Id.*[9]

Just one year ago, in *United States v. Mead Corp.*, 533 U.S. 218 (2001), this Court stated that almost all agency rulings were entitled to "some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Id.* at 234.

Judicial deference to the PTO's patentability determinations would seem to be even more appropriate in light of the fact that the patent statute explicitly provides that a patent issued by the PTO "shall be presumed valid" and that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. This Court has stated that the burden of proof

---

[9] Last year the Federal Circuit held that the APA standard of review adopted in *Zurko* has no application to a federal court's review of validity in a patent infringement action. *Purdue Pharma, L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1329 (Fed. Cir. 2000).

is clear and convincing evidence, *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810 (1986), but has not addressed this specific issue of deference.

The opinion below presents a dramatic reason why this Court needs to resolve the related issue of how much deference is owed to PTO patent decisions in the context of patent infringement litigation. In the case below, the federal courts gave the PTO decisions absolutely no deference. In fact, they granted *summary judgment* to the alleged infringers and, entirely on factual issues, invalidated patents on inventions that the PTO decided on four occasions to be patentable on substantially the same evidence.

One could imagine a situation in which it is appropriate for courts to grant less deference to PTO decisions in the infringement context if, in that litigation, many new relevant facts were raised in the court that were not raised before the PTO in the patent application or reexamination process. But even in that circumstance, following the logic of *Zurko*, the demands of section 282, and the holding in *Mead*, one must at least start with the proposition that the patent in issue is presumed valid and that substantial deference is owed. One must logically assume that the burden would be on the defendant to demonstrate that new facts not considered by the PTO would in some material way demonstrate that the patent, entitled to a presumption of validity and substantial judicial deference, is nevertheless invalid.[10]

---

[10] The Federal Circuit has stated that "the decision of the Patent and Trademark Office is accorded deference in district court litigation, deference that takes the form of the presumption of validity that is accorded to issued patents under 35 U.S.C. § 282." *Purdue Pharma*, 230 F.3d at 1329. Thus, the Federal Circuit does not appear to be of the view that the PTO's decision must be reviewed or considered, but only that the burden is on the party asserting invalidity to establish, on a *de novo* record, invalidity by clear and convincing evidence. *See also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001).

14

The case for deference is even stronger in the present appeal where no new facts were raised in the district court. The case below presents a situation in which the relevant facts regarding the printed publications were in all material respects the same before both the PTO (at the patent application and reexamination stages) and the reviewing courts. By granting summary judgment on the issue of patent invalidity based on substantially the same facts, the courts below gave none of the deference owed to the PTO required by *Zurko*, section 282, and *Mead*.

As the great volume of patent infringement litigation in the federal courts shows no signs of abating, this case presents the Court with the opportunity to clarify the important question of the degree of judicial deference owed to the PTO in patent infringement litigation. As this Court's decisions and the statute unequivocally stand for the proposition that a substantial degree of deference is owed, and as the case below stands for the proposition that no deference is owed (even to the point of granting summary judgment to defendants), Petitioners submit that the decision below is incorrect as a matter of law and must be reversed. In correcting this mistake, the Court can provide much needed guidance to the federal courts on this important issue.

### III. The Federal Circuit Erred in Attacking the Nonmovant's Credibility and in Granting Summary Judgment Despite the Fact that the Movant Presented No Evidence on an Essential Element of Its Affirmative Defense

Under this Court's clear precedent, the Federal Circuit committed a double error—not only should it have reversed the district court's decision granting summary judgment in favor of Respondents, it should also have ordered that summary judgment be entered in favor of *Petitioners* on these facts. Respondents failed to present any evidence on an essential element of their affirmative defense—that the prior

publications relied upon described making cruciferous sprouts with the concentration of Phase 2 enzyme inducers required by the patent claims. Respondents' failure to do so entitled Petitioners to a grant of summary judgment in *their* favor under *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In fact, Petitioners submitted substantial evidence that the concentrations of Phase 2 enzyme inducers required by the patent claims were *not* an inherent property of the subject matter described by the prior publications. The Federal Circuit's error also results from its failure to give deference to the fact that the PTO found the claims to be patentable based on essentially the same evidence and to follow the summary judgment standards set forth in *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986).

### A. The Federal Circuit Decision Directly Conflicts with this Court's Holding in *Celotex Corp. v. Catrett*

In *Celotex*, this Court held that Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who

> fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

477 U.S. at 322-23. The burden on the moving party is discharged by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. This Court has reiterated this standard on several occasions in a variety of legal claims. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999); *Hunt v. Cromartie*, 526 U.S. 541 (1999), *Lujan*

16

*v. National Wildlife Federation*, 497 U.S. 871 (1990). Although this Court has never addressed the standard for summary judgment when patent validity is being litigated, there can be no real dispute that the *Celotex* standard should apply to a defense of patent invalidity as well.

Respondents failed to submit *any* evidence that the prior publications relied upon in their motion for summary judgment disclosed all of the elements of the inventions claimed in the patents. More specifically, Respondents did not submit any evidence that any of the publications disclosed making cruciferous sprouts with the concentrations of Phase 2 enzyme inducers required by the patent claims. That is, they never submitted any evidence either that the requisite high concentrations, or at least 200,000 units per gram fresh weight sprouts, of Phase 2 enzyme inducers were an inherent property of the cruciferous sprouts described in the publications. Therefore, Respondents completely failed to establish the existence of an element essential to their affirmative defense on which they bore the burden of proof by clear and convincing evidence. Accordingly, Respondents' motion for summary judgment should have been denied.

The lower courts' failure to deny Respondents' summary judgment is even more egregious in light of section 282 and the clear law requiring deference to agency determinations. The Petitioners submitted, both at the PTO and at the district court, substantial evidence that the concentrations of Phase 2 enzyme inducers required by the patent claims were *not* an inherent property of the subject matter described by the prior publications. Petitioners submitted a sworn declaration stating that concentrations of Phase 2 enzyme inducers among cultivars of cruciferous sprouts varied widely, and that many cruciferous sprout cultivars did not have the requisite concentrations of Phase 2 enzyme inducers required by the patent claims. App. L, ¶¶ 7-10, at pp. 44a-45a.

Under this Court's clear precedents, the Federal Circuit

17

should have reversed the district court's decision and ordered that summary judgment be entered in favor of *Petitioners* on these facts. The PTO's decisions were entitled to substantial deference. Respondents failed to present evidence on an essential element of their case—that the prior publications relied upon described making cruciferous sprouts with the concentration of Phase 2 enzyme inducers required by the patent claims. Respondents' failure to do so meant there were no disputed facts for the jury to decide with respect to that essential element. *Celotex*, 477 U.S. at 322-23, *Anderson*; 477 U.S. at 250. The absence of a genuine issue of material fact on this essential element of Respondents' affirmative defense entitled Petitioners to a grant of summary judgment in *their* favor.

## B. The Federal Circuit Decision Directly Conflicts with *Anderson v. Liberty Lobby, Inc.*

The Federal Circuit's error in granting summary judgment to Respondents also stems from its obvious failure to follow the standards set forth in *Anderson v. Liberty Lobby, Inc.*. In *Anderson*, this Court clearly stated that at the summary judgment stage:

> (a) "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial";
> (b) "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge"; and
> (c) "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor".

18

477 U.S. at 249, 255.[11]

Although the Federal Circuit paid lip service to these rules, its actions speak louder. First, as previously discussed, it appears that the Federal Circuit never reviewed the parties' evidence on the inherency issue because Respondents never submitted any evidence that either the requisite high concentrations, or at least 200,000 units per gram fresh weight sprouts, of Phase 2 enzyme inducers were an inherent property of the cruciferous sprouts described in the prior publications, whereas Petitioners submitted evidence that this property was *not* inherent in that subject matter. *See Anderson*, 477 U.S. at 248 ("[T]he substantive law will identify which facts are material."). Further, because there was no evidence in the record from which the Federal Circuit could infer that the subject matter disclosed in the prior publications inherently possessed all of the patent claim elements to support a finding of inherency, the inference that the Federal Circuit drew was also unjustified.

Second, in granting summary judgment, the Federal Circuit found facts and made credibility determinations against the nonmovant, which were expressly admonished in *Anderson*.[12] The Federal Circuit's determination that "Brassica cannot *credibly* maintain that no one has heretofore grown and eaten one of the many suitable cultivars identified by its patents" was plainly improper on summary judgment.

Lastly, the Federal Circuit's credibility determination regarding prior use (*i.e.*, that one of the suitable cultivars must have previously been eaten) was also misplaced and without basis because a prior public use defense was neither

---

[11] *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Hunt*, 526 U.S. at 551-53; *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

[12] *See also Reeves*, *Hunt*; and *Crawford-El*, *supra*, note 11.

advanced by Respondents nor addressed by Petitioners. Respondents' invalidity defense was based on prior publication, not prior public use. Prior printed publication and prior public use are separate and distinct statutory bases for invalidity. 35 U.S.C. § 102(b) (A person shall be entitled to a patent unless … (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States….”). The Federal Circuit confused the two legal theories. In any case, summary judgment based on prior public use in this country could not have been granted in Respondents' favor because they never presented evidence of an invalidating use. *See Finnigan Corp. v. ITC*, 180 F.3d 1354, 1367 (Fed. Cir. 1999).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court issue a writ of certiorari to review the judgment of the Court of Appeals for the Federal Circuit.

Respectfully submitted,

GEORGE E. QUILLIN
   *COUNSEL OF RECORD*
RICHARD C. PEET
RICHARD G. STOLL
R. ELIZABETH BRENNER
TODD SPALDING
   FOLEY & LARDNER
   3000 K St., N.W.
   Suite 500
   Washington, DC  20009
   (202) 672-5300

*Counsel for Petitioner*

20

**APPENDIX**

**APPENDIX A**

**United States Court of Appeals for the
Federal Circuit**

_____

In re CRUCIFEROUS SPROUT LITIGATION.

Brassica Protection Products LLC and Johns Hopkins
University,

Plaintiffs-Appellants,

v.

Sunrise Farms, Becky Crikelair, and Frank Crikelair,

Defendants-Appellees,

and

Edrich Farms Inc., Edward B. Stanfield, III, Edward F.
Stanfield, Jr., Richard Stanfield, and Sally F. Stanfield,

Defendants-Appellees,

and

Banner Mountain Sprouts, Banner Mountain Sprouts Inc.,
and Lawrence Ravitz,

Defendants-Appellees,

and

Harmony Farms, Greg Lynn, and Lorna Lynn,

and

International Specialty Supply and Robert L. Rust,

Defendants-Appellees.

_____

No. 02-1031

_____

Argued:  May 9, 2002

DECIDED: Aug. 21, 2002

1a

Affirmed.

Before CLEVENGER, BRYSON, and PROST, Circuit Judges.

PROST, Circuit Judge.

Brassica Protection Products LLC and Johns Hopkins University (collectively "Brassica") appeal from the decision of the United States District Court for the District of Maryland granting summary judgment that U.S. Patent Nos. 5,725,895 ("the '895 patent"), 5,968,567 ("the '567 patent"), and 5,968,505 ("the '505 patent") are invalid as anticipated by the prior art. *In re Cruciferous Sprout Patent Litig.*, 168 F. Supp. 2d 534, 60 USPQ.2d 1758 (D. Md. 2001). We affirm the district court's ruling.

## BACKGROUND

The three patents-in-suit relate to growing and eating sprouts to reduce the level of carcinogens in animals, thereby reducing the risk of developing cancer. Specifically, the patents describe methods of preparing food products that contain high levels of substances that induce Phase 2 enzymes. These enzymes are part of the human body's mechanism for detoxifying potential carcinogens. Thus, they have a chemoprotective effect against cancer. '895 patent, col. 1, ll. 28-34. Foods that are rich in glucosinolates, such as certain cruciferous sprouts, have high Phase 2 enzyme-inducing potential. The inventors of the patents-in-suit recognized that the Phase 2 enzyme-inducing agents (or their glucosinolate precursors) are far more concentrated in certain sprouts (such as broccoli and cauliflower but not cabbage, cress, mustard or radish) that are harvested before the two-leaf stage than in corresponding adult plants. *Id.* at col. 7, l. 63 - col. 8, l. 14. However, glucosinolate levels in cruciferous plants can be highly variable. *See id.* at col. 12, ll. 66-67 ("There is variation in inducer potential among different broccoli cultivars."). According to the inventors, it is there-

2a

fore desirable to select the seeds of those cruciferous plants which, when germinated and harvested before the two-leaf stage, produce sprouts that contain high levels of the desired enzyme-inducing potential.

The '895 patent was filed on September 15, 1995, and claims, *inter alia*, "A method of preparing a food product rich in glucosinolates, comprising germinated cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds, and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts." '895 patent, claim 1. The '567 patent is a continuation of the '895 application and it claims a "method of preparing a human food product" from sprouts. '567 patent, claims 1 and 9. The '505 patent is a divisional of the '895 application and it claims a "method of increasing the chemoprotective amount of Phase 2 enzymes in a mammal," as well as a "method of reducing the level of carcinogens in a mammal," by creating a "food product" from sprouts and then "administering said food product" to a mammal. '505 patent, claims 1 and 16.

The three patents-in-suit are owned by Johns Hopkins University and exclusively licensed to Brassica Protection Products LLC. Johns Hopkins and Brassica sued Sunrise Farms, Becky Crikelair, Frank Crikelair, Edrich Farms, Inc., Edward B. Stanfield, III, Edward F. Stanfield, Jr., Richard Stanfield, Sally F. Stanfield, Banner Mountain Sprouts, Banner Mountain Sprouts, Inc., Lawrence Ravitz, Harmony Farms, International Specialty Supply, Greg Lynn, Lorna Lynn and Robert L. Rust (collectively "defendants") in various district courts. Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated the various cases in the District of Maryland for pretrial proceedings. On June 7, 2001, the defendants filed a joint motion for partial summary judgment of invalidity, arguing that the patents were anticipated by prior art references

3a

disclosing growing and eating sprouts. Brassica filed a cross-motion for summary judgment that the patents are not invalid. On July 23, 2001, the district court held a *Markman* hearing to address claim construction issues and the parties' motions for summary judgment.

On August 10, 2001, the court granted defendants' motion for summary judgment of invalidity and denied Brassica's cross-motion for summary judgment. According to the district court, "[t]he record before the Court makes it abundantly clear that, prior to the issuance of the patents-in-suit, one skilled in the art could, by following the teachings of the prior art, germinate broccoli seeds, harvest the sprouts, and sell them as a food product." *In re Cruciferous Sprout Patent Litig.*, 168 F. Supp. 2d at 540, 60 USPQ.2d at 1762. While recognizing that the inventors of the patents-in-suit may have discovered a new and significant property of certain types of cruciferous sprouts, the district court concluded that "merely describing unexpected beneficial results of a known process does not entitle Plaintiffs to patent that process." *Id.* at 538, 60 USPQ.2d at 1760. Thus, a "plant (broccoli sprouts), long well known in nature and cultivated and eaten by humans for decades, [cannot] be patented merely on the basis of a recent realization that the plant has always had some heretofore unknown but naturally occurring beneficial feature." *Id.* at 537, 60 USPQ.2d at 1759. On October 1, 2001, the court entered a Judgment Under Rule 54(b) in favor of defendants but limited its invalidity ruling to claims 1-6 and 9 of the '895 patent, claims 1-8 of the '567 patent, and claims 1 and 16 of the '505 patent. *In re Cruciferous Sprout Patent Litig.*, MDL Docket No. 1388 (D. Md. Oct. 1, 2001) (Rule 54(b) Determination). Brassica appeals the judgment of invalidity, arguing that the district court failed to properly construe the claims and did not apply the properly construed claims to the prior art when determining that the claims are anticipated under 35 U.S.C. § 102(b). We have jurisdiction under 28 U.S.C. § 1295(a)(1).

4a

DISCUSSION

This court reviews a grant of summary judgment *de novo*, drawing all reasonable factual inferences in favor of the non-moving party. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 247-48. Anticipation is a question of fact, *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353, 50 USPQ.2d 1910, 1912 (Fed. Cir. 1999), and is determined by first construing the claims and then comparing the properly construed claims to the prior art, *Gechter v. Davidson*, 116 F.3d 1454, 1457, 43 USPQ.2d 1030, 1032 (Fed. Cir. 1997). Claim construction is an issue of law that we review *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 USPQ.2d 1169, 1174 (Fed. Cir. 1998) (en banc). We also determine *de novo* whether the evidence in the record raises any genuine disputes about material facts. *Gen. Elec.*, 179 F.3d at 1353, 50 USPQ.2d at 1912.

I.

Brassica contends that the district court erroneously construed the claims by failing to treat the preamble of claim 1 of the '895 patent as a limitation of the claims. In addition, Brassica argues that the district court failed to construe the limitations "rich in glucosinolates" (appearing in claims 1 and 9 of the '895 patent) and "high Phase 2 enzyme-inducing potential" (appearing in claim 1 of the '567 patent and claims 1 and 16 of the '505 patent).

No litmus test defines when a preamble limits claim scope. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257, 9 USPQ.2d 1962, 1966 (Fed. Cir. 1989). Whether to treat a preamble as a limitation is a determination "resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Id.*;

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808, 62 USPQ.2d 1781, 1785 (Fed. Cir. 2002). In general, a preamble limits the claimed invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Catalina Mktg.*, 289 F.3d at 808, 62 USPQ.2d at 1784 (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305, 51 USPQ.2d 1161, 1165 (Fed. Cir. 1999)). Clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may indicate that the preamble is a claim limitation because the preamble is used to define the claimed invention. *Catalina Mktg.*, 289 F.3d at 808, 62 USPQ.2d at 1785; *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375, 58 USPQ.2d 1508, 1513 (Fed. Cir. 2001).

In this case, both the specification and prosecution history indicate that the phrase "rich in glucosinolates" helps to define the claimed invention and is, therefore, a limitation of claim 1 of the '895 patent. The specification, for example, states that "this invention relates to the production and consumption of foods which are rich in cancer chemoprotective compounds." '895 patent, col. 1, ll. 18-19. A stated object of the invention is "to provide food products and food additives that are rich in cancer chemoprotective compounds." *Id.* at col. 2, ll. 38-39. The specification therefore indicates that the inventors believed their invention to be making food products that are rich in chemoprotective compounds, or, in other words, food products "rich in glucosinolates."[1] In addition, during reexamination[2] of the '895

---

[1] Phase 2 enzymes are part of the human body's mechanism for detoxifying potential carcinogens. These enzymes therefore have a chemoprotective effect against cancer. According to the '895 patent, "most of the [Phase 2 enzyme] inducer potential of crucifer plants is due to their content of isothiocyanates and their biogenic precursors, glucosinolates." '895 patent, col. 8, ll. 14-16.

patent the patentee argued as follows:

> Claim 1 of the patent, for example, is directed to "[a] method of preparing a food product rich in gluco-sinolates, ... and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts." ... Although "rich in glucosinolates" is recited in the preamble of the claim, the pertinent case law holds that the preamble is given weight if it breathes life and meaning into the claim.... Accordingly, the cited prior art does not anticipate the claims because it does not explicitly teach a method of preparing a food product comprising cruciferous sprouts that are rich in glucosinolates or contain high levels of Phase 2 inducer activity.

This language shows a clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by the prior art. As such, the preamble is a limitation of the claims. *See Bristol-Myers Squibb*, 246 F.3d at 1375, 58 USPQ.2d at 1513.

Brassica also asks this court to construe the phrases "rich in glucosinolates" and "high Phase 2 enzyme-inducing potential" to require "at least 200,000 units per gram fresh weight of Phase 2 enzyme-inducing potential at 3-days

---

[2] On December 6, 1999, the Patent Office granted a request for reexamination of the '895 patent. Claims 1-6 and 9-13 were rejected as anticipated by or obvious in light of many of the same prior art references relied on by the defendants in this case. After considering the patentee's arguments and declarations in support of patentability, the Patent Office issued a reexamination certificate and gave the following examiner's statement of reasons for patentability: "a method of preparing a food product wherein cruciferous sprouts, with the exception of cabbage, cress, mustard, and radish sprouts, that are rich in glucosinolates or contain high levels of phase 2 inducer activity are harvested prior to the 2-leaf stage is not taught or fairly suggested by the prior art or any combination thereof."

following incubation under conditions in which cruciferous seeds germinate and grow." '895 patent, col. 7, ll. 47-53.

"[T]he words of a claim are generally given their ordinary and accustomed meaning, unless it appears from the specification or the file history that they were used differently by the inventor." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1577, 27 USPQ.2d 1836, 1840 (Fed. Cir. 1993). However, "limitations appearing in the specification will not be read into claims, and ... interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053, 12 USPQ.2d 1474, 1476 (Fed. Cir. 1989). Brassica's proposed construction violates this rule by improperly importing limitations from the specification into the claims. True, the specification states that "[s]uitable sprouts will have at least 200,000 units per gram of fresh weight of Phase 2 enzyme-inducing potential following 3-days incubation of seeds under conditions in which the seeds germinate and grow." '895 patent, col. 10, l. 66 - col. 11, l. 2. The specification does not, however, indicate that the phrases "rich in glucosinolates" or "high in Phase 2 enzyme-inducing potential" are limited to these precise conditions. Rather, the specification uses the term "high" in its ordinary, comparative sense to mean "not low." For example, the specification states that "[t]he cruciferous sprouts of the instant invention have higher Phase 2 enzyme-inducer potential than market stage plants," *id.* at col. 14, ll. 5-7, and the "Phase 2 enzyme-inducing potential of such sprouts may be as much as several hundred times higher than that observed in adult, market stage vegetables obtained from the same seeds," *id.* at col. 8, ll. 6-9; *see also Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1332, 59 USPQ.2d 1676, 1680 (Fed. Cir. 2001) (construing the term "small volume" based in part on the specification's use of the phrase in its general sense to mean "not large"). Likewise, the term "rich" is not specifi-

8a

cally defined or limited by the specification, but instead is used in its ordinary, relative sense. *See, e.g.*, *id.* at col. 11, ll. 15-17 ("Mature Brussels sprouts and rapeseed are rich in these undesirable glucosinolates."); col. 11, ll. 37-39 ("Seeds, as well as sprouts have been found to be extremely rich in inducer potential.").

Brassica's proposed construction is also inconsistent with the language of the dependent claims. Claim 19 of the '567 patent recites: "The method according to claim 1, wherein said seeds produce cruciferous sprouts containing at least 200,000 units per gram fresh weight of Phase 2 enzyme-inducing potential measured after 3-days of growth." '567 patent, col. 22, ll. 62-65. Brassica's proposed construction would render this claim meaningless. *See Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187, 48 USPQ.2d 1001, 1005-06 (Fed. Cir. 1998) (finding a violation of the doctrine of claim differentiation when a proposed construction would render another claim superfluous). We therefore reject Brassica's proposed claim construction for the phrases "rich in glucosinolates" and "high in Phase 2 enzyme-inducing potential."

## II.

Having construed the claim limitations at issue, we now compare the claims to the prior art to determine if the prior art anticipates those claims. In order to prove that a claim is anticipated under 35 U.S.C. § 102(b), defendants must present clear and convincing evidence that a single prior art reference discloses, either expressly or inherently, each limitation of the claim. *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565, 24 USPQ.2d 1321, 1326 (Fed. Cir. 1992).

Brassica argues that the prior art does not expressly or inherently disclose the claim limitations of "preparing a food product rich in glucosinolates" (claims 1 and 9 of the '895 patent), or "identifying seeds which produce cruciferous

9a

sprouts ... containing high Phase 2 enzyme-inducing poten-
tial" (claims 1 and 16 of the '505 patent, claim 1 of the '567
patent). According to Brassica, the prior art merely dis-
cusses growing and eating sprouts without mention of any
glucosinolates or Phase 2 enzyme-inducing potential, and
without specifying that particular sprouts having these bene-
ficial characteristics should be assembled into a "food prod-
uct."[3] Moreover, Brassica argues, the prior art does not
inherently disclose these limitations because "at most, one
following the prior art would have a possibility or probability
of producing a food product high in Phase 2 enzyme-induc-
ing potential" and the "fact that one following the prior art
might have selected seeds meeting the limitations of the
claims is not sufficient to establish inherent anticipation."

It is well settled that a prior art reference may anticipate
when the claim limitations not expressly found in that refer-
ence are nonetheless inherent in it. *See, e.g.*, *Atlas Powder
Co. v. Ireco Inc.*, 190 F.3d 1342, 51 USPQ.2d 1943 (Fed.
Cir. 1999); *Titanium Metals Corp. v. Banner*, 778 F.2d 775,
227 USPQ 773 (Fed. Cir. 1985). "Under the principles of
inherency, if the prior art necessarily functions in accordance
with, or includes, the claimed limitations, it anticipates."
*MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362,
1365, 52 USPQ.2d 1303, 1305 (Fed. Cir. 1999) (finding
anticipation of a method of hair depilation by an article
teaching a method of skin treatment but recognizing the
disruption of hair follicles, citing *In re King*, 801 F.2d 1324,
1326, 231 USPQ 136, 138 (Fed. Cir. 1986)). "Inherency is
not necessarily coterminous with the knowledge of those of
ordinary skill in the art. Artisans of ordinary skill may not
recognize the inherent characteristics or functioning of the

---

[3] "A food product is any ingestible preparation containing the sprouts
of the instant invention, or extracts or preparations made from these
sprouts ...." '895 patent, col. 6, ll. 26-28.

10a

prior art." *MEHL/Biophile*, 192 F.3d at 1365, 52 USPQ.2d at 1305-06; *Atlas Powder*, 190 F.3d at 1347, 51 USPQ.2d at 1946-47.

Brassica does not claim to have invented a new kind of sprout, or a new way of growing or harvesting sprouts. Rather, Brassica recognized that some sprouts are rich in glucosinolates and high in Phase 2 enzyme-inducing activity while other sprouts are not. *See* '895 patent, col. 10, ll. 28-42 ("Sprouts suitable as sources of cancer chemoprotectants are generally cruciferous sprouts, with the exception of cabbage (Brassica olecracea capitata), cress (Lepidiumsativum), mustard (Sinapis alba and S. niger) and radish (Raphanus sativus) sprouts."). But the glucosinolate content and Phase 2 enzyme-inducing potential of sprouts necessarily have existed as long as sprouts themselves, which is certainly more than one year before the date of application at issue here. *See, e.g.*, Karen Cross Whyte, *The Complete Sprouting Cookbook* 4 (1973) (noting that in "2939 B.C., the Emperor of China recorded the use of health giving sprouts"). Stated differently, a sprout's glucosinolate content and Phase 2 enzyme-inducing potential are inherent characteristics of the sprout. *Cf.* Brian R. Clement, *Hippocrates Health Program* 8 (1989) (referring to "[i]nherent enzyme inhibitors, phytates (natural insecticides), oxalates, etc., present in every seed"). It matters not that those of ordinary skill heretofore may not have recognized these inherent characteristics of the sprouts. *MEHL/Biophile*, 192 F.3d at 1365, 52 USPQ.2d at 1305.

*Titanium Metals Corp. v. Banner* is particularly instructive in this regard. In that case, the claim at issue recited:

A titanium base alloy consisting essentially by weight of about 0.6% to 0.9% nickel, 0.2% to 0.4% molybdenum, up to 0.2% maximum iron, balance titanium, said alloy being characterized by good corrosion resistance in hot brine environments.

11a

*Titanium Metals*, 778 F.2d at 776, 227 USPQ at 774. The prior art disclosed a titanium base alloy having the recited components of the claim, but the prior art did not disclose that such an alloy was "characterized by good corrosion resistance in hot brine environments." We nevertheless held that the claim was anticipated by the prior art, because "it is immaterial, on the issue of their novelty, what inherent properties the alloys have or whether these applicants discovered certain inherent properties." *Id.* at 782, 774 F.2d 483, 227 USPQ at 779. *Titanium Metals* explained the rationale behind this common sense conclusion:

> The basic provision of Title 35 applicable here is § 101, providing in relevant part: "Whoever invents or discovers any new ... composition of matter, or any new ... improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.".…

> ... [C]ounsel never came to grips with the real issues: (1) what do the claims cover and (2) is what they cover new? Under the laws Congress wrote, they must be considered. Congress has not seen fit to permit the patenting of an old alloy, known to others through a printed publication, by one who has discovered its corrosion resistance or other useful properties, or has found out to what extent one can modify the composition of the alloy without losing such properties.

*Id.* at 780, 782, 778 F.2d 775, 227 USPQ at 777-78. Brassica has done nothing more than recognize properties inherent in certain prior art sprouts, just like the corrosion resistance properties inherent to the prior art alloy in *Titanium*

*Metals*.[4]    While Brassica may have recognized something quite interesting about those sprouts, it simply has not invented anything new.

Brassica nevertheless argues that its claims are not anticipated because the prior art does not disclose selecting the particular seeds that will germinate as sprouts rich in glucosinolates and high in Phase 2 enzyme-inducing potential (as opposed to selecting other kinds of seeds to sprout) in order to form a food product.  We disagree.  The prior art teaches sprouting and harvesting the very same seeds that the patents recognize as producing sprouts rich in glucosinolates and having high Phase 2 enzyme-inducing potential.  According to the patents, examples of suitable sprouts are

> typically from the family Cruciferea, of the tribe Brassiceae, and of the subtribe Brassicinae.  Preferably the sprouts are Brassica oleracea selected from the group of varieties consisting of acephala (kale, collards, wild cabbage, curly kale), medullosa (marrow-stem kale), ramosa (thousand head kale), alboglabra (Chinese kale), botrytis (cauliflower, sprouting broccoli), costata (Portugese kale), gemmifera (Brussels sprouts), gongylodes (kohlrabi), italica (broccoli), palmifolia (Jersey kale), sabauda (savoy cabbage), sabellica (collards), and selensia (borecole), among others.

'895 patent, col. 10, ll. 32-42.  Numerous prior art references identify these same sprouts as suitable for eating.  *See, e.g.,*

---

[4] Most of the claims at issue are method claims, not composition or product claims.  Nevertheless, the principles of *Titanium Metals* still apply.  *See, e.g., MEHL/Biophile*, 192 F.3d at 1366-67, 52 USPQ.2d at 1306 (finding anticipation by inherency of a method of hair depilation); *Bristol-Myers*, 246 F.3d at 1376, 58 USPQ.2d at 1514 (Fed. Cir. 2001) (stating that "[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent").

Stephen Facciola, *Cornucopia: A Source Book of Edible Plants* 47 (1990) (listing "Brassica oleracea Botrytis Group Cauliflower ... Sprouted seeds are eaten"), Esther Munroe, *Sprouts to Grow and Eat* 9-14 (1974) (identifying "Broccoli, Brussels sprouts, Cabbage, Cauliflower, Collards and Kale"). These references therefore meet the claim limitation of identifying seeds to use in order to have sprouts with the inherent properties of glucosinolates and high Phase 2 enzyme-inducing activity. Despite the patents' admissions about the suitability of particular plant species found in these prior art references, Brassica argues that only specific cultivars of these plant species are rich in glucosinolates and high in Phase 2 enzyme-inducing activity. Thus, according to Brassica, the prior art fails to meet the "identifying" steps of the claims because it does not specify which cultivars should be sprouted. However, all of the appropriate cultivars that are identified in Brassica's patent are in the public domain. '895 patent, col. 10, ll. 43-65. Brassica cannot credibly maintain that no one has heretofore grown and eaten one of the many suitable cultivars identified by its patents. It is unnecessary for purposes of anticipation for the persons sprouting these particular cultivars to have realized that they were sprouting something rich in glucosinolates and high in Phase 2 enzyme-inducing potential. *Atlas Powder*, 190 F.3d at 1348, 51 USPQ.2d at 1947 ("The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup of the underlying scientific principles which allow them to operate.").

The prior art also discloses the remaining limitations of the claims. The Munroe reference, for example, recommends that sprouts be harvested between "3 to 5 days for a sprouted length of 1/2 to 1 inch." Munroe at 9. Photographs of these sprouts show that they have not yet reached the two-leaf stage of development. *Id.* at 10-13. Thus, this reference discloses the claim limitations of germinating the appropriate

cruciferous seeds and harvesting the resulting sprouts prior to the 2-leaf stage. *See* '895 patent, claims 1 and 9; '567 patent, claims 1 and 2; '505 patent, claims 1 and 16. Munroe also discloses that these particular sprouts can be used in food products such as "soups, salads and main dishes," *id*. at p. 14, thereby meeting the claim limitation of forming a food product comprising a plurality of the sprouts ('895 patent claims 1 and 9; '567 patent, claims 1 and 8; '505 patent, claims 1 and 16) and the claim limitation of administering (eating) the food product ('505 patent, claims 1 and 16). The Munroe reference therefore discloses each and every limitation of these claims of the patents. *See also*, Meyerowitz, *Growing Vegetables Indoors* (1990).

In summary, the prior art inherently contains the claim limitations that Brassica relies upon to distinguish its claims from the prior art. While Brassica may have recognized something about sprouts that was not known before, Brassica's claims do not describe a new method.

## CONCLUSION

For the foregoing reasons, we affirm the district court's summary judgment that the claims at issue are anticipated by the prior art. The prior art indisputably includes growing, harvesting and eating particular sprouts which Brassica has recognized as being rich in glucosinolates and high in Phase 2 enzyme-inducing potential. But the glucosinolate content and Phase 2 enzyme- inducing potential of these sprouts are inherent properties of the sprouts put there by nature, not by Brassica. Brassica simply has not claimed anything that is new and its claims are therefore invalid.

<u>AFFIRMED</u>

15a

## APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

——————

CIVIL ACTION NO:  MDL 1388.

——————

In re CRUCIFEROUS SPROUT PATENT LITIGATION.

——————

August 8, 2001

## MEMORANDUM

NICKERSON, District Judge.

Pursuant to 28 U.S.C. § 1407, the Judicial Panel for Multidistrict Litigation consolidated these actions before this Court for pre-trial purposes.  These actions all involve the validity of certain patents owned by Plaintiffs Brassica Protection Products LLC and Johns Hopkins University.   On July 23, 2001, the Court held a Markman[5] hearing addressing the construction of the claims at issue, and also heard argument on Defendants' Motion for Summary Judgment, which had been fully briefed.[6]   Upon consideration of the pleadings, the argument of counsel, and the relevant case law, the Court determines that Defendants' motion should be granted.

——————

[5] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L. Ed. 2d 577 (1996).

[6] Also pending is Plaintiffs' Cross Motion for Summary Judgment. Although Defendants vehemently disagreed with this characterization at the hearing, Plaintiffs' motion, for the most part, does represent the mirror image of the issues raised in Defendants' motion.  Thus, the Court has considered the briefing of Plaintiffs' motion in reaching the instant decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The patents-in-suit all involve the production and the consumption of the sprouts of certain types of cruciferous seeds such as broccoli and cauliflower. The inventors of the patents, Jed Fahey and Paul Talalay, discovered that the sprouts of these seeds, when harvested and consumed at a particular stage of their growth, contain high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates. These substances aid the body's natural cancer fighting defense mechanisms.

Although all three patents-in-suit relate to cruciferous sprouts and glucosinolates, each varies slightly in its emphasis. Patent 5,725,895 discloses and claims, *inter alia*, "a method of preparing a food product rich in glucosinolates, comprising germinated cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds,[7] and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts." '895 patent, claim 1. Patent 5,968,567 discloses and claims, *inter alia*, a method of preparing a human food product comprising cruciferous sprouts containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates. '567 patent, claim 1. The '567 patent also specifies the steps of the invention as "(a) identifying seeds which produce said sprouts ... (b) germinating said seeds; and (c) harvesting said spouts between the onset of germination up to and including the 2-leaf stage, to form a human food product." *Id*. The last patent-in-suit, Patent 5,968,505, claims "a method of increasing the chemoprotective amount

---

[7] The inventors discovered that while the sprouts of some cruciferous seeds, such as broccoli and cauliflower, contain high levels of glucosinolates, other cruciferous seeds, such as cabbage, cress, mustard and radish, do not contain the same concentration of that substance.

of Phase 2 enzymes in a mammal." '505 patent, claim 1. The '505 patent then recites the three steps of the '567 patent, and adds a fourth: "(d) administering said food product, or a non-toxic extract of said food product, to said animal."

Plaintiffs' sprouts have been the subject of litigation prior to the instant suits. In June of 1999, Plaintiff Brassica filed an action in the United States District Court for the District of Delaware against Sproutman, Inc. and Murray Tiser (collectively, Sproutman), alleging that these defendants were infringing on the '895 patent[8] by producing and selling broccoli sprouts. Civ. Action No. 99-350-SLR. Sproutman argued in that litigation that the '895 patent was invalid under 35 U.S.C. § 102(b), because the patent was anticipated by the prior art and was invalid as obvious under 35 U.S.C. § 103. This prior art reveals that it has been well known for years that broccoli seeds can be sprouted and the sprouts consumed as food.

During the pendency of the Delaware litigation, Sproutman also filed a request for reexamination with the U.S. Patent and Trademark Office. The Patent Office granted Sproutman's request and issued an Office Action in Reexamination, rejecting Claims 1-6 and 9-13 of the '895 patent, finding these claims both anticipated under § 102(b) and unpatentable under § 103. Brassica then filed an Amendment and Request for Reconsideration, raising essentially the same arguments that Plaintiffs raise here. Upon reconsideration, the Patent Office withdrew the rejections and re- affirmed the validity of Claims 1-6 and 9-13.

Referencing the prior art submitted in the re-examination proceedings, as well as some additional published sources that pre-date Plaintiffs' patents, Defendants argue in the

---

[8] At the time this suit was filed, the '567 and '505 patents had not been issued.

18a

pending summary judgment motion that Plaintiffs' patents are invalid because the "invention" is not "new." As Defendants succinctly present the question before the Court: "Can a plant (broccoli sprouts), long well known in nature and cultivated and eaten by humans for decades, be patented merely on the basis of a recent realization that the plant has always had some heretofore unknown but naturally occurring beneficial feature?" Defendants' June 7, 2001 Supplemental Memo. at 1 (emphasis in original). For the reasons that follow, the Court finds that the answer to that question must be "no."

## II. LEGAL STANDARD

Summary judgment is appropriate when, based on the record before the Court, no genuine issue exists as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). A genuine issue exists if the evidence is such that a reasonable jury could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 980 (Fed. Cir. 1997). A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceeding. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *General Mills*, 103 F.3d at 980.

Under the patent statutes, a patent enjoys a presumption of validity, see 35 U.S.C. § 282 (1994), which can be overcome only through clear and convincing evidence. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997). Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable finder of fact could conclude otherwise. In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the

nonmoving party and resolves all doubts in its favor.  *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274 (Fed. Cir. 1995).

III. DISCUSSION

The facts relevant to the construction and the validity of Plaintiffs' patent claims are fairly uncomplicated and largely undisputed.  Plaintiffs do not dispute that the prior art taught that cruciferous seeds, including broccoli, can be germinated and consumed as a food product in the sprout stage.[9]  *See, e.g.*, Esther Munroe, *Sprouts to Grow and Eat*, 9-14 (Second printing Dec. 1977) (1974) ("CABBAGE FAMILY— Broccoli ... Cauliflower ... and Kale....  All are easy to sprout and each one produces a tasty sprout .... these sprouts tend to be strong flavored or bitter if grown too long, so use them when they are most pleasant to your taste in soups, salads and main dishes.  Like their parent plants they are high in vitamins and so are well worth sprouting"); Stephen Facciola *Cornucopia:  A Source Book of Edible Plants*, 47 (1990).  Plaintiffs also do not claim that their patents involve doing anything to alter or modify the natural seeds.  They are simply germinated, harvested, and eaten.

Defendants, on the other hand, do not dispute that Fahey and Talalay discovered a new and significant property of certain types of cruciferous sprouts, *i.e.*, that these sprouts

---

[9] Plaintiffs' counsel represented at the hearing that, while the prior art may have described how cruciferous seeds could be grown into sprouts for food, few if any individuals were actually producing, marketing, or consuming broccoli sprouts until September 1997 when Fahey and Talalay published their findings regarding the beneficial health properties of those sprouts.  Assuming that this representation is accurate, it makes no difference to the question before the Court. Invalidity by anticipation requires only that the prior art discloses to one of skill in the art how to do a thing, it does not matter if it was ever done.  *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001).

contain high levels of substances that aid the human body in preventing cancer. Defendants do not challenge that Fahey and Talalay also discovered that certain cruciferous sprouts, such as broccoli and cauliflower, contain much higher levels of these substances than other cruciferous seeds. Instead, Defendants contend, and the Court agrees, that merely describing unexpected beneficial results of a known process does not entitle Plaintiffs to patent that process.

It is a fundamental precept of patent law that a product is not patentable unless it is new. Patent claims that lack novelty are said to be anticipated by the prior art and are invalid pursuant to 35 U.S.C. § 102(b). Section 102(b) provides that a patent is invalid as anticipated if the claimed invention "was patented or described in a printed publication in this or a foreign country or in public use or on sale in the country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Courts have interpreted § 102(b) to require that "each and every element as set forth in the claim [be] found, either expressly *or inherently* described, in a single prior art reference." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) (emphasis added).

Under the concept of inherency, where the prior art necessarily functions in accordance with or includes the claimed limitations, the prior art anticipates those limitations. *In re King*, 801 F.2d 1324, 1326 (Fed. Cir. 1986). It is important to note that a property or result can be inherent in the prior art regardless of whether those skilled in the art were previously aware of that property or result. "Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342 (Fed. Cir. 1999). "However, the discovery of a previously unappreciated property of a prior art composition ... does not render the old composition patentably new to the discoverer." *Id.*

21a

These principles were applied by the Federal Circuit Court of Appeals in *Titanium Metals Corp. of Amer. v. Banner*, 778 F.2d 775 (Fed. Cir. 1985). In *Titanium Metals*, the patent applicants sought to obtain a patent for an alloy made up of titanium and small percentages of nickel, molybdenum, and iron. The applicants had discovered that titanium alloys within a specified range were characterized by good corrosive resistance in hot brine environments. The patent examiner, as well as the Patent and Trademark Office Board of Appeals, rejected their patent application, however, on the ground, *inter alia*, that the claims were anticipated by an article published in a Russian journal of metallurgy five years prior to the filing date of the application. The applicant appealed the Patent Board's decision and the district court reversed, ordering the Commissioner to authorize the patent. The Commissioner then appealed and the Federal Circuit Court reversed the district court's decision, reaffirming the conclusion of the Patent Office that the patent was anticipated by the prior art.

There was no dispute in *Titanium Metals* that the referenced Russian journal article described a range of titanium-nickel-molybdenum alloys that included the alloys sought to be patented. The patent applicants and the district court concluded that the claims were not anticipated by the prior art, however, because the corrosive resistant properties of the selected alloys were not disclosed in the Russian article. In reversing, the Federal Court observed,

> As we read the situation, the [district] court was misled by the arguments and evidence to the effect that the inventors here found out and disclosed in their application many things that one cannot learn from reading the Russian article and that this was sufficient in law to justify granting them a patent for their contributions— such things as what good corrosion resistance the claimed alloys have against hot brine, which possibly

was not known, and the range limits of the Ni and Mo content, outside of which that resistance diminishes, which are teachings of very useful information. These things the applicants teach the art and the Russian article does not.

778 F.2d at 781.

The Federal Circuit further opined that counsel had lost sight of the real issues in the litigation: "1) what do the claims cover and 2) is what they cover new?" *Id.* at 782. "Congress has not seen fit to permit the patenting of an old alloy, known to others through a printed publication, by one who has discovered its corrosion resistance or other useful properties, or has found out to what extent one can modify the composition of the alloy without losing such properties." *Id.*

The court also provided some helpful guidance as to the proper construction of claims where the claims purport to include descriptions of the inherent properties of a process or composition. One of the claims at issue contained the phrase, "characterized by good corrosion resistance in hot brine environment." This phase was also applied to the two dependant claims. The Federal Circuit observed that this phrase may have led the district court to improperly interpret the claims as directed to the applicants' discoveries about the properties of the alloys instead of the alloys themselves. "[T]he correct and necessary construction of all three claims [is] that they simply define titanium base alloys.... [I]t is immaterial, on the issue of their novelty, what inherent properties the alloys have or whether these applicants discovered certain inherent properties." *Id.* at 782.

The Federal Circuit just recently repeated much of this same teaching in *Bristol-Myers Squibb Co. v. Ben Venue Labs, Inc. Bristol-Myers* involved two patents related to a method of administering the antitumor drug paclitaxel over a three hour period. Bristol-Myers, the assignee of the patent,

23a

brought an infringement action.  The defendants moved for summary judgment, arguing that the patents were invalid as their claims were anticipated by the prior art, specifically an article by Mark Kris, a researcher who had treated cancer patients with three hour infusions of paclitaxel within the claimed dosage ranges.  While Kris had employed that infusion method, the study was largely unsuccessful in that he did not observe any antitumor response.  Kris also recommended premedication regimens as a possible means to minimize hypersensitivity reactions, but he did not himself employ those regimens in his study.

After a Markman hearing, the district court held that much of the preamble language in the claims describing the intended results of the treatment was non-limiting and could be ignored for the purposes of construing the claim and determining anticipation.  The district court then granted the defendants' motion for summary judgment on the ground of invalidity by anticipation.

In affirming the district court's decision, at least in large part, the Federal Circuit agreed that the preamble language did not limit the claims. The court concluded that language such as "for reducing hematologic toxicity" and " 'to effect regression of a taxol-sensitive tumor, said method being associated with reduced hematologic toxicity,' only states an intended result of that claimed method....  The steps of the three-hour infusion method are performed in the same way regardless whether or not the patient experiences a reduction in hematologic toxicity...."  246 F.3d at 1374-75.  The court also affirmed the district court's conclusion that the patents were invalid on the basis of anticipation:

> Kris therefore performed all of the claimed steps at dosage levels that anticipate those in the claims. Although Kris did not observe any anticancer effects, we have already determined that the claims only require the administration of specific amounts of

24a

paclitaxel and not the achievement of a particular result.

*Id* at 1378. The court found that the patent claims related to premedication were also anticipated by the Kris article, even though Kris himself never followed the teaching. "[A]nticipation does not require actual performance of suggestions in a disclosure. Rather, anticipation only requires that those suggestions be enabling to one of skill in the art." *Id*. at 1379 (citing *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985)).

In construing the claims at issue here, the Court finds that they describe nothing more than germinating sprouts from certain cruciferous seeds and harvesting those sprouts as a food product, a process that was known long before the application for these patents. Phrases in the claims such as, "rich in glucosinolates," or "containing high Phase 2 enzyme potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates," simply describe the inherent properties of certain cruciferous seeds, in the same way that "characterized by good corrosion resistance in hot brine environment" described the inherent property of the selected alloys in *Titanium Metal*. Similarly, the phrase, "increasing the chemoprotective amount of Phase 2 enzymes in a mammal" does nothing more than describe an intended result of a process, in the same way as the phrase, "to effect regression of a taxol-sensitive tumors" functioned in the patent at issue in *Bristol-Myers*. These phrases are plainly non- limiting.

Plaintiffs attempted in their pleadings, and at the hearing, to argue that the claim language, "identifying seeds which produce cruciferous sprouts ... containing [the desired properties]" introduces a new "selection" step that was not a part of the prior art. All this step entails, however, is choosing to do one thing over another, in this case, choosing to grow broccoli or cauliflower sprouts instead of cabbage, cress,

25a

mustard or radish sprouts. Any process could be prefaced by a similar "selection" step. Certainly, that one first chooses to perform a particular process cannot be enough to make the process "new."

The record before the Court makes it abundantly clear that, prior to the issuance of the patents-in-suit, one skilled in the art could, by following the teachings of the prior art, germinate broccoli seeds, harvest the sprouts, and sell them as a food product. It is Plaintiffs' position that their patents now forbid Defendants from doing what they once could plainly do. Under longstanding principles of the patent law, "if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Atlas Powder*, 190 F.3d at 1346 (citing *Titanium Metals*, 778 F.2d at 781)). Thus, the Court finds that the patents-in-suit are invalid by anticipation.

## IV. CONCLUSION

For the above stated reasons, Defendants' Motion for Partial Summary Judgment will be granted. This decision would appear, as a practical matter, if not as a matter of law, to be dispositive of the pending actions. There was some disagreement on this issue, however, when it was raised by the Court at the hearing. Because of this uncertainly, the Court would like to hear from counsel as to what additional steps, in light of this decision, may be needed to finally resolve these actions, or to place them in a posture for appeal to the Federal Circuit. Accordingly, the Court requests that the parties confer and then submit a joint status report, on or before August 24, 2001.

A separate order will issue.

**APPENDIX C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

CIVIL ACTION NO:  MDL 1388.

_____

In re CRUCIFEROUS SPROUT PATENT LITIGATION.

_____

August 8, 2001

**ORDER**

NICKERSON, District Judge.

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 8th day of August, 2001, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendants' Motion for Partial Summary Judgment Regarding Invalidity of Patents in Suit, Paper No. 15, is GRANTED;

2. That Plaintiffs' Cross Motion for Partial Summary Judgment that the Patents-in-Suit Are Not Invalid, Paper No. 24, is DENIED;

3. That the parties are to submit to the Court a Joint Status Report on or before August 24, 2001;  and

4. That the Clerk of this Court is to transmit this memorandum and order to all counsel of record.

s/ William M. Nickerson
William M. Nickerson
United States District Judge

Date:  August 8, 2001

27a

## APPENDIX D

**United States Court of Appeals,
Federal Circuit.**

_____

In re CRUCIFEROUS SPROUT LITIGATION.

Brassica Protection Products LLC and Johns Hopkins
University,

Plaintiffs-Appellants,

v.

Sunrise Farms, Becky Crikelair, and Frank Crikelair,

Defendants-Appellees,

and

Edrich Farms Inc., Edward B. Stanfield, III, Edward F.
Stanfield, Jr., Richard Stanfield, and Sally F. Stanfield,

Defendants-Appellees,

and

Banner Mountain Sprouts, Banner Mountain Sprouts Inc.,
and Lawrence Ravitz,

Defendants-Appellees,

and

Harmony Farms, Greg Lynn, and Lorna Lynn,

and

International Specialty Supply and Robert L. Rust,

Defendants-Appellees.

_____

No. 02-1031

_____

## ORDER

A combined petition for panel rehearing en banc having

28a

been filed by the APPELLANTS, and the petition for rehearing having been referred to the panel that heard the appeal, and thereafter the petition for rehearing en banc having been referred to the circuit judges who are in regular active service,

UPON CONSIDERATION THEREOF, it is

ORDERED that the petition for panel rehearing be, and the same hereby is, DENIED and it is further

ORDERED that the petition for rehearing en banc be, and the same hereby is, DENIED.

The mandate of the court will issue on October 7, 2002.

FOR THE COURT,

<u>s/ Jan Horbaly</u>
Jan Horbaly
Clerk

Dated:  September 30, 2002

cc:    E. Anthony Figg
         J. Kromholz, P. Andrews, D. Barnard, D. Ulrich

Note:  Pursuant to Fed. Cir. R. 47.6, this order is not citable as precedent.  It is a public record.

**APPENDIX E**

**(Notice of Allowability for U.S. Patent No. 5,725,895)**

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent Trademark Office**

Address
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER 08/528,858 | FILING DATE 09/15/95 | FIRST NAMED APPLICANT FAHEY J | ATTORNEY DOCKET NO. 46528/102 |
|---|---|---|---|

| EXAMINER WONG, L | |
|---|---|
| ART UNIT 1302 | PAPER NUMBER 13 |

DATE MAILED:  8/14/97

FOLEY & LARDNER
3000 K STREET, NW
SUITE 500
WASHINGTON, D.C. 20007-5109

**NOTICE OF ALLOWABILITY**

**PART I.**

1. ☒ This communication is responsive to <u>papers filed 6/18/97</u>.

2. ☒ All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application.  If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.

3. ☒ The allowed claims are <u>21-26, 28-34 and 36-38</u>.

30a

\*\*\*

6. ☒ Note the attached Examiner's Amendment.

7. ☒ Note the attached Examiner Interview Summary Record, PTOL-413.

8. ☒ Note the attached Examiner's Statement for Reasons for Allowance.

\*\*\*

Attachments:
☒ Examiner's Amendment
☒ Examiner Interview Summary, Record PTOL-413
☒ Reasons for Allowance

Serial Number: 08/528858                                    Page 2
Art Unit: 1302

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312.  To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

\*\*\*

The following is an examiner's statement of reasons for allowance:  a method of preparing a food product wherein cruciferous sprouts, with the exception of cabbage, cress, mustard, and radish sprouts are harvested prior to the 2-leaf stage is not taught nor fairly suggested by the prior art or any combination thereof.

\*\*\*

s/Leslie Wong
Primary Examiner
Art Unit 1302

LAW
August 13, 1997

32a

**APPENDIX F**

**(Notice of Allowability for U.S. Patent No. 5,968,567)**

| | Application No. | Applicant(s) |
|---|---|---|
| **NOTICE OF ALLOWABILITY** | 08/840,234 | Fahey et al. |
| | Examiner | Group Art Unit |
| | Leslie Wong | 1761 |

All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.

☒ This communication is responsive to <u>papers filed 11/18/98 and 1/7/99</u>.

☒ The allowed claim(s) is/are <u>69-90 (renumbered 1-22)</u>.

\*\*\*

<u>/s Leslie Wong</u>
Leslie Wong
Primary Examiner
Group 1700
1/27/99

33a

**APPENDIX G**

**(Notice of Allowability for U.S. Patent No. 5,968,505)**

| **NOTICE OF ALLOWABILITY** | Application No.<br>08/997,813 | Applicant(s)<br>Fahey et al. |
|---|---|---|
| | Examiner<br>Kimberly Jordan | Group Art Unit<br>1614 |

All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.

☒  This communication is responsive to Paper Nos. 8-9.

☒  The allowed claim(s) is/are 48-57, 68, 69, and 72-79.

* * *

/s Kimberly Jordan
Primary Examiner
Art Unit 1614

34a

**APPENDIX H**

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent Trademark Office**

Address
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| CONTROL NUMBER | FILING DATE | PATENT UNDER REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 90/005,530 | 10/12/99 | 5725895 | 5121.02L |

| EXAMINER WONG, L | |
|---|---|
| ART UNIT 1761 | PAPER NUMBER 11 |

DATE MAILED:  7/12/00

BERNARD D SAXE
FOLEY & LARDNER
3000 K STREET, NW SUITE 500
WASHINGTON, D.C. 20007-5109

**NOTICE OF INTENT TO ISSUE**
**REEXAMINATION CERTIFICATE**

1. ☒ Examination has been terminated in this reexam proceeding and a Certificate will be issued in due course in view of:

    a. ☒ Patent owner's communication filed on: <u>May 8, 2000</u>.

    ***

2. ☒ Note attached statement of reasons for patentability and/or confirmation….

4. ☒ Note attached LIST OF REFERENCES CITED, PTO - 1449, which is part of this communication and serves as an acknowledgment of receipt of patent owner's

35a

prior art statement. The references which were consid-
ered have been initialed on the form by the examiner
and the claims are deemed patentable thereover.

Application/Control Number Reexamination          Page 2
Control No.:  90/005,530

Art Unit:

### STATEMENT OF REASONS FOR PATENTABILITY
### AND/OR CONFIRMATION

The following is an examiner's statement of reasons for patentability and/or confirmation of the claims found patentable in this reexamination proceeding:  a method of preparing a food product wherein cruciferous sprouts, with the exception of cabbage, cress, mustard, and radish sprouts, that are rich in glucosinolates or contain high levels of phase 2 inducer activity are harvested prior to the 2-leaf stage is not taught nor fairly suggested by the prior art or any combination thereof.

***

s/Leslie Wong
Primary Examiner
Art Unit 1302

LAW
June 29, 2000

37a

# APPENDIX I

## U.S. Patent No. 5,725,895 Claims at Issue

**1.** A method of preparing a food product rich in glucosinolates, comprising germinating cruciferous seeds, with the exception of cabbage, cress, mustard and radish seeds, and harvesting sprouts prior to the 2-leaf stage, to form a food product comprising a plurality of sprouts.

**2.** The method according to claim 1, wherein said sprouts contain non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucose isolates.

**3.** The method according to claim 1, wherein said seeds are a Brassica oleracea selected from the group of varieties consisting of acephala, alboglabra, botrytis, costata, gemmifera, gongylodes, italica, medullosa, palmifolia, ramosa, sabauda, sabellica, and selensia.

**4.** The method according to claim 3, wherein said seeds are Brassica oleracea variety italica.

**5.** The method according to claim 3, wherein said seeds are Brassica oleracea variety botrytis.

**6.** The method according to claim 5, wherein said seeds are Brassica oleracea variety botrytis subvariety cauliflora.

**9.** A method of preparing a food product rich in glucosinolates, comprising germinating cruciferous seeds that produce sprouts having at least 200,000 units per gram fresh weight of Phase 2 enzyme-inducing potential when measured after 3-days of growth and which contain non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, and harvesting sprouts prior to the 2-leaf stage to form a food product comprising a plurality of sprouts.

38a

## APPENDIX J

### U.S. Patent No. 5,968,567 Claims at Issue

**1.** A method of preparing a human food product comprising cruciferous sprouts containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates, comprising the steps of:

(a) identifying seeds which produce said sprouts, with the exception of Brassica oleracea capitata, Lepidium sativum, Sinapis alba, Sinapis nigra, and Raphanus sativus sprouts;

(b) germinating said seeds; and

(c) harvesting said sprouts between the onset of germination up to and including the 2-leaf stage, to form a human food product comprising a plurality of said sprouts.

**2.** The method according to claim 1, wherein said sprouts are harvested 1 to 14 days post-germination and contain at least 200,000 units per gram fresh weight of Phase 2 enzyme-inducing potential when measured after 3-days of growth and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates.

**3.** The method according to claim 1 or 2, wherein said seeds are a Brassica oleracea selected from the group of varieties consisting of acephala, alboglabra, botrytis, costata, gemnifera, gongylodes, italica, medullosa, palmifolia, ramosa, sabauda, sabellica, and selensia.

**4.** The method according to claim 3, wherein said seeds are Brassica oleracea variety italica.

**5.** The method according to claim 3, wherein said seeds are Brassica oleracea variety botrytis.

**6.** The method according to claim 5, wherein said seeds

are Brassica oleracea variety botrytis subvariety cauliflora.

**7.** The method according to claim 1, wherein said sprouts are substantially free of Phase 1 enzyme-inducing potential.

**8.** A human food product comprising cruciferous sprouts made according to the method of claim 1.

## APPENDIX K

### U.S. Patent No. 5,968,505 Claims at Issue

**1.** A method of increasing the chemoprotective amount of Phase 2 enzymes in a mammal, comprising the steps of:

(a) identifying seeds which produce cruciferous sprouts, with the exception of Brassica oleracea capitata, Lepidium sativum, Sinapis alba, Sinapis nigra, and Raphanus sativus sprouts, containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates;

(b) germinating said seeds;

(c) harvesting said sprouts between the onset of germination up to and including the 2-leaf stage to form a food product comprising a plurality of sprouts; and

(d) administering said food product, or a non-toxic extract of said food product, to said mammal.

**16.** A method of reducing the level of carcinogens in a mammal, comprising the steps of:

(a) identifying seeds which produce cruciferous sprouts, with the exception of Brassica oleracea capitata, Lepidium sativum, Sinapis alba, Sinapis nigra, and Raphanus sativus sprouts, containing high Phase 2 enzyme-inducing potential and non-toxic levels of indole glucosinolates and their breakdown products and goitrogenic hydroxybutenyl glucosinolates;

(b) germinating said seeds;

(c) harvesting said sprouts between the onset of germination up to and including the 2-leaf stage to form a food product comprising a plurality of sprouts; and

(d) administering said food product, or a non-toxic extract of said food product, to said mammal.

41a

**APPENDIX L**

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Attorney Docket No. 046585/0122

In re patent under reexamination of

U.S. 5,725,895

Jed W. FAHEY *et al.*                    Group Art Unit: 1761

Serial No. 90/005,530                    Examiner: L. Wong

Filed: October 12, 1999

For:   METHOD OF PREPARING A FOOD PRODUCT FROM CRUCIFEROUS SEEDS

**DECLARATION OF JED W. FAHEY UNDER 37 C.F.R. § 1.132**

Assistant Commissioner for Patents

Washington, D.C.  20231

   Sir:

   I, Jed W. Fahey, being duly warned, hereby declare and say:

   1. I am a citizen of the United States of America, and reside at 6704 Ridge Road, Eldersburg, Maryland 21784.

   2. I am a faculty research associate in the Brassica Chemoprotection Laboratory in the Department of Pharmacology and Molecular Sciences at Johns Hopkins University School of Medicine.  My resume and list of publications are appended hereto as **Appendix 1**.

   3. I am a co-inventor of U.S. patent No. 5,725,895 ("the patent") which is the subject of a reexamination proceeding which has been accorded serial No. 90/005,530.  In relation to the reexamination, I have reviewed an Official Action,

42a

mailed April 6, 2000, and the prior art cited therein, and I make the following observations.

4. Dr. Paul Talalay and I determined that certain cruciferous sprouts prepared according to the methods claimed in the patent contain high levels of Phase 2 inducer activity. Induction of Phase 2 detoxication enzymes, such as glutathione transferases, epoxide hydrolase, NAD(P)H: quinone reductase and glucuronosyltransferases, provides protection against carcinogenesis, mutagenesis and various forms of oxidative- and electrophile-induced cell damage. Cruciferous sprouts prepared according to the claimed methods can provide over 100-fold higher levels of Phase 2 enzyme inducer activity than market stage cruciferous vegetables.

5. Phase 2 enzyme inducer activity was measured in the Hepa 1c1c7 murine hepatoma cells grown in 96-well microtiter plates according to the method of Prochaska *et al., Anal. Biochem.* 169: 328-336 (1988) and Prochaska *et al., Proc. Natl. Acad. Sci USA* 89: 2394-2398 (1992), as modified by Fahey *et al., Proc. Natl. Acad. Sci. USA* 94: 10367-10372 (1997), after adding exogenous myrosinase to the incubation mixture. (**Appendix 2**). One unit of Phase 2 inducer activity is defined as the amount that when added to cells in a single microtiter well, doubles the quinone reductase activity. As noted above, quinone reductase is a typical Phase 2 enzyme.

6. Using the highly efficient and quantitative methods described in paragraph 5 above, Dr. Talalay and I unexpectedly found that market stage cauliflower may contain as little as about 5,000 Units/g fresh wt Phase 2 enzyme inducer activity. In contrast, 3-day-old cauliflower sprouts have Phase 2 inducer potential as high as 560,000 Units/g fresh wt. The range of differences between market stage broccoli and broccoli sprouts is similarly as high as 100-fold. For example, a fresh market stage broccoli cultivar may have an inducer potential as low as about 11,000 Units/g fresh wt. of Phase 2 enzyme inducer activity while a very high 3-day-old

43a

broccoli sprout may have an inducer potential of 769,000 Units/g fresh wt. as reported in Fahey *et al., Proc. Natl. Acad. Sci. USA* <u>94</u>: 10367-10372 (1997) on page 10370, second column, second complete paragraph (**Appendix 2**). Certain cruciferous sprouts may contain substantial quantities of isothiocyanates, mostly in the form of their glucosinolate precursors. Some of these isothiocyanates, including sulforaphane or 4-methylsulfinylbutyl isothiocyanate, are strong inducers of Phase 2 enzymes. Sulforaphane and several synthetic acetylnorbornyl isothiocyanate analogues, which are potent Phase 2 enzyme inducers, reduced the incidence, multiplicity and weight of mammary tumors and retarded tumor development in female Sprague-Dawley rats treated with a single of dose of DMBA. Zhang *et al., Proc. Natl. Acad. Sci USA* <u>91</u>: 2147-2150 (1994) (**Appendix 3**).

7. Importantly, not all cruciferous sprouts have high levels of Phase 2 enzyme inducer activity. Among those species of crucifers which <u>do</u> produce sprouts with high levels of Phase 2 inducer activity, not all plant selections or cultivars within a given species, have the high levels of inducer activity. As shown in **Appendix 4**, for example, randomly selected Brussels sprout cultivars did not produce 3-day-old sprouts that contain more than 200,000 Units/g fresh wt. of phase 2 enzyme inducer potential.

8. I determined the Phase 2 inducer activity in 3-day-old sprouts of 28 different and randomly selected commercial cultivars of broccoli (**Appendix 5**). The Phase 2 inducer activity in each of these cultivars ranged from as little as 10,000 to as high as 769,000 Units quinone reductase inducing potential activity per gram fresh weight**.** Among the cultivars tested, 46% produced 3-day-old sprouts which had 200,000 or fewer Units quinone reductase inducing activity per gram fresh weight**.**

9. I determined the Phase 2 inducer activity in 3-day-old sprouts of a number of randomly selected commercial culti-

44a

vars of cauliflower. Phase 2 enzyme inducer activity was measured in the Hepa 1c1c7 murine hepatoma cell assay. The inducer potencies ranged from 50,000 to 560,000 Units quinone reductase inducing activity per gram fresh weight. These results are reported in Fahey *et al., Proc. Natl. Acad. Sci. USA* <u>94</u>: 10367-10372 (1997) on page 10370**,** column 2, second complete paragraph (**Appendix 2**).

10. Likewise, the Phase 2 inducer activity in 3-day-old sprouts made from different kale cultivars ranged from less than 10,000 to greater than 200,000 Units quinone reductase inducing activity per gram fresh weight (**Appendix 6**).

11. I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

<u>May 8, 2000</u>                          <u>s/ Jed W. Fahey</u>

Date                                Jed W. Fahey

45a

RECEIVED

DEC 2 7 2002

SUPREME COURT U.S.
POLICE DEPARTMENT

IN THE

## 𝔖upreme 𝔠ourt of the 𝔘nited 𝔖tates

BRASSICA PROTECTION PRODUCTS LLC AND JOHNS HOPKINS UNIVERSITY,
*Petitioners,*

v.

SUNRISE FARMS, BECKYCRIKELAIR, FRANK CRIKELAIR, EDRICH FARMS, INC.,
EDWARD B. STANFIELD, III, EDWARD F. STANFIED, JR., RICHARD STANFIELD,
SALLY F. STANFIELD, BANNER MOUNTAIN SPROUTS, BANNER MOUNTAIN SPROUTS, INC.,
LAWRENCE RAVITZ, HAR,MANY FARMS, GREG LYNN, LORNA LYNN,
INTERNATIONAL SPECIALTY SUPPLY AND ROBERT L. RUST,
*Respondent.*

### AFFIDAVIT OF SERVICE

I HEREBY CERTIFY that all parties required to be served, have been served on this 27th day of December, 2002, in accordance with U.S. Supreme Court Rule 29.5(c), three (3) copies of the foregoing **PETITION FOR WRIT OF CERTIORARI** by placing said copies in the U.S. Mail, first class postage prepaid, addressed as listed below:

Philip M. Andrews
Kramon & Graham, P.A.
One South Street
Suite 2600
Baltimore, MD 21202

Joseph A. Kromholz
Daniel R. Johnson
Ryan, Kromholz & Mansion, S.C.
3360 Gateway Road
Brookfield, WI 53045

Delbart J. Barnard
Barnard & Pauly, P.S.
947 Powell, Avenue, S.W.
Suite 105
Renton, WA 98055-2908

Donald Ullrich, Jr.
The Ullrich Law Firm
424 32nd Street
Sacramento, CA 95816-0007

RAYMOND CHARLES CLARK
BYRON S. ADAMS, LEGAL & COMMERCIAL PRINTERS
1615 L Street, NW, Suite 100
Washington, DC 20036
(202) 347-8203

Sworn to and subscribed before me this 27th day of December, 2002.

WILLIAM R. PIERANGELI
NOTARY PUBLIC
District of Columbia

My commission expires April 30, 2004.



RECEIVED

DEC 2 7 2002

SUPREME COURT U.S.
POLICE DEPARTMENT