```
                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND

                                    *
  IN RE:                            *
                                    *        MDL Docket No. 1388
CRUCIFEROUS SPROUT                  *
PATENT LITIGATION                   *
                                 *******
```

## MEMORANDUM

Before the Court is a motion for attorneys' fees filed by several of the defendants in these consolidated actions.[1]  The motion is fully briefed.  Upon a review of the pleadings and the applicable case law, the Court determines that no hearing is necessary and that the motion should be denied.

The factual and procedural background of these related actions has been set out in prior opinions of this Court and of the Federal Circuit Court of Appeals.  See <u>In re Cruciferous Sprout Patent Litigation</u>, 168 F.Supp.2d 534 (D. Md. 2001) and <u>In re Cruciferous Sprout Patent Litigation</u>, 301 F.3d 1343 (Fed. Cir. 2002).  That background will not be repeated here in any detail.  Briefly stated, however, Plaintiffs Brassica Protection Products LLC and Johns Hopkins University were the holders of various patents related to the production and consumption of sprouts grown from certain types of cruciferous seeds, such as broccoli and cauliflower.  Researchers at Johns Hopkins had

---

[1] A number of miscellaneous motions are also pending, including: several motions to withdraw as counsel (Paper Nos. 62, 63, 64) and several motions to seal (Paper Nos. 92, 95, 99, 104) which will all be granted; a motion to reconsider this Court's lifting of a stay (Paper No. 57) which will be denied as moot; a motion for leave to file a sur-reply (Paper No. 98) which will be granted; and, a motion for oral argument (Paper No. 93) which will be denied.

1

discovered that sprouts grown from these particular seeds and harvested at a particular time after germination contain high levels of glucosinolates, which are substances involved in the human body's production of Phase 2 enzymes. Phase 2 enzymes, in turn, are part of the body's mechanism for detoxifying potential carcinogens.  Thus, the researchers were able to associate the consumption of these sprouts with a lower risk of cancer.

News of this discovery led to a rapid expansion in the market for the particular sprout products identified by the Hopkins researchers as being the most beneficial.  Plaintiffs sought to capitalize on their discovery by obtaining patents for the process of producing these sprouts, and then licensing the process to producers in exchange for royalties.  Defendants in these actions were among the producers that stepped in to supply that market, but they did so without entering into licensing agreements with Plaintiffs. When Plaintiffs learned of Defendants' activities, they contacted Defendants, informed them of their patents, and extended offers of licensing agreements. Defendants declined the offers, but continued to produce sprouts which Plaintiffs believed were infringing on their patents.

In these consolidated actions, Plaintiffs sued the following corporate entities and individuals: (1) Harmony Farms, Greg Lynn and Lorna Lynn (Harmony Farm Defendants); (2) Chau Minh Do, d/b/a Veg-Pack (Veg-Pack Defendants); (3) Edrich Farms, Inc., Edward B. Stansfield, III, Edward F. Stansfield Jr., Richard Stansfield and Sally Stansfield (Edrich Farms Defendants); (4) Sunrise Farms, Becky Crikelair and Frank Crikelair (Sunrise Farms Defendants); (5) Banner Mountain Sprouts, Banner Mountain Sprouts, Inc. and Lawrence Ravitz (Banner Mountain); and (6) International Specialty Supply and Robert Rust (ISS Defendants).  Plaintiffs alleged that these six entities were involved in the

sale of sprouts that infringed upon their patents, and that the individuals named as Defendants were all inducing the entities with which they were associated to engage in infringing activities. After the Panel for Multidistrict Litigation transferred these cases here, this Court determined that the issue of the validity of the patents-in-suit should be resolved prior to any consideration of issues related to infringement.

On August 8, 2001, this Court granted summary judgment in favor of Defendants on the issue of validity, finding that process of producing the sprouts in question was not patentable under the doctrine of inherency. In this Court's view, the method of producing these sprouts was well known prior to Plaintiffs' research and that "merely describing unexpected beneficial results of a known process does not entitle Plaintiffs to patent that process." In re Cruciferous Sprout Litig., 168 F.Supp.2d at 538. Plaintiffs appealed and the Federal Circuit Court of Appeals affirmed, concluding that "[w]hile Brassica may have recognized something about sprouts that was not known before, Brassica's claims do not describe a new method." 301 F.3d at 1352. Plaintiffs petitioned to the Supreme Court for certiorari, and that petition was denied. Brassica Protection Products LLC v. Sunrise Farms, 538 U.S. 907 (2003).

At various stages of this litigation, Plaintiffs were able to settle the claims and counterclaims in three of the six actions brought in or transferred to this Court. All that remains in this litigation are the claims for attorneys' fees asserted by the Edrich Defendants, the Sunrise Farm Defendants, and the ISS Defendants (collectively, the Remaining Defendants).

Under Section 285 of Title 35 of the United States Code, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party"

in a patent action. "In the case of awards to prevailing accused infringers . . . 'exceptional cases' are normally those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent." McNeil-PPC, Inc. v. L. Perrigo Co., 337 F.3d 1362, 1371-72 (Fed. Cir. 2003) (quoting Cambridge Prods. Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1051-52 (Fed. Cir. 1992)). A conclusion that the alleged inequitable conduct occurred "must be supported by clear and convincing evidence." Id. (citing Beckman Instruments, Inc. v. LKB Produkter AB, 892 F.2d 1547, 1551 (Fed. Cir. 1989)). An award of fees is not to be made routinely, and should be "limited to circumstances in which it is necessary to prevent a gross injustice to the accused infringer." Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1329 (Fed. Cir. 2003).

The Remaining Defendants advance a variety of arguments to establish that this case is "exceptional." They assert that: (1) Plaintiffs engaged in no meaningful investigation of infringement prior to filing suit; (2) Plaintiffs had no basis upon which to assert any claims against the individual defendants; and (3) Plaintiffs engaged in litigation misconduct by failing to turn over certain documents claimed as privileged and by destroying other relevant documents.

Before advancing these specific assertions, the Remaining Defendants begin their brief with the "Prefatory Comment" that "this was not a close case on the merits." Mot. at 1. This Court would certainly agree that, as to the merits of the issues actually litigated and resolved by the Court, this was not a close case. As to the validity of the patent, this Court, since this litigation first landed before it, has found farfetched Plaintiffs' position that they could patent a plant product that was, undisputably, "long well

4

known in nature and cultivated and eaten by humans for decades." 168 F.Supp.2d at 537. Yet, the Court acknowledges that Plaintiffs were able, not only to obtain three patents from the United States Patent and Trademark Office (PTO) related to these sprouts, but were also able to confirm the patentability of each of the claims of one of those patents, without amendment, when that patent was challenged in a reexamination proceeding before the PTO.

Thus, on the issue of validity, Plaintiffs had a strong presumption in their favor. As the Federal Circuit has cautioned, "the present fact of (the challenged patent claims') invalidity cannot be used to bootstrap the argument that they were asserted in bad faith, absent clear and convincing evidence that (the patent holder) had reason to believe that the claims were invalid or not infringed." McNeil, 337 F.3d at 1372-73. Although the Remaining Defendants challenge the legal basis for patentability advanced before the PTO, they make no argument that Plaintiffs engaged in any inequitable conduct or misconduct in obtaining the patents. Nor do they assert that Plaintiffs' legal arguments concerning patentability were asserted in bad faith.

The Court disagrees with the Remaining Defendant's prefatory statement insofar as it relates to the issue of infringement. Had Plaintiffs' patents been valid, the determination as to whether Defendants' conduct infringed upon those patents would have been a much closer call and could, quite possibly, have been resolved in Plaintiffs' favor. Having made these general observations, the Court will now address the specific criticisms raised by the Remaining Defendants.

First, the Remaining Defendants contend that Plaintiff conducted an insufficient investigation before filing suit. Specifically, they allege that

5

Plaintiffs failed to construe the relevant patent claims, failed to adequately test Defendants' products, and failed to inspect Defendants' production facilities prior to filing suit.  Plaintiffs counter that their pre-filing investigation was "extremely thorough and exemplary."  While the Court would not go so far as to describe it under those exaggerated terms, the Court does find Plaintiffs' investigation adequate under the prevailing case law.

For each of the Remaining Defendants, Plaintiffs purchased samples of their products prior to filing suit.  They visually examined the sprouts, smelled and/or tasted them, and determined them to be broccoli spouts.  They also determined that the sprouts were harvested between the onset of germination and prior to the two-leaf stage, a harvesting time consistent with Plaintiffs' patent claims.

Plaintiffs also examined the labeling and promotional material for each defendant.  Edrich Farm's label stated that "Researchers at Johns Hopkins have found broccoli sprouts to be a highly concentrated source of sulforaphane, a compound that reduces risk of developing cancer.  Broccoli sprouts contain 20 to 50 times the amount of sulforaphane found in mature broccoli heads and may offer a simple dietary means of reducing cancer risk."[2]  Notably, Plaintiffs were aware from newspaper reports that Edrich Farms only entered the sprout business after Richard Stanfield, Edrich's Farms' manager, read the Hopkins study touting broccoli sprouts as a cancer-fighting food product.  Sunrise

---

[2] Edrich Farms states that after Plaintiffs' patents were issued, it changed its label language to "University research studies have shown that broccoli sprouts may offer a healthful addition to your diet."  Given Edrich Farms' prior labeling, and the significant amount of media exposure to the Hopkins research this superficially less specific label nonetheless conveyed the same message.

6

Farms employed a similar label: "Recent studies show that certain broccoli sprouts contain the powerful anti-oxidant compound sulforaphane. Sunrise Farms, Inc. seeds have been laboratory tested to produce the highest quality, naturally grown broccoli sprouts. . . ."[3]  Before filing suit, Plaintiffs were aware that Defendant ISS had distributed a newsletter entitled "Brocco-Mania" that specifically cited the Hopkins study for the proposition that "3 day old broccoli sprouts can have 10 to 100 times the amount of glucoraphanin as mature broccoli sprouts. Glucoraphanin is the glucosinolate of sulforaphane - a powerful cancer fighting compound."

In addition to the simple sight, smell, and taste tests to which the Remaining Defendants' products were subjected, Plaintiffs also conducted High Performance Liquid Chromatography (HPLC) tests on the Remaining Defendants' products. These tests were used to determine the concentration of glucoraphanin per gram fresh weight of sprouts. That measurement, in turn, can be used to calculate the units per gram of fresh weight of Phase 2 enzyme-inducing potential. During the pre-filing investigation, Plaintiffs had interpreted the claim terms "rich in glucosinolates" and "high in Phase 2 enzyme inducing potential" as being satisfied by a finding of 200,000 units per gram fresh weight of Phase 2 enzyme-inducing potential. Plaintiffs assert that they obtained results exceeding this amount in testing at least one

---

[3] Remaining Defendants attach significance to their observation that "[t]here is no mention of preventing cancer" on the Sunrise Farms labels. Remaining Defendants' Response to Sur-reply at 6. Again, in the context of the media coverage regarding the Hopkins research, Sunrise Farms' mention of "recent studies" and "the powerful antioxidant compound sulforaphane" was obviously intended to make the connection, even without the use of magic word "cancer."

sample from each of the Remaining Defendants.

A significant portion of Remaining Defendants' pleadings seeking attorneys' fees is devoted to criticizing various aspects of the methodology related to the HPLC testing. Remaining Defendants accuse Plaintiffs of improperly extrapolating results, of including "unknown" compounds as glucosinolates, and of ignoring or even destroying unfavorable results. The Court is satisfied, however, that Plaintiffs did construe at least one of the patent claims, and did obtain at least one sample from each of Remaining Defendant that was infringing based upon that construction, prior to filing suit. Certainly, the Remaining Defendants' evidence to the contrary is not clear and convincing. Ultimately, however, the Court would not conclude that this was an "exceptional" case warranting attorneys' fees even had the Remaining Defendants demonstrated that Plaintiffs had failed to conduct that pre-filing testing. In a decision issued earlier this year, <u>Q-Pharma, Inc. v. Andrew Jergens Company</u>, 360 F.3d 1295 (Fed. Cir. 2004), the Federal Circuit affirmed a district court's denial of a request for attorneys' fees under circumstances similar to those presented here. This Court reads <u>Q-Pharma</u> as greatly limiting the amount of pre-filing testing that must be done prior to filing suit where the alleged infringer's own promotional material suggest the infringement.

Q-Pharma owned a patent for a method of treating damaged skin tissue with a composition containing as the "'principal active ingredient a therapeutically effective amount of Coenzyme Q10 (CoQ10).'" 360 F.3d at 1297 (quoting Q-Pharma's patent). The alleged infringer, Jergens, marketed a product called "Curel Age Defying Therapeutic Moisturizing Lotion with Coenzyme Q10." Jergens' promotion material stated that the product "which now

contains the natural power of Q10, helps reveal visibly healthier skin," and the product label prominently displayed the term Q10, and touted the benefits of CoQ10.  Without conducting any chemical analysis of Jergens' product, Q-Pharma filed suit alleging patent infringement.

Through discovery, Q-Pharma learned that Jergens' product contained no more than 0.00005% CoQ10.  Q-Pharma then moved to voluntarily dismiss the suit.  After the dismissal, Jergens' moved for attorneys' fees under 35 U.S.C. § 285.  The district court denied that motion, finding, "that Q-Pharma's pre-filing investigation, while not ideal, did not rise to the level of bad faith litigation or gross negligence required for an award of attorney fees under § 285."  Id. at 1298.  The district court also found that "because [Q-Pharma] had successfully licensed the [CoQ10] patent to more than ten companies, Q-Pharma had reason to believe that its patent was valid when it filed suit."  Id.

In affirming the decision of the district court, the Federal Circuit held,

> While it is true that Q-Pharma could have conducted a more thorough investigation before filing suit, we conclude that its pre-filing infringement analysis was supported by a sufficient evidentiary basis.  Q-Pharma acquired a sample of the Curél CoQ10 lotion and reviewed its advertising and labeling, which listed the product's ingredients and repeatedly touted the therapeutic effects of CoQ10.  Q-Pharma concluded, however, that chemical analyses identifying the actual percentage of CoQ10 in the accused product would not likely have changed its infringement analysis.  Given Q-Pharma's nonfrivolous interpretation of claim 1 as requiring no specified minimum amount of CoQ10 and Jergens' forthright assertions regarding the therapeutic effects of CoQ10 in the accused product, we conclude that it was reasonable for Q-Pharma to believe that the accused product contained a

>    "therapeutically effective amount" of CoQ10 as the
>    "principal active ingredient."[4]

Id. at 1302.

Under Q-Pharma, this Court has no difficulty in concluding that Plaintiffs' pre-filing claim construction and investigation was adequate.

The Remaining Defendants next argue that Plaintiffs conducted an insufficient pre-trial investigation to support a claim of personal liability against the individual defendants. This argument is premised, in large part, on an assumption that Plaintiffs had brought claims against the individual defendants for actual infringement under 35 U.S.C. § 271(a). To support such claims, Plaintiffs would need to present evidence sufficient to justify piercing the corporate veils. This, there is no dispute, Plaintiffs cannot do.

Plaintiffs respond that they never intended to assert liability for direct infringement against the individual defendants, but only liability for inducing infringement under 35 U.S.C. § 217(b). Plaintiffs point out that each of the complaints make clear that the individual defendants are only sued for inducing infringement under § 217(b). See Sunrise Farms Complaint at ¶¶ 32, 36, 44, 48, 56, at 60; Edrich Farms Complaint at ¶¶ 34, 38, 42, 46, 54, 58, 62, 66, 74, 78, 82, and 86; ISS Complaint at ¶¶ 39 and 47. Only in one paragraph, ¶ 31 for the ISS Complaint, are there any allegations of an individual defendant violating § 217(a), and Plaintiffs attribute that

---

[4] Q-Pharma interpreted its claim language very broadly. It interpreted the term "therapeutically effective amount" to mean "an amount sufficient to have a therapeutic benefit," without specifying any specific minimum amount of CoQ10. The Federal Circuit found that broad pre-filing construction to be adequate. Id. at 1301.

10

reference to a typographical error.  In light of the rest of the ISS Complaint, it is clear that this was an error.

As to the claims of inducing infringement, the Court finds that they were adequately investigated and supported.  There was some evidence, known to Plaintiffs prior to filing, that the individuals were actively involved in the decision to have their respective corporate entities grow and sell broccoli sprouts.  For example, Plaintiffs had this fact confirmed about the Edrich Farm defendants by an article published in a local community newspaper.  One of the Hopkins researchers also reports that he was present at a public meeting where individual defendant Sally Stansfield talked at length about Edrich Farms' sprout production, and distributed literature.

The Remaining Defendants next take issue with Plaintiffs' refusal to produce documents related to the validity of the patents-in-suit based upon their assertion of the attorney-client privilege.  Because Plaintiffs elected to waive that privilege as to documents related to patent infringement, the Remaining Defendants argue that Plaintiffs also waived the privilege as to validity documents.  Defendants contend that these two issues, patent validity and patent infringement, are "inextricably intertwined."  Motion at 26. Plaintiffs counter that the issues are not intertwined, and that in deciding how to proceed in this litigation, they decided that they did not need to waive the privilege regarding validity because they could rest on the presumption of validity emanating from the PTO's issuance of a patent. Plaintiffs also note that the Defendants never challenged Plaintiffs' assertion of this privilege by requesting a meet and confer, or by filing a motion to compel.

The Court agrees with Plaintiffs that the issues of infringement and

validity are not, in all situations, necessarily intertwined and that Plaintiffs' waiver of the attorney-client privilege as to infringement documents did not also waive the privilege as to validity documents. See Nitinol Medical Technologies, Inc. v. AGA Medical Corporation, 135 F.Supp.2d 212, 217 (D. Mass. 2000) (holding that "[t]he issue of infringement is distinct from the issues of validity and enforceability" and rejecting the identical argument made here by the Remaining Defendants). Furthermore, the Remaining Defendants cannot, at this stage in the litigation, use Plaintiffs' withholding of these documents to demonstrate bad faith when they did not challenge that withholding in the discovery process. See Arbrook, Inc. v. American Hospital Supply Corp. 645 F.2d 273, 279 (5th Cir. 1981) (holding that the proper remedy for improper conduct during discovery lies under Fed.R.Civ.P. 37 and not under § 285).

    The Remaining Defendants' other claim of litigation misconduct on the part of Plaintiffs arises from Plaintiffs' acknowledged inability to find a few of the pre-suit test results of Defendant's sprouts. There is no evidence, however, much less clear and convincing evidence, that Plaintiffs intentionally destroyed these isolated documents.

    A separate order will issue.

/s/

William M. Nickerson
Senior United States District Judge

Date: September 29, 2004